UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

Mar 11  4 14 PM '04

U.S DISTRICT COURT
NEW HAVEN, CONN.

VICTOR T. CONTE
                    Plaintiff          :

    v.                                 :    3:01 CV 463 (EBB)
                                       :
US ALLIANCE FEDERAL CREDIT UNION,      :

                    Defendant

## AMENDED RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff, Victor Conte (hereinafter "Conte"), brought an eight-count complaint against Defendants US Alliance Federal Credit Union (hereinafter "US Alliance"), Affina Brokerage Services, Inc., and three of its employees. Defendants moved to dismiss the Complaint or, in the alternative, for summary judgment. As a result, in a ruling on Defendants' Motion for Summary Judgment, dated March 28, 2002, this Court dismissed the individual defendants and Affina Brokerage Services, Inc., and granted summary judgment for the present defendant as to several of plaintiff's claims. The court denied the motion as to the claims of negligence, breach of fiduciary duty, conversion, and breach of oral contract. Following the completion of discovery, defendant US Alliance now moves for summary judgment on the remaining four counts of the complaint.

STATEMENT OF FACTS

The following facts are culled from the parties' Local Rule
9(c) Statements, affidavits, and the exhibits attached to their
respective memoranda.  The facts are either undisputed or are
read most favorably to the non-movant Plaintiff, Victor T. Conte
(hereinafter "Conte" or "plaintiff").  The Court sets forth only
those facts deemed necessary to an understanding of the issues
raised in, and decision rendered on, this Motion.

The plaintiff is a resident of the State of Connecticut and
a member of US Alliance.  US Alliance is a federally regulated
credit union that provides many different financial services.
Affina Brokerage, Inc., (hereinafter "Affina") is the brokerage
arm and fully owned subsidiary of US Alliance, sharing employees,
office space and assets.  Conte avers he was never aware of
Affina's existence or that it existed as an entity separate from
US Alliance.

Conte first joined the IBM Credit Union, which was a
corporate predecessor of US Alliance, in 1970.  Since then,
plaintiff has taken advantage of multiple services of US
Alliance, including loans, banking services and brokerage
services.  Conte signed a Secured Loan Application and a Stock
Secured Loan Agreement on October 11, 1994, in order to set up a
Secured Loan Revolving Credit Plan with US Alliance.  The Secured
Loan Application signed by Conte includes the following relevant

2

terms:

> Security Collateral: The value of your collateral, as determined by the Credit Union, must remain greater than the principal balance plus accrued finance charges you owe.  Should the loanable value of your securities decline, the Credit Union may, at its sole option and without prior notice, transfer funds from another account or loan of yours to pay down your loan, or sell your collateral and apply the proceeds to this and any other debts you may owe the Credit Union.

> Stock Sales: When necessary, Credit Union members can sell securities to repay an outstanding Credit Union loan, in whole or in part, in accordance with federal accounting procedures.

Similarly, the Secured Loan Revolving Credit Plan and Disclosure Agreement provides:

> Security Interest: That to protect the Credit Union in the event of default, you grant the Credit Union a security interest in any shares of Capital Stock or other stocks or bonds which have been endorsed, delivered and/or pledged to the Credit Union as collateral.  You also pledge and grant a security interest in and/or right to offset against all Credit Union account balances on which you are an account owner except qualified retirement accounts...

> [T]he Credit Union's responsibility for your collateral in its possession is to use reasonable care for the custody and preservation of your collateral...

> [I]n the event of default, the Credit Union may, at its sole option and without prior notice,...sell or transfer your collateral and apply the proceeds to this or any other debts you may owe the Credit Union.

Plaintiff was aware that, under the terms of his agreement, he could borrow up to 85% of the value of the assets in his portfolio that were on deposit at the Credit Union.  Plaintiff avers that, throughout his business with US Alliance, he was of

the belief that his stocks were maintained through a margin
account.  US Alliance avers that this was not a margin account,
but that, instead, his securities on deposit with US Alliance
served as collateral for loans he took out with US Alliance.
Regardless of the form of the account, Conte admits to using the
value of his assets on deposit at US Alliance to purchase
securities, with the understanding that if he was undersecured he
would have to make up the difference.  At the same time, however,
Conte also avers that because the loan statements he received for
various loans he took out from 1984 until 2001 included the
statement "DEMAND LOAN - OUTSTANDING BALANCE CALLABLE ON 7 DAYS
NOTICE," he was under the impression that he would be given seven
days to bring any undersecured loan back into balance.

