UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR T. CONTE,<br>　　Plaintiff,<br>v.<br><br>US ALLIANCE FEDERAL CREDIT UNION,<br>AFFINA BROKERAGE SERVICES, INC.,<br>ROBERT AMBROSE, and JOHN WALSH,<br>　　Defendants. | Civil Action No.<br>3:01 CV 463 (EBB)<br><br>**Affirmation**<br><br>April 7, 2004 |

Elisabeth Seieroe Maurer, being duly sworn, hereby affirms under penalties of perjury:

1.　I make this affirmation in support of Plaintiff Victor Conte's Motion in Limine, seeking the following relief:

　　(a)　An order prohibiting Defendant US Alliance Federal Credit Union (referred to herein as "Defendant" and/or "US Alliance") from, in the presence of the jury (i) offering or soliciting any evidence or testimony from the incomplete tape recordings produced by US Alliance to Plaintiff Victor Conte (referred to herein as "Plaintiff" and/or "Conte") during discovery; and (ii) using in any manner at trial the incomplete tape recordings it produced to Plaintiff during discovery.

　　(b)　In the alternative, in the event that US Alliance is permitted to use those tape recordings at trial, that the jury be instructed as follows: (i) that US Alliance failed to safeguard, and destroyed / permitted to be destroyed and/or otherwise permitted to become 'unavailable', tape recordings containing conversations between Conte and US Alliance, after being on notice since 1998

of US Alliance's obligation to preserve such crucial evidence; (ii) that the jury may thus conclude that the destruction of those tape recordings was in bad faith, or at a minimum was grossly negligent, and (iii) that US Alliance destroyed those recordings because an examination of those destroyed recordings would have revealed evidence unfavorable to US Alliance and favorable to Conte.

2.  The recordings at issue were first requested by me on Conte's behalf in September of 1998. At that time, I informed US Alliance that I had commenced an investigation into the activity that occurred in Conte's account at US Alliance and requested that US Alliance provide me with a number of documents relating to same, including but not limited to any and all records of conversations between Conte and US Alliance. (See **Exhibit "A"** hereto, which contains a copy of a letter dated September 28, 1998 from Elisabeth Maurer, Esq. to US Alliance, page 1.) About one month later, at US Alliance's request, I paid a research fee to US Alliance for its retrieval of that requested information. (See **Exhibit "A"** hereto, which also contains a copy of two letters from Elisabeth Maurer, Esq. to US Alliance, dated October 14, 1998 and November 11, 1998, by which I submitted the requested fee and asked US Alliance when my office could expect to receive all of the requested information.) However, US Alliance failed to provide me with any recordings (or transcripts thereof) of conversations between Conte and US Alliance until almost four years after they were first requested in 1998. Moreover, as indicated by this motion *in limine,* US Alliance also failed to safeguard, destroyed and/or permitted to be destroyed many essential recordings containing crucial evidence of conversations between Conte

and US Alliance, despite being on notice since 1998 of their obligation to preserve and maintain same.

3.  On numerous other occasions, I have, to no avail, requested that US Alliance provide Conte with all recordings of conversations between Conte and US Alliance representatives.  For example, on or about July 13, 2001, Conte served Plaintiff's "First Request for Production of Documents" (the "First Request") upon Defendant US Alliance.  (The first 10 pages of the First Request are attached as **Exhibit "B"** hereto.)  The First Request sought, among other things, "All recordings and notes of telephone calls or conversations regarding Conte's accounts and transactions between Conte or any person acting on his behalf and Defendants or any associated persons of Defendants, regarding Conte's accounts and transactions, during the relevant time period".  (See Exhibit "B" hereto, ¶ 7.)  The First Request furthermore appropriately required US Alliance to provide "the identity of the person who has custody" of the requested recordings (see Exhibit "B" hereto, p. 6-7, ¶ 2(f)) and to provide the following information in the event any of the requested recordings was lost or destroyed or otherwise unavailable:

> In the event any document called for by this request has been destroyed, discarded, misplaced or otherwise disposed of, or is otherwise presently unavailable to Defendants, the unavailable document is to be identified as follows: addresser, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all persons to whom the document was distributed shown or explained, date of destruction or disposal and name and business title of person who destroyed, discarded, misplaced or disposed of such document.

