# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| VICTOR T. CONTE,<br>        Plaintiff,<br>v.<br><br>US ALLIANCE FEDERAL CREDIT UNION,<br>AFFINA BROKERAGE SERVICES, INC.,<br>ROBERT AMBROSE, and JOHN WALSH,<br>        Defendants. | Civil Action No.<br>3:01 CV 463 (EBB)<br><br>May 14, 2003 |

## AFFIDAVIT OF VICTOR T. CONTE IN
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I Victor T. Conte, of 162 Mimosa Circle, Ridgefield, Connecticut, 06877, being

first duly sworn, do depose and say:

1.     I make this affidavit upon personal knowledge, except where I testify on

information and belief, the basis of which will be stated.

2.     I have been told that defendant, Affina Brokerage Services, Inc.

(hereinafter, "Affina"), is a wholly owned and controlled subsidiary of

Defendant, USAlliance Federal Credit Union (hereinafter, "Credit Union")

3.     I first joined the IBM Credit Union, a corporate predecessor of the Credit

Union, as an IBM employee in 1970.  Since then the Credit Union has

merged with other organizations and is now doing business as USAlliance

Federal Credit Union.

1

4.     The Credit Union has offered all sorts of financial services including loans,
various banking type services and brokerage services throughout my
membership. Attached as **Exhibit "1"** are several brochures and pages
from the Credit Union's web site, which indicate the breath and scope of
their evolving service portfolio.

5.     I have actively used many of those services at different times. For
example, I borrowed money to buy a car, funded my children's college
education's, invested in IBM and other stocks, invested in real estate, as
well as purchase IRA's, 401K plans and other retirement accounts
including my recent Roth IRA conversions.

6.     In October 1994 I borrowed $25,000 from the Credit Union to lend to my
son Damon to use to buy a truck. A copy of my October 1994 Credit
Union Statement is attached as **Exhibit "2"** which shows the increase in
my loan account and the cash disbursement. I was asked to sign a stock
secured loan agreement on that day. A copy of that agreement is attached
as **Exhibit "3".** When I was given the check for $25,000 it was attached
to a receipt, a copy of which is attached as **Exhibit "4".** The receipt says,
"Demand loan; Outstanding balance callable on seven days notice." Over
the years, I believe I filled out a form like this each time I borrowed money

2

for my children's tuition or a car loan. However, I do not remember ever signing or being asked to sign an agreement relating to my brokerage account.

7.    My USAlliance statement, as did all my previous statements, includes my money market accounts, my home equity loan, my brokerage investments as well as my IRA and other retirement investments, as it has for years. Attached as **Exhibit "5"** are samples of my statements over the last ten years showing the total integration of all Credit Union services.

8.    I was never aware of Affina's existence or that it existed as a separate entity from the Credit Union. There was simply a department that took care of brokerage matters for the members of the Credit Union in the same way that the real estate department took care of the home loan function. I was always told that my Credit Union was responsible for all of these functions.

9.    John Walsh ("Walsh") is the general manager of the brokerage function while also being a full time employee of the Credit Union. My lawyer has told me that his CRD reflects his joint employment. To my knowledge, during 1998, the brokerage department employees were Credit Union employees. Each of the brokerage department employees was accessed

3

through the Credit Union's phone system and was never identified as employees of a separate organization.

10.    I have had a brokerage account with the Credit Union for many years beginning in 1970 when I became eligible for IBM's employee stock purchase program and my shares were deposited at, what was then, the IBM Credit Union. I have never been asked to fill out a new client application, a margin or option agreement or any form of new account information form as is now required if I were to open an account with Affina Brokerage.

11.    I began actively trading to build a stock portfolio in 1996 during my retirement. In order to add additional stocks to my portfolio, I utilized a margin account that the Credit Union had established on my behalf.

12.    My Credit Union monthly statements reflected my loan balance and borrowing limits.

13.    Both my wife and I believed that we were operating in nothing other than a normal margin account.

14.    Specifically, I was told by the Credit Union that I could borrow 85% of the equity in my account. From 1996 through 1999, I have actively used the margin account borrowing over a million dollars and paying approximately

4

$140,000.00 in interest over that time frame. Since 1996 the balance of my portfolio has been in excess of $3,500,000.00.

15.  On a daily basis I used the automated dial-up telephone service provided by the Credit Union to check current portfolio account balances. When I called the dial-up service, the system always answered with "Thank you for calling the Credit Union's dial-up service", or was accessed through Credit Union phone numbers.

16.  However, this dial-up automated system would only provide delayed transactional information. Current information and real time information was not posted to the Credit Union's dial up telephone system until the day after the three-day settlement date. Further, the loan balance on an active account like mine was not current. Even my available credit could not be accessed in a timely manner.

17.  Over the years of 1997 and 1998, I opened two additional Money MAX3 and 5 money market accounts with the Credit Union. These accounts, as of August 1998, had a balance of approximately $40,750.00.

18.  Throughout the spring and summer of 1998, I maintained daily contact with the Credit Union. I spoke regularly with John Petrie, Norm Jackson and Barry Moxler. Each of these individuals were well aware of my

trading history since I had approximately a thirty-year relationship with the Credit Union and most of these individuals.