Conte maintained a large stock portfolio at US Alliance.
All securities transactions made and authorized by Conte before
September 9, 1998, were unsolicited, and no member of US Alliance
or Affina encouraged Conte to buy or sell stock.  From 1996
through 1999, Conte estimates that he borrowed approximately one
million dollars and paid US Alliance $140,000.00 in interest
during that time.  Conte kept track of the value of his
securities portfolio on a regular basis, utilizing the automated
dial-up telephone service provided by US Alliance to check
portfolio account balances.  However, the dial-up system did not
provide current balances, as there was a delay in reporting

4

transactional information.

   In 1993, Conte became undersecured due to a drop in the
value of his stock.  US Alliance responded by placing a courtesy
call to Conte, informing him of how much he was undersecured and
the best way to satisfy the issue.  According to Conte, he
discussed the options available to him with the employee and they
concluded that pledging two condominiums he owned would be the
best way to solve his under-collateralization.  Conte also
received a letter that informed him of his undersecured status.
Conte assumed thereafter that, if he became under-collateralized
again, US Alliance would carry out the same procedure to resolve
another default.

   On September 8, 1998, Conte received a courtesy call from
David Brody, an employee of US Alliance's collections department,
alerting him to the fact that he was undersecured in his loan
account.  The details of the discussion are in dispute.  Conte
avers that Brody was unable to tell him how much he was under-
secured and did not instruct him that he needed to deposit
additional collateral, or that he needed to take any specific
action.  Conte further avers that he informed Brody he was away
on business, but would address the issue immediately upon his
return.  On September 9, 1998, Conte and US Alliance did not
communicate.  As of the close of business on September 9, 1998,
defendant avers that Conte's Stock Secured Loan Account balance

had dropped drastically, approaching 100 percent under-collateralization. However, Conte avers he never received any further communication from US Alliance or Affina.

Also in dispute is how much additional collateral Conte possessed at the time he became undersecured, which Conte believes could have been used to cure his default. The parties agree that from July 1, 1998, through September 16, 1998, Conte did not have a mortgage or other realty line of credit at US Alliance. In September, 1998, Conte owned his principal residence, but had not taken another mortgage or refinanced his existing mortgage in order to increase his collateral with US Alliance. Conte also had an IRA and Money Market account at US Alliance which he avers were worth approximately $150,000.00 at the time defendant liquidated his account. He further avers that John Walsh, a US Alliance employee, was not aware of the existence of these assets when Walsh began selling his stock. In response, US Alliance contends that these assets were irrelevant to their decision to sell Conte's stock because they were not transferable and US Alliance could not have used these assets to offset the deficiency in his loan account.[1]

On September 10 and 11, 1998, Conte spoke with John Walsh, John Petrie, Norman Jackson, and various other US Alliance

---

[1] The Secured Loan Revolving Credit Plan and Disclosure Agreement gave the Credit Union, in the event of default, the option of transferring funds from other accounts held by the borrowers which seems inconsistent with this position, at least with respect to the Money Market account.

employees regarding the sales of Conte's securities placed by US Alliance on September 10, 1998 and the under-collateralization of his account.    Plaintiff avers that Petrie and Jackson worked in the brokerage services department and were joint employees of US Alliance and of Affina.

On September 10, 1998, Conte spoke with Al Menard, one of the Vice Presidents in charge of Conte's account.  Conte assured Menard he would take steps to try to cure his under-collateralization, at which point Conte was thereafter given some control over which securities were sold in order to cure his default.  Menard transferred Conte to John Petrie, who went through the list of stocks that had already been sold with Conte, and agreed to cancel certain liquidation orders that had been placed to sell securities in his account.

When Conte spoke with John Walsh on September 11, 1998, Walsh could not inform Conte as to the decision-making process involved in which stocks were sold and, in fact, commented that it was done "arbitrarily" and that "theoretically, we're liquidating your whole portfolio which is what they can do." Conte informed Walsh that he wanted to reactivate his home equity loan in order to offset the default, and that some stock he would be willing to sell but others he did not want sold.  At that point, Walsh attempted to get in touch with one of the Vice Presidents who had ordered him to sell Conte's stock.  When Walsh

could not reach any of them, he gave Conte a list of some of the stocks that had already been sold upon market opening.