(Exhibit "B" hereto, p. 7.)

3

4.     In "Defendant's Response to Plaintiff's First Request For Production of Documents" dated September 20, 2001, US Alliance responded as follows to Plaintiff's request for those recordings: "***Subject to the General Objections, Defendants hereby assert they have no such documents in their possession***" (emphasis added), (see **Exhibit "C"** hereto, which contains pages 1 through 3 of "Defendant's Response to Plaintiff's First Request For Production of Documents" dated September 20, 2001), but failed to address whether those recordings are in its custody or control.

5.     Significantly, US Alliance has admitted that its recording system (which recorded all incoming and outgoing phone calls) was in effect for <u>all</u> of 1998. (See paragraph 12 below). Moreover, Conte was in regular contact with US Alliance in 1998, especially during the spring and summer, and in September 1998. (<u>See</u> paragraph 10 below and exhibit referenced therein.) As demonstrated in paragraph 2 above and in the paragraphs below, it took <u>just under four years</u> from the time those recordings were first requested in 1998, and more than one year from the time those recordings were requested during this proceeding, for US Alliance to retrieve and produce to Plaintiff <u>any</u> such recordings. Moreover, only a tiny portion of the recordings have been produced to date. Many of the requested recordings of crucial conversations between Conte and US Alliance have still to date not been produced, to Conte's great prejudice.

6.     In 2002, Conte continued his efforts to find out whether and to what extent US Alliance had those recordings in its possession, custody or control. US

4

Alliance and its representatives deliberately stonewalled Plaintiff's efforts in this regard by providing vague, incomplete responses to Plaintiff's inquiries. For example, Barry Moseley, who was employed by US Alliance during all times relevant[1], was asked by me during his July 15, 2002 deposition about what if any efforts were made to retrieve the tape recordings requested by Plaintiff. Mr. Moseley responded that he would retrieve tape recordings by informing Mr. John Walsh[2] of US Alliance which tapes were needed, at which point Mr. Walsh would retrieve them. (See **Exhibit "D"** hereto, which contains a copy of pages 65-67 of Barry Moseley's July 15, 2002 deposition.)

7. John Walsh, who was US Alliance's "Stock Services Manager" and "Record Retention Manager" at all times relevant[3], admitted during his deposition on July 16, 2002 that US Alliance's recording system recorded all incoming and outgoing phone calls occurring during the relevant period (see **Exhibit "E"** hereto, pages 48 and 49. Exhibit "E" hereto contains a copy of the following pages of Mr. Walsh's deposition transcript: pp. 48, 49, 52, 53 and 76) and that <u>he attempted but was unable to retrieve the recordings requested by Plaintiff</u> (See Exhibit "E" hereto, pp. 52 and 53.) Mr. Walsh also represented during that deposition that he had "no control" over US Alliance's tape system, and promised

---

[1] US Alliance represented to Plaintiff during discovery that Barry Moseley was employed by US Alliance at all times relevant.

[2] As indicated in paragraph 7 above, Mr. John Walsh testified in his deposition he had 'no control' over US Alliance's tape recording system.

[3] US Alliance represented to Plaintiff during discovery that John Walsh was US Alliance's "Stock Services Manager" and "Record Retention Manager" at all times relevant.

5

he would "try to make his best efforts" to retrieve the requested tapes. (See Exhibit "E" hereto, p. 76).

8. Robert Ambrose, who was an officer and Vice President of Member Services at US Alliance during all times relevant[4], also was asked during his July 16, 2002 deposition what efforts had been made to locate the requested recordings. Mr. Ambrose testified during that deposition that "we have been unable to target and retrieve and I am still trying to find calls from this time period, because…[US Alliance's recording system] is not an indexed system". (See **Exhibit "F"** hereto, which contains pages 41 and 42 from the transcript of Mr. Ambrose's deposition on July 16, 2002.)