19.   Upon information and belief, I was one of the largest, if not the largest margin account at the Credit Union.

20.   The Credit Union and its' employees knew that they could contact me twenty-four hours a day, seven days a week, either through my home telephone numbers and/or my work telephone numbers.

21.   I was always very aware of the amount of borrowing power my margin account afforded me. Despite the fact that the Credit Union often was unable to tell me the impact of a particular purchase or sale on my account, I made an effort to manage and keep careful records of my accounts and the activities with each. I supervised my accounts daily.

22.   In 1993, I had become under-secured with regard to the margin account. The under-secured position arose because in 1993 the value of IBM stock dropped precipitously while I was using it as collateral in my margin account. Upon the Credit Union discovering the under-secured position, I was given a margin call from Chris Kahn, a Credit Union employee. Kahn informed me that I was under-secured, exactly how much I was under-secured, and told me the best way to satisfy the under-secured issue. A

copy of the notice I received as well as another notice I had received earlier are attached as **Exhibit "6"**.

23. Specifically, Kahn asked me if I could deposit more money or alternatively whether I had other collateral available that I could use to secure my loan. We discussed the options available to me and concluded that pledging the two condominiums that I fully owned would be a beneficial way of clearing the collateral issue. So over the next twenty-one (21) days, we arranged to appraise the condominiums and set up the loan accounts. Attached as **Exhibit "7"** are copies of the documents generated in this transaction.

24. This was the first time that my margin account became under-secured and upon satisfactory action on the part of everyone involved, the issue was taken care of. I now knew that if a similar situation or the same situation arose again, the Credit Union would carryout the same practice to resolve any problem.

25. Credit Unions' treatment of my March 1993 under-secured position was consistent with the way they acted upon the relationship with their customers. They advertised themselves as a member owned service organization with the goal of assisting their members financial planning and stock transaction execution at a moderate cost. In fact, whenever I

took money from the margin account, the receipt always showed that it was a "demand loan- callable on 7 days notice." Attached as **Exhibit "8"** are copies of various receipts for loans taken over 1984 through 2001. My understanding of the "demand loan—callable on 7 days" notice was that I had seven days to bring the account back into balance. Between April and August 1998, I initiated over thirty sell transactions in my account that had as their purpose reducing the amount of my margin loan and maintaining the ratio between my loans and collateral within the Credit Union guidelines which I was told was 85% loan to collateral.

26.    Due to changing market conditions around mid-year 1998, I deposited, without request by the Credit Union, $25,000 on or about August 5, 1998 with the Credit Union to reduce the balance of my loan in account number 7200. The purpose of this deposit was again to maintain an adequate "cushion" between the current value of the portfolio and the Credit Union's loan to collateral requirements.

27.    After depositing the $25,000 on August 5th, I had $40,750 cash in my money market account and over $110,000.00 in my IRA accounts at the Credit Union. I also had substantial real estate assets that I owned that could have been quickly mortgaged or converted to cash if necessary.

28.    However, in late August 1998, I was still anticipating a further market
       decline. I made the decision to sell stock to cover a predicted shortage in
       collateral on Tuesday, September 1st, 1998. The total sale of stock was
       approximately $109,000 thus further reducing my loan to collateral ratio.

29.    While calling to place the sell orders with a Credit Union representative, I
       inquired whether the representative could tell me what the account's
       collateral position would be after the transaction. The Credit Union
       representative informed me that he had no access to that information. I
       called several other members' services representatives, trying to obtain
       the exact balance. None were able to provide that information.

30.    On the morning of Tuesday, September 8th, 1998, I received a telephone
       call from David Brody (hereinafter, "Brody"), a member service
       representative from the Credit Union. He explained that this was a
       "courtesy call" to inform me that my account was under-secured due to
       market conditions. I asked him specifically how much the account was
       under-secured and he replied that he did not know the amount. I
       explained to him that I had been trying to get current information on my
       account using their automated dial-up telephone service, however,
       accurate information was not available because the system provides only

very delayed information. The dial-up automated system never provides any information regarding how much the loan is under-secured. Upon telling Brody this information, he told me to call another department in member services and speak to someone else who might be able to give me more specific information on how much the loan was under-secured. So I called another department and even though I spoke to several other customer representatives, none of them could give me information regarding how much my loan was under-secured.

31. Since I could not get any accurate information about how much my loan was under-secured, I calculated a rough estimate, and concluded that I was approximately $142,767.00 under-secured or about 4.8% of the account. I calculated this amount by using close of business numbers of September 8th, 1998.

32. At no time did Brody tell me that I was at least $130,000 undersecured. Further, I assured Brody that I would settle this.

33. After doing the calculations, I could easily have met any margin call made at that time by transferring cash that I had in other accounts in the Credit Union to my brokerage account. I also could have sold a portion of my portfolio to bring the loan to collateral back into balance.

34.  Brody then inquired whether I owned my home or had other assets I could pledge as collateral. I informed him that I had over $250,000.00 in equity in my home and over $150,000.00 in other cash or cash equivalents deposited in accounts in the Credit Union. Additionally, I reminded Brody that in 1993, I had pledged two condominiums that I owned when the price of the IBM stock I held had dropped precipitously.