Conte also wired $50,000.00 to US Alliance to offset his under-collateralization, but did not order US Alliance to repurchase the stocks US Alliance had already sold.  In fact, Conte informed US Alliance that he was going to sell some of the stocks anyway, but he wanted a say in which stocks were sold. Conte was thereafter given some control over which securities were sold in order to cure his default.  However, many of Conte's stocks, which he avers were his most valuable, had already been sold.  Conte subsequently brought this action against US Alliance on March 21, 2001.

Legal Analysis

I. The Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).  If the moving party meets its burden of identifying those portions of the record that it believes demonstrate the absence of genuine issues of material fact, "the non-moving party must, under Federal Rule of Civil

8

Procedure 56, demonstrate to the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit Info. Co., 970 F.2d 1110, 1112 (2d Cir. 1992).

To meet its burden and avoid summary judgment, the nonmoving party "must come forward with affirmative evidence showing a genuine issue of material fact exists for trial." Chandra Corp. v. Val-Ex, Inc., No.99-9061, 2001 WL 669252, at *2 (S.D.N.Y. Jun. 14, 2002) (citing Celotex v. Catrett, 477 U.S. 317, 324 (1986)). The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2nd. Cir.), cert. denied 502 U.S. 849 (1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d. Cir.), cert. denied, 502 U.S. 849(1991).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact...Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Liberty Lobby, Inc., 477 U.S. at 247-48. (emphasis in original). Nonetheless, summary judgment is

9

improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." Brady v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988) (citing Celotex v. Catrett, 477 U.S. at 330, n.2 (Brennan, J., dissenting) and Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59(1970)); Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992). When examining the record before it to see if there are any genuine issues of material fact, this court's focus is on issue finding, not on issue-resolution. The district court's role is not to resolve disputed issues of fact itself, but rather to see if there are issues of fact to be resolved by the fact-finder at trial. See Liberty Lobby, Inc., 477 U.S. at 249.


II. CHOICE OF LAW


Before turning to the substantive law to decide whether there are disputes as to material issues of fact in this case, this Court must determine which state law applies to the causes

10

of action before us.  In diversity actions, federal courts must apply the substantive law of the forum state.  In an action sounding in contract and tort, such as the one before us, a court must look to the law of that state having the most substantial relationship or significant contacts with the parties, as well as the contracts themselves, to determine the applicable law. Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir. 1987); Don King Productions, Inc., v. Douglas, 742 F. Supp. 741, 758 (S.D.N.Y. 1990).  U.S. Alliance's headquarters are located in New York, the Stock Secured Loan Account in question is also in New York, and all of the trades in dispute took place in New York. In addition, the Secured Loan Revolving Credit Plan and Disclosure Agreement, signed by the Plaintiff, provides that the agreement shall be governed and construed in accordance with the Federal Credit Union Act and the laws of the state where the Credit Union's Headquarters are located, namely New York. Accordingly, it is clear that New York has the most substantial relationship with the parties and the greatest interest in the action, warranting the application of New York law.

Further, neither party disputes that this action is governed by New York Law. Where "the parties' briefs assume that New York law controls...such 'implied consent... is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil &

11

Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239,
242 (2d Cir. 1989)); see also, e.g., American Fuel Corp. v. Utah
Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the
parties have agreed to the application of the forum law, their
consent concludes the choice of law inquiry."). Accordingly, New
York Law is applicable to this action.

III.   The Standard As Applied

A.   Fiduciary Duty Claim

Defendant moves for summary judgment against plaintiff's
allegation that US Alliance breached its fiduciary duty to
plaintiff by selling his securities, which served as the
collateral in his Stock Secured Loan Account.  US Alliance argues
that, as Conte's lender-bank, there was only a debtor-creditor
relationship between the two parties, and they therefore did not
owe him any fiduciary duty.