9. On September 10, 2002, which is more than one year after Plaintiff first requested those recordings from US Alliance, counsel for US Alliance Martin Unger informed me by letter that US Alliance had "found" tape recordings of conversations between Plaintiff Victor Conte and US Alliance representatives. (See **Exhibit "G"** hereto, which contains a copy of a letter dated September 10, 2002, from Martin Unger, Esq. to Plaintiff's counsel Elisabeth S. Maurer, Esq.) Sometime between September 11, 2002 and September 25, 2002, I received those recordings from Attorney Unger.

10. As indicated below and in the Memorandum of Law accompanying this Affirmation, upon review of the recordings received from Attorney Unger, Plaintiff realized that the recordings produced by US Alliance were deficient, incomplete and inherently unreliable. For example, the tapes at issue had no time or date

---

[4] US Alliance represented to Plaintiff during discovery that Robert Ambrose was an officer and Vice President of Member Services at US Alliance during all times relevant.

6

stamp. Therefore, it could not be conclusively identified which specific conversations were contained in those recordings. Moreover, those recordings did not include many conversations that occurred between Plaintiff Victor Conte and Defendant US Alliance representatives during 1998. Conte maintained regular contact with US Alliance in 1998, particularly in the spring and summer of 1998 (during which he was in daily contact with US Alliance) and in September of 1998 (which was a crucial month during which US Alliance was negligent in its handling of Conte's assets and breached its fiduciary duty to Conte). (See **Exhibit "H"** hereto, which contains the Affidavit of Victor Conte dated May 14, 2003 submitted in opposition to US Alliance's motion for summary judgment ("Conte Aff."), ¶18 thereto.)

11.     On September 25, 2002, I wrote to US Alliance's counsel Martin Unger, Esq. in an attempt to elicit answers to the many questions and deficiencies that existed with respect to the recordings produced by US Alliance. (See **Exhibit "I"** hereto, which contains a copy of a letter dated September 25, 2002 from Elisabeth S. Maurer, Esq. to Martin Unger, Esq.) However, as evidenced below, counsel for US Alliance failed to provide answers to those questions.

12.     On October 23, 2002, the second day of Robert Ambrose's[5] deposition, I asked Ambrose about the vast amount of recordings that were still not produced by US Alliance more four years after I first requested them. When asked at that time whether US Alliance's inability to produce recordings was due to the volume of messages on US Alliance's tape system, Ambrose responded evasively,

---

[5] As indicated above, Robert Ambrose was an officer and Vice President of Member Services at US Alliance during the relevant period.

stating "I don't know", and stated that the calls are routed between two call centers and that without knowing the date and time of a call he is "not sure how we would ever find a call among the thousands of calls for a day…". (See **Exhibit "J"** hereto, which contains a copy of pages 142-146 of the transcript from Mr. Ambrose's October 23, 2002 deposition). Mr. Ambrose admitted during his deposition that US Alliance's tape recordings are not indexed, stating "…those are not time-stamped. It does not help us to find when the call has been taped". (See Exhibit "J" hereto, page 144, lines 2-3.) Mr. Ambrose also revealed for the first time during that second day of his deposition testimony that he was unable to retrieve recordings of any September 8, 1998 conversations that were routed through their Massachusetts call center on their "800 line", because the tape on which those conversations were recorded is completely blank. (Id.) About six months after testifying in his deposition, Ambrose admitted in an affidavit filed with this Court that US Alliance's recording system was in effect for all of 1998. (See **Exhibit "K"** hereto, ¶2. Exhibit "K" contains the first and second pages of an Affidavit of Robert Ambrose dated April 3, 2003, which US Alliance submitted in support of its motion for summary judgment.) On October 23, 2002 (the date on which Ambrose's deposition was completed) Plaintiff served upon Defendant US Alliance "Plaintiff's Second Request for Production of Documents" (the "Second Request"), which once again requested the same recordings initially sought more than one year earlier in the First