35.  At no time did Brody tell me that the Credit Union was requesting that I deposit more cash or collateral. In fact, he did not suggest I take any specific action.

36.  I offered to refinance with the equity in my home and thought that Credit Union was in the process of drafting the proper documents. I reasonably believed that Credit Union was satisfied with my offer to meet with them and address the under-secured amount when I returned from a business trip the following Monday. I believed that based on prior practice and Brody's call that Credit Union would properly notify me if a need for collateral developed or became immediate.

37.  Brody never informed me that a forced liquidation of my entire account was imminent or that the Credit Union required me to deposit additional funds. In fact, at the time of the IBM share value drop in March 1993, it

had taken the Credit Union several weeks to appraise the condominiums and draw up the documentation. I reasonably believed that the Credit Union was satisfied with my offer to meet with them and address the issue when I returned from my business trip the following Monday. I believed that the Credit Union would properly notify me if a need for additional collateral became urgent.

38. Every time I had taken money from my loan account I had received a receipt that said "Demand Loan callable on seven days notice." This consistent message led me to believe that I would have notice and a sufficient amount of time to resolve any issues that might arise.

39. I never received another communication from the Credit Union or Affina. Never a telephone call or message, a voicemail, a telegram, a fax, nor an e-mail demanding that I deposit additional collateral or informing me that I had a margin call and that a total sell-out was going to take place.

40. On Thursday September 10th, 1998 at approximately 11:15 a.m., I called the Credit Union to place additional sell orders and was immediately informed by representatives, John Petrie and Norman Jackson, that they had already been ordered to "sell out" my entire account. I was shocked to hear this and instructed the representatives to only sell specific

12

securities. They responded that most of my portfolio had already been sold and that neither had any control over which securities were being sold because sell orders had already been put in for all of the stocks. At that time, I was under-collateralized no more than $216,000.00 and had an account valued at $2,879,000.00. They gave me a list of the stocks that had already been sold upon market opening. These stocks represented over 50% of the portfolio valued at $1,411,466.00 and the majority of the increase in equity. At this point, the sell off had generated $1,195,465.00 more cash than was needed to meet any shortfall in collateral.

41. I then told Petrie and Jackson to stop selling specific securities but was informed that they were getting their orders from the Credit Union's management and that the sell orders for the entire portfolio were already in the system. This sell order was entered without regard for what the value of the under-collateralized loan was or at what point in the sell off process the loan would be satisfied. No provision was made to stop selling when the loan to collateral ratio did not come within the Credit Union's guidelines nor was the order in which the stocks were to be sold

determined. Petrie and Jackson told me that I should speak to their manager, John Walsh ("Walsh".)

42. After transferring to Walsh, I was informed that Robert Ambrose and Albert Menard, Credit Union Vice Presidents had made the decision to liquidate all of the stocks in the account. I told Walsh that by selling off the particular stocks that had already been sold that the Credit Union was creating a "domino" effect because seven of the twenty-three stocks sold were the biggest gainers and had approximately $387,000.00 in equity. I reiterated that the Credit Union's random liquidation was compounding the purported under-secured position of my account.

43. I reminded Walsh that there were other assets (Money Market and IRA) in the Credit Union accounts that could have been used to help cover any deficit. These totaled a minimum of $150,000.00. Walsh responded "you have an IRA and other accounts in this institution?" It was obvious that Walsh was unaware of the extent of my assets within the Credit Union or the September 8th conversation with David Brody.

44. Walsh could not give me any current accurate information on the status of my account. I told Walsh that I should have been consulted before the liquidation because the random selling was causing avoidable damage to

me in the form of unnecessary capital gains tax. Additionally, this uncontrolled sell-off prevented me from converting my IRA's to Roth IRA's. I asked Walsh to explain who determined in what order the stocks in my account were sold, saying, "Are they sold in alphabetical order or what?" Walsh's response was that "you are raising some very valid points". I asked to speak to the Vice Presidents in charge of my account. Walsh said Albert Menard ("Menard") and Robert Ambrose ("Ambrose") were out to lunch.

45.    I called Walsh back at 1:30 p.m. and asked to speak to Menard or Ambrose who both were in meetings. While speaking to Walsh, I offered to wire an additional $50,000. Walsh said that he did not have the authority to stop the sell orders but recommended that I wire $50,000 first thing in the morning. I again asked what had been sold. Walsh still did not have any accurate information so he transferred me to Norman Jackson who gave me the list of stocks that had been sold. Neither knew at this point what my loan to collateral ration was.

46.    On Friday, September 11th I wired $50,000 to the Credit Union and directed Walsh to apply it to the margin account, which he did. I also agreed to release 38 shares of IBM stock from my dividend reinvestment

15

program totaling approximately $5000. I informed Walsh that I would like to speak to Ambrose and. Menard as soon as possible. Walsh said to come down later the next week.