The issue before this court is not whether the plaintiff has
established the existence of a fiduciary duty as a matter of law,
but whether he has pled sufficient facts that may support a
finding that such a duty existed between the parties, a
fact-specific inquiry reserved for a jury. See Richardson
Greenshields Sec., Inc. v. Mui-Hin Lau, 693 F. Supp. 1445, 1456
(S.D.N.Y. 1988); See also, BNY Capital Markets, Inc. v. Moltech
Corp., No. 99 Civ. 11754, 2001 WL 262675, at *7 (S.D.N.Y. March
14, 2001) (noting that "several New York authorities have held

that under various factual circumstances, a fiduciary
relationship can arise within an investment banking context.");
Frydman & Co. v. Credit Suisse First Boston Corp., 708 N.Y.S.2d
77, 79 (1st Dep't 2000) (reversing dismissal of breach of
fiduciary duty claim by potential acquirer against investment
bank advisory firm.). Accordingly, when there is a factual issue
as to whether a fiduciary relationship may exist between a bank
and its client, summary judgment is not appropriate.

This Court finds that questions of fact remain concerning
the relationship between Conte and US Alliance. In general, a
bank does not have a fiduciary duty to its borrowers. State St.
Bank & Trust Co. v. Inversiones Errazuriz Limitada, 246 F. Supp.
2d 231, 256-257 (S.D.N.Y. 2002). See also, Aaron Ferer & Sons
Ltd. v. Chase Manhattan Bank, 731 F.2d 112, 122 (2d Cir. 1984)
(under New York law, "usual relationship of bank and customer is
that of debtor and creditor" and a bank owes no fiduciary duty to
borrower). However, an exception has been recognized whereby
courts will find that a fiduciary duty was created where a bank's
conduct exceeds the usual creditor-debtor relationship. Scott v.
Dime Sav. Bank of New York, FSB, 886 F. Supp. 1073 (S.D.N.Y.
1995) aff'd, 101 F.3d 107 (2d Cir. 1996). As the Scott court
summarized, "in special circumstances... a fiduciary relationship
will arise between a bank and a customer if there is a confidence
placed in the bank that gives it an advantage in dealing with the

13

customer who is placing his trust in the bank." *Id.* at 1078 n.7.

Since <u>Scott</u>, courts have found, on a case-by-case basis, that special circumstances between a borrower and creditor have created a fiduciary duty. <u>Wiener v. Lazard Freres & Co.</u>, 672 N.Y.S.2d 8 (N.Y. App. Div. 1998)("ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts.")(citing <u>Kern v. Robert Currie Assocs.</u>, 632 N.Y.S.2d 75, 76 (N.Y. App. Div. 1995)). *See also,* <u>Manufacturers Hanover Trust Co. v Yanakas,</u> 7 F. 3d 310, 318 (2d Cir 1993), *motion for vacatur denied* 11 F.3d 381 (2d. Cir. 1993)("a fiduciary relationship may arise even between a bank and a customer if there is either a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding...or an assumption of control and responsibility.") (internal quotations and citations omitted).

Accordingly, many courts have determined that "the existence of a fiduciary relationship is a factual question." <u>Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.</u>, 179 F. Supp. 2d 118, 152 (S.D.N.Y. 2000). As the <u>Lehman Bros.</u> court explained, "[i]t cannot be determined 'by recourse to rigid formulas;' rather, 'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'" *Id.* (quoting <u>Dime Sav. Bank</u>, 886 F. Supp. at 1078 (S.D.N.Y. 1995).

Similarly, a contractual relationship may give rise to fiduciary duties regardless of whether the contract itself includes specific words or language. <u>Mandelblatt v. Devon Stores</u>, 521 N.Y.S.2d 672, 675 (N.Y. App. Div. 1987). New York courts have made clear that "it is not mandatory that a fiduciary relationship be formalized in writing," and "the ongoing conduct between the parties may give rise to a fiduciary relationship that will be recognized by the courts," regardless of the contractual relationship. <u>Lazard Freres & Co.</u>, 672 N.Y.S.2d at 13-4. Therefore, the fact that Conte signed a secured loan agreement providing that US Alliance had the right to sell his stock in the event that he became under-collateralized is not dispositive as to whether or not a fiduciary duty existed.