Request[6]. (See **Exhibit "L"** hereto, which contains pages 1 through 9, and page 12, of the Second Request. )

13. On or about November 21, 2002, US Alliance provided the following vaguely worded, incomplete statement, purportedly in response to Plaintiff's Second Request for those recordings: "***Defendant has no such document that can be recovered from its computer data base at this time covering the period July 1998 through September 11, 1998***". (Emphasis added.) (See **Exhibit "M"** hereto, which contains a copy of the first three pages of "Defendant US Alliance Federal Credit Union's Response to Plaintiff's Second Request For Production of Documents", page 3, ¶ 7 thereto.) Once again Defendant failed to specify the reasons behind its claim that the requested recordings could not be recovered from its computer data base, the location of those recordings, and names of persons in possession of those recordings, and the like. (See Exhibit "B" hereto, pp. 6-7.

14. In light of the foregoing, it is clear US Alliance cannot prove the authenticity and accuracy of the incomplete, unreliable recordings it produced to Plaintiff. As stated in further detail in the Memorandum of Law accompanying

---

[6] The Second Request, like the First Request, requested that US Alliance produce "All recordings and notes of telephone calls or conversations Conte's accounts and transactions between Conte or any person acting on his behalf and Defendants or any associated persons of Defendants, regarding Conte's accounts and transactions, during the relevant time period".
  In addition, the Second Request, like the First Request, directed Defendant US Alliance to identify the current custodian of all such recordings, and, with respect to any recording that was destroyed, discarded, misplaced or otherwise disposed of, or is otherwise presently unavailable to Defendants, to identify the addresser, addressee, indicated or blind copies, date, subject matter, number of pages, attachments or appendices, all persons to whom the document was distributed shown or explained, date of destruction or disposal and name and business title of person who destroyed, discarded, misplaced or disposed of such document". Exhibit "L" hereto, pp. 6-7.

9

Plaintiff's Motion in Limine herein, US Alliance will be unable to provide sufficient, reliable evidence of the following factors, which are used by our Courts in determining the authenticity, accuracy and admissibility of tape recordings: (1) what recording device was used to create the recordings produced and whether that device was capable of taping the conversation(s) produced; (2) who the operator was of the device used to make such recordings, and whether that operator was competent to operate that device; (3) that the recordings are authentic and correct; (4) that changes, additions, deletions have not been made in the recordings; (5) that the recordings have been preserved in a manner that is shown to the Court; (6) that the speakers are identified; (7) that the conversations elicited were made voluntarily and in good faith, without any kind of inducement. As such the recordings produced by US Alliance are not admissible as evidence in this proceeding.

15.   Moreover, as indicated above, US Alliance has, to Conte's great prejudice, failed to produce recordings of a multitude of conversations that occurred between Conte and representatives of US Alliance in 1998 regarding matters directly at issue such as, by way of example, US Alliance's breach of the fiduciary duty it owed to Conte, and US Alliance's negligence in its dealings with Conte, through, *inter alia,* its failure to fully apprise Conte in a timely manner of the situation existing on or about September 10, 1998 regarding Conte's account. As indicated in paragraph 10 above, Conte was in regular, and often daily contact with US Alliance representatives in 1998, particularly during the spring and summer and in September of 1998.