47. On Friday, September 18, 1998, I met with both Ambrose and Walsh at the Credit Union. Menard introduced himself and excused himself to a meeting. Ambrose said that the Credit Union had the right to sell member's securities to protect the interest of the Credit Union. I asked why I had not been informed prior to its occurrence of the decision to liquidate the entire portfolio or been allowed to participate in deciding what order the stocks were to be sold in, such as liquidating the stocks in the declining order of loss. Ambrose said that the agreement between the Credit Union and me gave it the right to sell off assets at his discretion.

48. I inquired why other assets (money market accounts, IRA and cash deposits) in the Credit Union were not used to cover the margin call instead of selling off securities. Neither Ambrose nor Walsh had an answer. It appeared that neither knew that the assets existed at the Credit Union.

49. To summarize, as of September 9, 1998 at market close I was approximately $216,000.00 under-collateralized in my securities account.

However, as of that same date, I had over $150,000.00 in cash or IRA accounts in the Credit Union. Further, a Credit Union representative, David Brody, had inquired and been assured that I had over $250,000.00 in equity in my home and other cash assets of $150,000.00. On September 10,1998 the Credit Union placed orders to sell the entire account valued at $2,879,000.00 at market open without notifying me. Before I could convince the Credit Union to cancel the sell orders, over $1,412,462.00 of securities had been liquidated leaving me with a capital gains tax impact of $191,526.78. I was then forced to liquidate an additional $1,191,306.00 in stocks to avoid paying capital gains tax as well as to protect the loan to collateral ratio. Since that time, the portfolio I had on September 9, 1998 has increased in value to $5,753,220.00, causing me a lost opportunity cost of $3,450,978.00.

50.    Had any Credit Union representative called me before liquidating my account I could have identified the other assets in the Credit Union, wired the $50,000.00 (as I did immediately when requested to do so) and pledged other assets (my home or IBM stock as I did immediately upon request). This simple phone call could have saved me over $191,526.78

in unnecessary capital gains taxes and the lost increase in the value of the

securities as the market began to recover late on September 10, 1998.

Dated:  May 14, 2003

Victor T. Conte


COUNTY OF FAIRFIELD          )
                             ) SS #
STATE OF CONNECTICUT         )


On this the 14 day of May 2003 before me, personally appeared Victor T. Conte, signer and sealer of the foregoing instrument and acknowledged the same to be his free act and deed.


Elisabeth Seieroe Maurer
Commissioner of the Superior Court

# EXHIBIT I

LAW OFFICES OF
**ELISABETH SEIEROE MAURER, PC**

ELISABETH SEIEROE MAURER: CT, NY, IL
THOMAS W. OZIMKOSKI, JR.

871 ETHAN ALLEN HIGHWAY, SUITE 202
RIDGEFIELD, CT 06877

DANIEL P. HUNSBERGER
Of Counsel

GLORIA A. STEARNS
Legal Assistant

TEL: 203-438-1388
FAX: 203-431-0357
e-mail: emaurer@msn.com
esmaurer@snet.net

September 25, 2002

VIA FACSIMILE 516-296-7111
And First Class Mail

Martin P. Unger, Esq.
Certilman Balin Adler
90 Merrick Ave
East Meadow, NY 11554

·RE:    Victor T. Conte v. US Alliance Federal Credit Union, et al.
        Civil Action No. 3:01 CV 463 (SRU)

Dear Attorney Unger:

    Mr. Conte is available on October 22, 2002 in Stamford and I will look forward to taking Mr. Ambrose and Mr. Brody's deposition on October 23, 2002 in Rye.

    Mr. Conte has reviewed the tapes. He tells me that there are at least two more conversations on September 10 and two or three more conversations on September 11 that are not included.  If the tapes are recorded sequentially, it should not be that hard to find the conversations that are between the second and third conversations on September 10 and the later ones from September 11.  Does your client expect to be able to provide them before we continue? Also, Mr. Conte asked if the tapes had time and date stamps preceding the conversations? If so, we would appreciate knowing when these conversations were reported.

    Finally, I will be able to complete our response to you by the middle of next week and review the documents provided to see if I can identify any documents that appear to still be necessary.  Thank you for your courtesy in this matter.

                                        Sincerely,

                                        Elisabeth Seieroe Maurer

# EXHIBIT J

ORIGINAL

1

2     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF CONNECTICUT
3     ---------------------------------------x

4     VICTOR T. CONTE,                          :

5                             Plaintiff,        :

6                   -against-                   :

7     US ALLIANCE FEDERAL CREDIT UNION,         :
      AFFINA BROKERAGE SERVICES, INC.,
8     ROBERT AMBROSE AND JOHN WALSH,            :

9                             Defendants.        :

10    ---------------------------------------x

11                          600 Midland Avenue
                            Rye, New York
12
                            October 23, 2002
13                          10:30 A.M.

14

15

16         CONTINUED EXAMINATION BEFORE TRIAL of

17    ROBERT AMBROSE, one of the Defendants herein,

18    taken by the Plaintiff, pursuant to Court

19    Order.

20

21

22            NEW YORK REPORTING SERVICE
                 192 Lexington Avenue
23            New York, New York 10016
                  (212) 233-6797
24

25

1                     R. Ambrose

2         A.    There are no copies of individual form

3    ones.  So any infogram that was produced for

4    Mr. Conte, once it was mailed, there would be no

5    copy of it to the Credit Union.