Construing the record in favor of the Plaintiff, there is enough evidence to convince this court that a factual issue remains as to whether Conte and US Alliance had a regular arms-length debtor-creditor relationship, or whether US Alliance assumed a fiduciary duty in its ongoing relationship with Conte. Conte had been a member of US Alliance for over 30 years, using a broad range of the credit union's banking and brokerage services. A reasonable person may find Conte's previous dealings with US Alliance created a fiduciary duty. For example, on a previous occasion, in 1993, Conte became under-collateralized, and received both a letter and a phone call informing him of his

undersecured position.  Conte states that the US Alliance employee "told me the best way to satisfy the undersecured issue" and "we discussed the options available to me" to cure the default. (Affidavit of Victor Conte, May 14, 2003, 6-7).  Conte then pledged two condominiums that he owned as collateral to cure his undersecured status.  Conte asserts that he was confident that, if a similar situation arose again, Alliance would carry out the same practice in resolving his under-collateralization, rather than liquidating his securities without warning.  Conte also contends that the loan receipts he received throughout this thirty-year period, which included the terms "DEMAND LOAN – OUTSTANDING BALANCE CALLABLE ON 7 DAYS NOTICE," further led him to believe he would be notified before his account was liquidated for being under-collateralized.  Whether these prior dealings are enough to constitute a special relationship giving rise to a fiduciary duty is a factual question within the province of the jury.

Further, one circumstance where courts have recognized that a fiduciary relationship can develop between bank and borrower is where a bank employs "dual employees" that work for a bank and broker-subsidiary.  In Scott, the court recognized that, because stockbrokers may owe fiduciary duties to their customers under New York law, the fact that "dual employees" of the bank and its brokerage affiliate were advising the plaintiffs about their

stock purchases created special circumstances in which a fiduciary duty was created. 886 F. Supp. at 1079. Therefore, a bank can be found to owe a fiduciary duty to its customer, based upon the principal-agent status of the bank and brokerage affiliate.

In this case, Conte has pleaded facts alleging that US Alliance and its subsidiary, Affina Brokerage Services, Inc., (hereinafter "Affina") employed dual employees. Specifically, Conte states that Affina and US Alliance shared customers, office space, advertising materials, and other business resources and assets. Further, the employees of Affina were also full-time employees of the Credit Union, and managed the securities transactions for Credit Union members. During the events at issue, when Conte was informed that his securities were sold, he spoke with employees of the brokerage department and the credit union. Even where the broker does not have discretionary trading authority, the relationship between a broker and the customer is still one of principal and agent, creating a fiduciary duty with respect to the invested funds. Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 45 (2d Cir. 1978), cert. denied, 439 U.S. 1039 (1978); Jaksich v. Thomson-McKinnon, 582 F. Supp. 485, 502 (S.D.N.Y. 1984); Sec. Investor Prot. Corp. v. Nappy (In re Nappy), 269 B.R. 277, 297 (Bankr. E.D.N.Y. October 13, 1999). Accordingly, a jury could find that Affina and US Alliance had an

17

agency relationship, and any duty owed by Affina was also owed by US Alliance.  Defendant provided this court with no evidence that Affina Brokerage Services, Inc., was not an agent of US Alliance, but instead dismissed plaintiff's claim as irrelevant because Affina Brokerage Services, Inc. was dissolved as a business entity and replaced with Affina Brokerage Services, LLC, during the time period of the events in question.  This court cannot, therefore, declare that there are no genuine issues of material fact with regard to US Alliance's fiduciary obligations created by an agency relationship with Affina Brokerage, Inc., or Affina Brokerage Services, LLC.

Issues of fact are therefore in existence as to whether the relationship between US Alliance and Conte were fiduciary in nature, such that defendant owed plaintiff a duty of care in selling the stock that secured his loan.  Therefore, summary judgment on plaintiff's fiduciary duty claim is denied.


B. <u>Negligence Claim</u>

Defendant next moved for summary judgment on plaintiff's claim that US Alliance was negligent in the manner it sold his securities.  The Second Circuit has made clear that "summary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury."  <u>Russell v. Crossland Sav. Bank</u>, 111

F.3d 251, 259-260 (2d Cir. 1997); *see also* <u>INA Aviation Corp. v.</u> <u>United States</u>, 468 F. Supp. 695, 699 (E.D.N.Y.), aff'd, 610 F.2d 806 (2d Cir. 1979) ("Negligence questions are properly resolved at trial because, upon a motion for summary judgment, a court may not try issues of fact; it may only determine whether there are factual issues to be tried.").