16. Complete, accurate recordings of all conversations that occurred between Conte and US Alliance representatives in 1998 are crucial evidence that address the heart of the dispute between Conte and US Alliance. Without the recordings that US Alliance has destroyed or otherwise permitted to become 'unavailable', Plaintiff obviously cannot set forth a verbatim account of each and every statement made during those missing conversations. However, in an attempt to demonstrate the grave prejudice that US Alliance's spoliation of this evidence has caused, we will attempt to use deposition testimony and other evidence described below, to describe, in summary form, a number of pertinent discussions that occurred just before, and on, September 10, 1998 (the date on which US Alliance sold off Conte's assets), which US Alliance has failed to produce in recorded form. As illustrated below, the dates and content of those discussions establish the grave prejudice that US Alliance has caused to Plaintiff due to its failure to preserve and produce recordings of all discussions that occurred between Conte and US Alliance:

### Examples of Discussions That
### US Alliance Had Failed to Produce In Recorded Form

    a. <u>September 8, 1998:</u> As illustrated by Victor Conte and David Brody's depositions herein, and the Affidavit of Victor Conte dated May 13, 2003 submitted in opposition to US Alliance's motion for summary judgment, a number of discussions (described below) took place on September 8, 1998 between Victor Conte and David Brody of US Alliance, and between Conte and representatives of US Alliance member services and brokerage departments. [7]

---

[7] As indicated above, Robert Ambrose, who was an officer and Vice President of US Alliance Member Services during the relevant period, testified that he unable to retrieve recordings of any September 8, 1998 conversations that were routed through US Alliance's Massachusetts call center on the "800 line", because the tape on which those conversations were recorded is completely blank. (<u>See</u> Exhibit "J" hereto, Ambrose deposition, pp. 142-143.)

11

i. <u>September 8, 1998 discussion between Victor Conte and David Brody</u>:  Conte testified during his October 22, 2002 deposition that on September 8, 1998, Brody informed Conte by telephone that Conte's account was under collateralized, but that when Conte asked Brody to tell him by how much his account was under collateralized, Brody told Conte that he could not provide him with that information.  (<u>See</u> **Exhibit "N"** hereto, pages 93, 105-6, 144, 145 thereto.  This exhibit contains a copy of pages 93, 105-6, 126, 127, 138, 144 and 145 from Conte's October 22, 2002 deposition.)  Conte testified that Brody thus advised Conte to call member services to find out by how much his account was under collateralized.  (<u>Id</u>.)  Conte testified that he also advised Brody that he was out of state on business until that following Monday.  (<u>Id</u>.)  However, Conte indicated to Brody that he would be able to meet with US Alliance officials upon his return that following Monday.  (<u>See</u> Conte. Aff., Exhibit "H" hereto, ¶34.)

Brody did not advise Conte to take any specific action, nor did Brody inform Conte during this discussion that liquidation of his account was imminent or that the US Alliance required Conte to deposit additional funds or collateral.  (<u>See</u> Conte Aff., Exhibit "H" hereto, ¶¶34-35.)  Conte also told Brody during this discussion that Conte had other assets he could pledge, such as over $250,000 of equity in his home and over $150,000 in other cash or cash equivalents deposited with the credit union.  (<u>Id.</u>, ¶34 thereto.)

Brody admitted during his October 23, 2002 deposition that he spoke with Conte on September 8 1998 and advised him during his discussion with Conte that his account was under collateralized.  (<u>See</u> **Exhibit "O"** hereto, which contains a copy of pages 32-34 and 39 from Brody's deposition. )  Brody also admitted during his deposition that Conte mentioned that he had other assets with the credit union, such as a line of credit.  (<u>Id</u>.)

ii. <u>September 8, 1998 discussions between Conte and US Alliance member services and brokerage departments</u>:  Conte testified during his deposition that at Brody's advice he called US Alliance's member services department on September 8, 1998, shortly after his telephone discussion with Brody on that same date, to find out by how much his account was under collateralized, and the person or persons he spoke to there could not provide him with that information.  (<u>See</u> Exhibit "N" hereto, Conte Deposition, pages 105-6.)  Conte testified that the member services department in turn advised Conte to speak with US Alliance's brokerage department to obtain that information, but when Conte spoke with the brokerage

department, the brokerage department was also unable to provide that information to Conte. (See Exhibit "N" hereto, Conte deposition, page 146.)

      b.    September 10, 1998: Victor Conte at deposition testified about discussions he had on September 10, 1998 with various US Alliance representatives, including but not limited to, John Walsh (US Alliance's "Stock Services Manager" and "Record Retention Manager"), and John Petrie (who was a US Alliance employee during the relevant period). (See citations in this section below.)