6         Q.    Mr. Ambrose, we talked something about

7    your taping system and am I correct that the tapes

8    for September 8th were in some way destroyed, that

9    they were not able to be accessed at any time?

10        A.    We have a tape for the machine in

11   Massachusetts for the 800 lines that come in

12   through Massachusetts and we're unable to retrieve

13   anything on that when running through the machine.

14   The machine thing is a blank tape.

15        Q.    And as to the September 8th tapes

16   related to this office in New York?

17        A.    We were able to retrieve conversations

18   that we have been unable to find out of the

19   several thousand conversations any -- the

20   conversation of Mr. Conte calling Mr. Brody or

21   Mr. Brody calling and leaving a message for

22   Mr. Conte.

23        Q.    Do you believe that it's simply because

24   of the volume of the messages that are on the

25   tape?

NEW YORK REPORTING SERVICE (212) 233-6797

R. Ambrose

1

2      A.    I don't know.  Again, the calls are

3  based on the incoming trunk lines, so we don't

4  even know it.  It could be here or it could be in

5  Massachusetts.  The 800 number incoming calls are,

6  as I understand, fed by the service provider and I

7  am not even sure who it was, Sprint or MCI or AT&T

8  or whichever one we were using.

9          But the calls are balanced out to the

10  two different call centers.  So without knowing

11  specifically the date and time, I am not sure how

12  we would ever find a call among the thousands of

13  calls for a day.

14      Q.    And as a general matter, if you don't

15  have a tape of the call, would it be your position

16  that that call did not occur?

17      A.    No.

18      Q.    It may simply be that you were unable to

19  find it?

20      A.    Correct.  And in the case of this

21  particular call, there is a notation in our

22  comment file -- a particular file we call it --

23  that David Brody left a note that he had left a

24  message and I believe it was also a note that

25  Mr. Conte returned the call later that day, but

```
 1                        R. Ambrose
 2      those are not time-stamped.  So it does not help
 3      us find when the call may have been on the tapes.
 4                MS. MAURER:  I need to take a short
 5           break.
 6                (Whereupon, a short recess was taken)
 7                MS. MAURER:  Thank you very much.  I
 8           have no further questions.
 9                MR. UNGER:  These are information I
10           received from the Credit Union that came from
11           logs, which I have not seen regarding calls
12           and the time of the calls.  We will deal with
13           the September 21st --
14                MS. MAURER:  Wait a minute.  Hold on
15           just one second.
16                MR. UNGER:  Okay.
17                MS. MAURER:  All right.  Go ahead.
18                MR. UNGER:  I showed three calls.  The
19           first call was 13:29:25.  The duration was 14
20           minutes and 4 seconds.
21                MS. MAURER:  Are you telling me that the
22           first call was at 1:29 in the afternoon?
23                MR. UNGER:  Correct.  The second call
24           was at 2:23:11.
25                MS. MAURER:  So that would be 14?
```

1                          R. Ambrose

2              MR. UNGER:  2:23:11 and they showed the

3         continuation and it looks like 37 minutes and

4         57 seconds total.  The tape could be several

5         people in them at different times.

6              Then the third call was 15:51:08 and was

7         7 minutes and 21 seconds.

8              MS. MAURER:  So you have three calls on

9         the 10th?

10             MR. UNGER:  Right.

11             MS. MAURER:  With Minard, we have three.

12        And on the 11th?

13             MR. UNGER:  On the 11th, two calls.  The

14        first one is at 8:45:25 and 17 minutes and 30

15        seconds.  Now, of course, I think it probably

16        included the whole thing at the beginning

17        about your tape and so on and so forth,

18        quality control, assuming that is where it

19        starts.

20             The second call was at 13:37:55 and ran

21        for 12 minutes and 28 seconds.  And as we

22        know, there was some hold times and other

23        things.

24             MS. MAURER:  How long was the first

25        call?

1                          R. Ambrose

2              MR. UNGER:  The first call was -- on the

3         11th?

4              MS. MAURER:  On the 10th.

5              MR. UNGER:  On the 10th, it is 14

6         minutes and 14 seconds according to --

7              MS. MAURER:  Does this log complete the

8         recognition on the tape or does this log in

9         some way sort by number?

10             MR. UNGER:  I can't tell you.  I haven't

11        read the information.  I have not seen the

12        log.  There is a way of retrieving it and

13        that's what they did.

14             MS. MAURER:  I'm sorry.

15             MR. UNGER:  I guess if we measure the

16        time on the tape of the call, we can get

17        something similar.

18             (Time noted: 11:55 a.m.)

19

20

21

22

23

24

25

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____X

VICTOR T. CONTE,

               Plaintiff,          Civil Action No.
                                         3:01 CV 463 (EBB)

     v.

US ALLIANCE FEDERAL CREDIT UNION,    AFFIDAVIT OF
AFFINA BROKERAGE SERVICES, INC.,     ROBERT AMBROSE
ROBERT AMBROSE and JOHN WALSH,

              Defendants.