While New York law does not permit a tort claim to stand when it merely duplicates an alleged breach of contract, if a legal duty independent of the contract has been violated, a tort claim may stand. <u>Clark-Fitzpatrick, Inc. v. Long Island R. Co.</u>, 70 N.Y.2d 382, 389 (N.Y. 1987); <u>LaSalle Bank Nat'l Assoc. v.</u> <u>Citicorp Real Estate Inc.</u>, No.02-7868, 2003 WL 1461483, at *3-4 (S.D.N.Y. Mar. 21, 2003). Because there are issues of material fact with respect to whether a fiduciary relationship existed between US Alliance and Conte, we cannot find, as a matter of law, that US Alliance did not owe any duty of care to Conte independent of their contractual relationship. Whether US Alliance owed a duty to employ reasonable care in the handling of Conte's Stock Secured Loan Account, and whether US Alliance breached that duty in the manner it liquidated his stocks, are factual questions appropriately left to the jury. Accordingly, summary judgment on plaintiff's negligence claim is denied.

C. <u>Breach of Oral Contract Claim</u>

19

Defendant also moved for summary judgment on Conte's claim that US Alliance breached an oral contract that was created through a "course of dealings" between the parties. Conte alleges that US Alliance was obligated to give him notice before liquidating his collateral, despite the terms to the contrary written in the Stock Secured Loan Agreement, which governed the terms of his loans with US Alliance.

While industry custom and prior course of dealings between parties is relevant in determining the meaning of an ambiguous contract, it is clear that, in New York, a course of dealing would not alter the express terms of a contract when, as here, the contract is not ambiguous. In re Frederes, 98 B.R. 165, 168 (Bankr. W.D.N.Y. April 5, 1989) (citing City of New York v. New York City Ry. Co., 86 N.E. 565, 567 (N.Y. 1908); Division of Triple T Serv., Inc. v. Mobil Oil Corp., 304 N.Y.S.2d 191, 203 (N.Y. Gen. Term 1969), aff'd 311 N.Y.S.2d 961 (N.Y. App. Div. 1970). Further, one incident, on its own, is insufficient to establish a custom or practice, as necessary to establish a contract through a course of dealings. See Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115 (S.D.N.Y. Sept. 5, 2002) ("it is settled law that a single instance cannot establish a course of dealing."). See, also, General Motors Acceptance Corp. v. Clifton-Fine Cent. School Dist., 85 N.Y.2d 232, 237 (N.Y. 1995)(under the U.C.C., a

20

single prior incident cannot establish course of dealing waiving assignment rights). A "course of dealing" is "a sequence of previous acts and conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." In re Frederes, 98 B.R. at 168 (citing Black's Law Dictionary 318 (5th Ed. 1979)). Because Conte only alleges one incident where US Alliance diverged from its practice of liquidating securities without notice, he has not alleged a pattern or practice. Accordingly, there is no genuine issue of material fact, and this court finds plaintiff's breach of oral contract claim fails as a matter of law.

### D. Conversion Claim

Finally, defendant moves for summary judgment on plaintiff's claim of conversion. Conte asserts that the liquidation of his securities constituted unlawful conversion, as US Alliance had no authority to trade in his account. "Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Employers' Fire Ins. Co. v Cotten, 156 N.E. 629, 630 (Court of Appeals of NY, March 31, 1927). Because there are no genuine issues of material fact with respect to the conversion

21

claim, it is appropriate for summary judgment.

There is disagreement among the parties as to the value of plaintiff's security account on the day US Alliance liquidated, as well as the value of the assets Plaintiff possessed which could have been used to cure the default. However, these facts are not material to whether or not US Alliance converted Conte's account without authority. Conte admitted that he knew he was undersecured as of September 9, 1998, the day before US Alliance began selling his securities in order to cure the default in his stock secured loan. (Plaintiff's Statement of Material Facts, May 15 2003, p.3). By signing the Secured Loan Agreement, Conte authorized US Alliance to sell his collateral in the event he defaulted on the Secured Loan Account. Accordingly, because he provides no legal or factual support for the proposition that US Alliance's action with respect to his securities constituted conversion under New York law, Conte's claim of conversion fails as a matter of law.

## CONCLUSION

Defendant's Motion for Summary Judgment [Doc. No. 64] is hereby GRANTED IN PART AND DENIED IN PART. It is denied as to the First and Second Causes of Action and is granted as to the Third and Fourth Causes of Action.

SO ORDERED

ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this __/(__ day of March, 2004.