As indicated in further detail in section i. below, Martin Unger, Esq., counsel for US Alliance, during deposition represented that the first conversation occurring between Conte and US Alliance on September 10, 1998 was at 1:29 in the afternoon. In contrast to Attorney Unger's representation, US Alliance admitted in depositions of two of its employees that conversations occurred between US Alliance and Conte on the morning of September 10,1998. This illustrates that there is a distinct discrepancy between what US Alliance's counsel and US Alliance itself is representing about the extent to which discussions occurred on September 10, 1998 between Conte and US Alliance, and further illustrates that there are additional recordings and records of conversations that US Alliance has failed to produce.

Listed in section ii. below are examples of some of the discussions that occurred between Conte and US Alliance on September 10, 1998 for which no recording was produced.

    i.   <u>Conflicting Representations by US Alliance and Its Counsel Regarding Conversations between Conte and US Alliance on the morning of September 10, 1998:</u> During the deposition of Robert Ambrose (who in 1998 was US Alliance's Vice President of Member Services) (see ¶8 above), Margin Unger, Esq., counsel for US Alliance, asserted in the following exchange that the first conversation between Conte and anyone at US Alliance was at 1:29 in the afternoon of September 10, 1998:

> "**MR. UNGER: These are information I received from the Credit Union that came from logs[8], which I have not seen regarding calls and the time of calls**…I showed three calls [on September 10, 1998]. The first call was 13:29:25. The duration was 1…I showed three

---

[8] US Alliance has also failed to produce the "log" that Attorney Unger refers to in this deposition. When asked about that log, Attorney Unger stated during that deposition that "I can't tell you. I haven't read the information. I have not seen the log", but he admits that "there is a way of retrieving it and that's what [US Alliance] did". (See Exhibit "J" hereto, transcript of Robert Ambrose's deposition, p. 146 (lines 9-13)). US Alliance has thus admitted through its Attorney Martin Unger that it is completely capable of retrieving that log. **Yet US Alliance failed to produce this crucial information to Plaintiff during discovery.**

13

calls. The first call was 13:29:25. The duration was 14 minutes and 4 seconds.

**MS. MAURER: Are you telling me that the first call [on September 10, 1998] was at 1:29 in the afternoon?**

**MR. UNGER: Correct.** The second call was at 2:23:11.

MS. MAURER: So that would be 14?

MR. UNGER: 2:23:11 and they showed the continuation and it looks like and it looks like 37 minutes and 57 seconds total. The tape could be several people in them at different times.
Then the third call [on September 10, 1998] was 15:51:08 and was 7 minutes and 21 seconds.

MS. MAURER: So you have three calls on the 10th?

MR. UNGER:    Right.

(Exhibit "J" hereto, pp. 144 (lines 9 –25), 145 (lines 1-10) (emphasis added)).

However, in contrast to what Attorney Unger asserted in the above exchange, John Walsh admitted during his July 15, 2002 deposition that he spoke to Victor Conte in the morning of September 10, 1998, sometime after the market opened. (See **Exhibit "P"** hereto, page 55. Exhibit "P" hereto contains a copy of the following pages from John Walsh's deposition: pages 55, 59, 62 and 63.) Moreover, during John Petrie's July 16, 2002 deposition, Petrie admitted that he spoke with Conte in the morning of September 10, 1998. (See **Exhibit "Q"** hereto, which contains page 24 from Mr. Petrie's deposition.)

Conte also testified in his deposition that he had discussions with John Petrie and John Walsh during the morning of September 10, 1998. (See **Exhibit "R"** hereto, p. 160-161. Exhibit R contains a copy of pages 160-164,167, 168, 174, 176 from Conte's deposition transcript.)