_____X

STATE OF NEW YORK       )
                    ) ss.:
COUNTY OF WESTCHESTER  )

     ROBERT AMBROSE, being duly sworn, deposes and says:

     1.    I am the Senior Vice President of Member Support at USAlliance Federal Credit

Union ("USAlliance"). In August and September 1998 I was Vice President of Member

Services. In those capacities I was fully familiar with the procedures and records relating to

USAlliance's members and the accounts they maintained, including those discussed herein. I

submit this affidavit in support of USAlliance's motion for summary judgment.

     2.    USAlliance maintains a recording system for all telephone calls to USAlliance's

offices and personnel. Each caller is notified at the beginning of the call that the telephone call

may be recorded. The recording system was in effect during all of 1998.

     3.    These electronic records are made and kept in the regular course of USAlliance's

business activity, and it was during 1998, and continues to be, the regular course of USAlliance's business activity to make and maintain such recordings.

4.    These electronic recordings can be identified by USAlliance as to date, time conversation commenced and time conversation ceased and length of conversation.

5.    The electronic recordings, and the date, time and length thereof, transcripts of which are annexed to the Affidavit of Martin P. Unger, sworn to April 16, 2003 ("Unger Aff'd"), as Exhibits F, G and H, were made and maintained in the manner described herein. The original electronic recordings as well as relevant excerpts thereof are available to the Court for review on request.

6.    The documents marked as Plaintiff's Deposition Exhibit 2 on October 23, 2002 (Exhibit A hereto) and those annexed as Exhibit B hereto, are Undercollateralized Stock Loan Reports These Reports were made and kept in the regular course of USAlliance's business activity during 1998 and, during 1998, it was the regular course of USAlliance's business activity to make and maintain such documents.

7.    The documents annexed hereto as Exhibits A and B were made and maintained in the manner described in paragraph 6 above.

8.    The documents marked as Plaintiff's Deposition Exhibit 13 on July 16, 2002 (Exhibit C hereto) are known as Que 10 Reports and are printouts of a Que 10 computer screen produced by USAlliance's internal computer system. During 1998 these documents were made and kept in the regular course of USAlliance's business activity and it was during 1998, and is, the regular course of USAlliance's business activity to make and maintain such documents. These documents were available via the computer screen to the USAlliance Collection

iManage:1392143.1

# EXHIBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VICTOR T. CONTE,<br>    Plaintiff,<br>v. | :<br>:<br>: | Civil Action No.<br>3:01 CV 463 (SRU) |
| | : | |
| US ALLIANCE FEDERAL CREDIT UNION,<br>AFFINA BROKERAGE SERVICES, INC.,<br>ROBERT AMBROSE, and JOHN WALSH,<br>    Defendants. | :<br>:<br>:<br>: | October 23, 2002 |

## PLAINITFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

The Plaintiff, Victor T. Conte, (hereinafter "Conte"), pursuant to Rule 34 of the

Federal Rules of Civil Procedure hereby requests that the Defendant, US Alliance

Federal Credit Union, (hereinafter, "Credit Union"), produce the following requested

documents that are within the possession, custody or control of themselves, their

agents, employees, attorneys, investigators, or any persons acting on their behalf.

All documents shall be produced within thirty (30) days from the date of service.

If you cannot produce the requested documents or any part thereof, after exercising due

diligence to secure the documents, than so state and produce the remainder of the

documents as fully as possible.

Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Defendants are under a continuing duty to promptly supplement their production with documents obtained subsequent to the preparation and filing of a response to each request. Thus, these Requests for Production are to be considered continuing. Therefore, Defendants are requested to provide, by way of supplementary production, such additional documents as they or any person acting on their behalf may obtain which will augment or modify their initial compliance. Such supplementary compliance is to be served upon Plaintiff's counsel within thirty (30) days of the receipt of such documents.

### A.    DEFINITIONS:

1.    "Document(s)": The term "document", as used throughout this particular document, refers to any kind of written, typewritten, printed or graphic material or matter, e-mail, reproduction, xerographic reproduction or photocopy thereof, or any other tangible means of recording or memorializing any form of communication, intelligence, or representation however produced or reproduced, of every kind and description in the actual or constructive possession, custody or control or producing parties, their agents, attorneys, accountants, and/or any other person authorized to act on behalf of said party, wherever located, including specifically, but without limiting the generality of the foregoing, the originals (or copies where originals are not available)

2

and all copies that are not identical to the original, of file indices, file folders, notes, memoranda, letters, telegrams, books, accounts, microfilm, microfiche, ultrafiche, papers, certificates, notices, computer tapes, computer cards, computer print-outs, inter-office communications, intra-office communications, visual recordings, motion pictures, videotapes, audio tapes, photographs, reports, drafts, calendars, appointment books, diaries, minutes of meetings of boards of directors, notices of meetings or conversations, catalogues, written agreements, plans, charts, maps, diagrams, contracts, checks, check registers, passbooks, books of account, statements, confirmations, financial statements, statements of income, receipts, invoices, bills, cables, leases, or any other form of writing or other material similar to the foregoing, however denominated by Defendants.