Thus, there are discussions that occurred on the morning of September 10, 1998 between Conte and US Alliance for which recordings should have been produced.

ii. Examples of Some of The September 10, 1998 Discussions That US Alliance Has Failed to Produce in Recorded Form:  While it is impossible to detail each and every September 10, 1998 discussion that US Alliance

14

has failed to produce in recorded form, the content of some of those discussions are as follows:

(a) Conte testified that on September 10, 1998, he asked Walsh whether US Alliance took into consideration the capital gains tax consequences of selling Conte's entire portfolio in the random manner in which it was proceeding and expressed concern about those consequences. (See Exhibit "R" hereto, Conte deposition transcript, pp. 160-161.) Conte testified that Walsh acknowledged that Conte had brought up some valid points in that regard. (Id. at 164.) Conte also reminded Walsh that there were assets (e.g., Money Market and IRA accounts) totaling a minimum of $150,000 in his credit union accounts that he could use to help cover any deficit, to which Walsh responded "you have an IRA and other accounts at this institution?". (See Conte. Aff., Exhibit "H" hereto, ¶43.)

(b) Conte also told Walsh on September 10, 1998 that he should have been consulted before the liquidation because the random selling was causing avoidable damage to him in the form of unnecessary capital gains tax. (See Conte. Aff., Exhibit "H" hereto, ¶44.) Conte also told Walsh that US Alliance's uncontrolled sell-off of his assets prevented Conte from converting his IRAs to Roth IRAs. (Id.) Conte asked Walsh who determined in what order the stocks were sold, and whether they were sold in alphabetical order. (Id.) Walsh responded that Conte was "raising some very valid points". (Id.)

(c) Conte testified that he also discussed with Mr. Walsh on September 10,1998 what he could do and what assets he could send to stop the liquidation of his account. (Id.) During this discussion, Conte told Walsh that he could wire $50,000 to US Alliance immediately. (Id.) Walsh responded that Conte should proceed to wire in those funds. (Id.) Conte took immediate steps thereafter to wire those funds to US Alliance and to send additional assets to US Alliance. (Id. at pp. 167-168.) Conte testified that Walsh then transferred him to Norman Jackson, a US Alliance employee, who gave Conte an update on the status of sales occurring in his portfolio. (Id. at page 175.) At that time, Conte was using his PC to update the status of his portfolio and calculate the collateralization figures for his portfolio. (Id. See also Exhibit "H" hereto, Conte Aff., ¶45.)

17.    As indicated in Plaintiff's accompanying Memorandum of Law submitted in support of Plaintiff's Motion in Limine, US Alliance had a duty to maintain and

15

preserve its recordings of all conversations between Conte and US Alliance representatives, being that US Alliance was on immediate notice since 1998 that the recordings of those conversations would be relevant to possible future litigation. I was in frequent and regular contact with US Alliance officials on Plaintiff's behalf, beginning just after the "sell off" at issue occurred on September 10, 1998 and continuing through the date the complaint was filed. Thus, ever since September 28, 1998, 18 days after US Alliance engaged in the wrongful sale of Conte's assets on September 10, 1998, US Alliance was on clear notice that future litigation would be possible. (See paragraph 2 above and Exhibit "A" hereto cited in that paragraph, for information regarding some of those contacts between Conte and US Alliance just after September 10, 1998.) US Alliance nonetheless breached its duty to preserve and produce those recordings by permitting their loss and/or destruction. As a result, Conte has been significantly prejudiced.

18.     Moreover, as also illustrated herein and in Plaintiff's accompanying Memorandum of Law, US Alliance's loss and/or destruction of relevant recordings is certainly not inadvertent. The evidence clearly establishes that US Alliance's loss and/or destruction of those recordings was done with deliberate indifference or gross recklessness. For example, John Walsh, Barry Moseley and Robert Ambrose, who as indicated above are individuals responsible for maintaining and retrieving those recordings, were inexplicably vague, evasive and conflicting when they testified during their depositions about efforts made to locate and retrieve those recordings. For example, as indicated above, during