2.      "Communication": The term "communication" means the transmittal of information, the information transmitted, and any process by which information is transmitted.

3.      "Plaintiff": The term "Plaintiff" refers to Victor T. Conte, who shall be referred to as "Conte" throughout this document.

4.      "Defendants": The term "Defendants" refers to US Alliance Federal Credit Union, Affina Brokerage Services, Inc., Robert Ambrose, and John Walsh and their officers, directors, employees, members, partners, corporate parents, subsidiaries,

affiliates, or any similar person.  This definition is not intended to impose a discovery obligation on any person who is not a party or an agent of a party to this litigation.

5.    "Person": The term "person" is defined as any natural person or business, legal or governmental entity or association.

6.    "Regarding": The term "regarding" means concerning, relating to, referring to, describing, evidencing or constituting.

7.    "Relate(s)": The term "relate(s)" means concerning, reflecting, regarding, referring to, describing, evidencing or constituting.

8.    "Relevant Time Period": The phrase "relevant time period" as used throughout this document shall be construed to encompass the time period from January 1st, 1995 through January 1st, 2000.

9.    Conte's Accounts: The phrases "Conte's accounts", "Conte accounts", or "accounts", shall be construed to encompass any accounts held by Victor T. Conte and/or Doris Conte, both individually and/or together, whether at Credit Union or Affina and any transaction that, although done in Credit Union, was later reported to Conte's accounts.

10.    Customer/Investor: Any person maintaining an account for the purpose of purchasing and selling investment vehicles.

4

11.    <u>Transaction:</u> The term "transaction", refers to any transaction in Conte's accounts or any transaction later credited or reported to Conte's accounts without regard to the name under which the transaction is undertaken or consummated. Further, the term "transaction" shall include any sale or purchase of securities ordered by Conte through Credit Union without regard to what entity executed the transaction.

12.    <u>Affina Brokerage Services, Inc.:</u> Referred to throughout this document as "Affina", shall be read to include any predecessor, successor, or any and all other organizations related to Affina, without regard to its organizational structure.

13.    <u>US Alliance Federal Credit Union:</u> Referred to throughout this document as "Credit Union", shall be read to include any predecessor, successor, or any and all other organizations related to Credit Union, without regard to its organizational structure.

### B.    RULES OF CONSTRUCTION:

1.    <u>"All/Any":</u> The terms "all" and "any" shall be construed to include all and any of what may be requested.

2.    <u>"And/Or":</u> The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

5

## C.    INSTRUCTIONS:

1.    With respect to any document requested which was once in the possession, custody or control of Defendants, but no longer is, please indicate the date the document ceased to be in possession, custody or control, the manner in which it ceased, and the name and address of the present custodian.

2.    Whenever a description of a document or information is requested, it is the intention that the answer shall state the following information with respect to each such document:

(a)    The title, heading or caption of such document, if any.

(b)    The identifying number(s), letter(s), or combination thereof, if any and the significance or meaning or such number(s), letter(s), or combinations thereof.

(c)    The inclusive dates of each such document.

(d)    The general nature of such documents (i.e. whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists.

(e)    The name of the person to whom such document was addressed and the name of each person, other than such

6

addressee, to whom such document or a copy thereof, was
sent.

(f)     The identity of the person who has custody of such
document.

The foregoing information shall be given in sufficient detail to enable a
party or person to whom subpoena is directed to identify fully the document to be
produced and to enable a party to determine that such document then produced is in
fact the document so desired.

3.     The documents produced in this request shall include all
attachments and enclosures.

4.     In the event any document called for by this request has been
destroyed, discarded, misplaced or otherwise disposed of, or is otherwise presently
unavailable to Defendants, the unavailable document is to be identified as follows:
addresser, addressee, indicated or blind copies, date, subject matter, number of pages,
attachments or appendices, all persons to whom the document was distributed shown
or explained, date of destruction or disposal and name and business title of person who
destroyed, discarded, misplaced or disposed of such document.

5.     In the event Defendants decline to produce any document on the

7

ground of evidentiary privilege or discovery exclusion: (1) state the basis for assertion of the privilege or exclusionary principle and (2) give a summary statement of the document's title, date, author, recipient, custodian and subject matter in sufficient detail to permit the Panel to reach a determination in the event of a motion to compel the production of the requested documents.

      6.     The document requests shall be deemed to be continuing and it is requested that you promptly supplement your production to include documents subsequently located or acquired.

      7.     Each request shall be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall produce the any portion of the document to the extent the interrogatory is not objectionable.

      8.     All grounds for an objection to a request shall be stated with specificity.

## REQUESTS FOR PRODUCTION

1) Affina Brokerage Services ( in either corporate form) operations manual in effect from 1997 through today. If the document is voluminous, you may produce the index and I will select the appropriate sections.

2) USAlliance brokerage department ( in any corporate form) operations manual in effect from 1997 through today. If the document is voluminous, you may produce the index and I will select the appropriate sections.

3) Affina Brokerage Services ( in either corporate form) compliance manual in effect from 1997 through today. If the document is voluminous, you may produce the index and I will select the appropriate sections.