16

discovery US Alliance identified John Walsh as US Alliance's "Record Retention Manager". Barry Moseley during his deposition represented that John Walsh was the individual responsible for retrieving recordings from US Alliance's files. (See Exhibit "D" hereto, p. 67.) However, during John Walsh's deposition testimony, Walsh denied having any "control" whatsoever over US Alliance's tape system, and offered the vague explanation that "it was a new installation" when asked to explain US Alliance's failure to retrieve and produce the remaining recordings. (See Exhibit "E" hereto, p. 76.) Similarly, during Robert Ambrose's deposition (which occurred almost one year after Conte's first document demand and three years after I first requested those recordings) Ambrose failed to offer any credible reason or justification whatsoever for US Alliance's failure to preserve and produce all such recordings. For example, when asked whether US Alliance's inability to produce those recordings was due to the volume of messages on the tape, Ambrose responded "I don't know" and explained how the calls are routed between two call centers and that without knowing the date and time of a call he is "not sure how we would ever find a call…..". (See Exhibit "J" hereto, p. 143.) Again, Ambrose's testimony on US Alliance's failure to preserve, locate and produce the recordings evidences a deliberate effort to evade Plaintiff's questions and inquiries in this regard.

19.     Even if it could be credibly argued that US Alliance's loss and/or destruction of that crucial evidence was not done with deliberate indifference or gross recklessness, it remains clear that US Alliance was, at a minimum, grossly negligent in failing to preserve and produce this crucial evidence. As indicated in

Plaintiff's accompanying Memorandum of Law, a party does not have to be found to have acted intentionally or recklessly in order to be held responsible for its failure to preserve evidence that it had a duty to preserve. Rather, a party will be held accountable for its negligent failure to maintain and preserve evidence, and must bear the risk of its own negligence in this regard. As such, US Alliance remains responsible, and must be accordingly held accountable, for its wrongful and prejudicial spoliation of crucial evidence.

20. Conte has during the course of this action expressed to this Court and reserved his objections to US Alliance's use of the few recordings it produced to Conte, and any transcripts thereof, on the grounds that they are incomplete, unreliable and are a suspect version of the events that transpired between Conte and US Alliance. By way of example, Conte expressed his objections to the use of those recordings and transcripts in his opposition to US Alliance's motion for summary judgment, in which Conte asserted, *inter alia*, that the recordings produced by US Alliance were at best an incomplete, suspect version of events that transpired between Conte and US Alliance, and that US Alliance's failure to produce recordings of critical conversations between Conte and US Alliance raises an inference that the contents of those unproduced unpreserved recordings would be adverse to US Alliance's position in this action. (See **Exhibit "S"** hereto, which contains a copy of the Affirmation of Elisabeth Maurer, Esq. dated May 15, 2003, submitted in opposition to US Alliance's motion for summary judgment, ¶29 and page 6 therein.)

21. For all of the reasons stated above and in the accompanying submissions, Plaintiff respectfully requests that this Court (a) issue an order prohibiting Defendant from, in the presence of the jury (i) offering or soliciting any evidence or testimony from the incomplete tape recordings produced by US Alliance to Plaintiff during discovery; and (ii) using in any manner at trial the incomplete tape recordings it produced to Plaintiff during discovery; or (b) in the alternative, in the event that US Alliance is permitted to use those tape recordings at trial, instruct the jury as follows: (i) that US Alliance failed to safeguard, and destroyed / permitted to be destroyed and/or otherwise permitted to become 'unavailable', tape recordings containing conversations between Conte and US Alliance, after being on notice since 1998 of US Alliance's obligation to preserve such crucial evidence; (ii) that the jury may thus conclude that the destruction of those tape recordings was in bad faith, or at a minimum was grossly negligent, and (iii) that US Alliance destroyed those recordings because an examination of those destroyed recordings would have revealed evidence unfavorable to US Alliance and favorable to Conte.

Dated: April 7, 2004
Ridgefield, Connecticut

_____
Elisabeth Seieroe Maurer (ct11445)