4) USAlliance brokerage department ( in any corporate form) compliance manual  or stock procedures in effect from 1997 to present. If the document is voluminous, you may produce the index and I will select the appropriate sections.

5) All "learning tools" or other training materials maintained in the computer system or in any other format by defendant or any subsidiary, regarding brokerage services, loan collection policies and procedures, collateral to loan ratios, liquidation of members accounts, "margin" nomenclature, or notification

9

brokerage function of Affina or defendant including any document issued by the NCUA or NASD.

18)  All year end Federal form 1120 tax returns for defendant and Affina for years 1998 through present.

19)  All Daily Undercollateralized Reports for August and September 1998 referring to an Conte account.

20)  Any policy of insurance, overage, or excess that may provide coverage in this matter as well as any documents reflecting a reservation of rights by the carrier.

21)  All recordings, logs and notes of telephone calls or conversations regarding Conte's accounts and transactions between Conte or any person acting on his behalf and Defendants or any associated persons of Defendants, regarding Conte's accounts and transactions, during the relevant time period.

# EXHIBIT M

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

———————————————————————X

VICTOR T. CONTE,

               Plaintiff,

    v.

US ALLIANCE FEDERAL CREDIT UNION,
AFFINA BROKERAGE SERVICES, INC.,
ROBERT AMBROSE and JOHN WALSH,

               Defendants.

———————————————————————X

Civil Action No.
3:01 CV 463 (SRU)

DEFENDANT
US ALLIANCE FEDERAL
CREDIT UNION'S RESPONSE
TO PLAINTIFF'S SECOND
REQUEST FOR PRODUCTION
OF DOCUMENTS

Defendant, US Alliance Federal Credit Union, by its attorneys, Certilman Balin Adler &
Hyman, LLP and Shipman & Goodwin LLP, hereby states its responses and objections to
Plaintiff's Second Request for Production of Documents as follows:

## GENERAL OBJECTIONS

(A)    Defendant's response or answer to any demand does not constitute an admission of

       relevance, materiality or admissibility of the subject matter or documents referred to

       therein.

(B)    These responses are made without waiver of, and with preservation of, the right to correct

       amend, supplement and/or clarify any response herein when other or additional

       information becomes available through further discovery or otherwise.

(C)    Defendants object to Plaintiff's Second Request to the extent that it requires production

       of documents which are prepared in anticipation of litigation, which constitute attorneys'

work-product, contain privileged attorney-client communications, or which are otherwise privileged.

(D)    Defendant objects to Plaintiff's Second Request to the extent it seeks documents not in its possession, custody or control.

(E)    Defendant objects to Plaintiff's Second Request insofar as it is vague, ambiguous, overly broad and/or unduly burdensome.

(F)    Defendant objects to Plaintiff's Second Request to the extent it seeks documents which are irrelevant and immaterial to the issues in this action and/or not reasonably calculated to lead to the discovery of admissible evidence.

(G)    Defendant objects to Plaintiff's Second Request insofar as it is related to the period prior to July 1998 or beyond September 11, 1998, except as further limited in the responses below.

(H)    Each response below is made subject to and without prejudice to the foregoing general objections.

## RESPONSES

1.    Defendant objects to this Request on the grounds that it is unduly burdensome and seeks documents which are irrelevant and immaterial to the issues in this action and/or not reasonably calculated to lead to the discovery of admissible evidence.

2.    Defendant objects to this Request on the grounds that it is unduly burdensome and seeks documents which are irrelevant and immaterial to the issues in this action and/or not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding, defendant is producing herewith (a) two documents both titled "Undercollateralized Loan

-2-

Processing" which were printed from defendant's computerized data base and the first of which

is Bates stamped numbers 001000-001011 which is from the current IS Run Books, and the

second of which is also from defendant's current IS Run Books (Bates # 001012-001026); (b) a

document titled "Undercollateralized Stock Loans" that was in effect during July 1998 through

September 11, 1998 from the Operations Manual of the Collections Department (Bates #

001029-001030); (c) a document titled "Secured Loans" (Bates # 001027) from the current

Operations Manual of the Loan Department; the manual in effect in July-September 11, 1998 is

not in existence, and (d) a document titled "Stock Interest Only Loan # 7200" (Bates # 002028)

from the current Member Services Reference Manual; the manual in effect in July-September 11,

1998 is not in existence.

3.    Defendant objects to this Request on the grounds that it is unduly burdensome and

seeks documents which are irrelevant and immaterial to the issues in this action and/or not

reasonably calculated to lead to the discovery of admissible evidence.

4.    The Response contained in number 2 above, is repeated as if fully set forth hereat.

5.    The Response contained in number 2 above, is repeated as if fully set forth hereat.

6.    Defendant states that it has no such documents in its possession.

7.    Defendant has no such document that can be recovered from its computer data

base at this time covering the period July 1998 through September 11, 1998.

8.    The Response contained in number 2 above, is repeated as if fully set forth hereat.

9.    Defendant has no such documents in its possession.

10.    Defendant objects to this Request on the grounds that it is unduly burdensome and

seeks documents which are irrelevant and immaterial to the issues in this action and/or not

iManage:1316582.1