# EXHIBIT N

1

2      UNITED STATES DISTRICT COURT

       EASTERN DISTRICT OF CONNECTICUT

3      ---------------------------------------x

4      VICTOR T. CONTE,                          :

5                            Plaintiff,          :

6                    -against-                   :

7      US ALLIANCE FEDERAL CREDIT UNION,         :

       AFFINA BROKERAGE SERVICES, INC.,

8      ROBERT AMBROSE AND JOHN WALSH,            :

9                            Defendants.         :

10     ---------------------------------------x

11                         One Landmark Square

                           Stamford, Connecticut

12

                           October 22, 2002

13                         10:10 A.M.

14

15

16          EXAMINATION BEFORE TRIAL of VICTOR T.

17     CONTE, the Plaintiff herein, taken by the

18     Defendants, pursuant to Court Order.

19

20

21

22

23          NEW YORK REPORTING SERVICE

                192 Lexington Avenue

24            New York, New York 10016

                (212) 233-6797

25

```
 1                           V.T. Conte

 2        A.    During what period?

 3        Q.    The 1990s.  Did anybody encourage you to

 4   buy stock?

 5        A.    No.

 6        Q.    Or to sell stock?

 7        A.    No.

 8        Q.    You are to maintain a secured loan

 9   account?

10        A.    No.

11        Q.    Or to leverage that account?

12        A.    No.

13        Q.    You borrowed money from the Credit Union

14   and we were talking about that, right?

15              Did anybody discuss with you what you

16   were using the money that you borrowed for?

17        A.    No.

18        Q.    Through September 10, 1998, did anybody

19   at the Credit Union discuss with you the size of

20   your loan?

21              Let's say, other than your conversation

22   with David Brody, which we will get to.

23              MS. MAURER:  I'm sorry.  Between the

24              '90s and September of --

25              MR. UNGER:  Yes.
```

NEW YORK REPORTING SERVICE  (212) 233-6797

1                          V.T. Conte

2     general information, whoever picked up the phone,

3     you would just wait and they would just pick up

4     the phone, and then you would ask them for

5     whatever information you wanted.

6          Q.   Who did you speak to on September 8th?

7          A.   Brody.

8          Q.   Just Brody?

9          A.   Brody.

10         Q.   Did you speak to Petrie, Jackson or John

11    Walsh on the 8th?

12         A.   No.

13         Q.   And the brokerage services?

14         A.   No.

15         Q.   So you just spoke to Brody and Brody,

16    you're saying did not tell you how much you would

17    have had to put in to bring your account to

18    85 percent?

19         A.   Correct.

20         Q.   So on September 8, nobody could tell you

21    how much you were under collateralized, is that

22    correct, or how much over the 85 percent you were?

23         A.   Correct.  Brody could not tell me and if

24    I remember the conversation correctly, he said he

25    did not have information and he suggested to call

1                           V.T. Conte

2    member services.

3         Q.   Did you call member services?

4         A.   I don't remember exactly, but I think I

5    did.

6         Q.   Who did you talk to?

7         A.   I don't remember.  Whoever picked up the

8    phone.  I don't remember.

9         Q.   Was whoever picked up the phone able to

10   give you any information?

11        A.   No.

12        Q.   How about on the 9th, were you able get

13   any information from anybody at the Credit Union

14   on the 9th as to the amount that you were under

15   collateralized?

16        A.   To my recollection, no.

17        Q.   When you asked for the information, were

18   you looking for information based upon unsettled

19   trades or based upon settled trades?

20        A.   I don't remember exactly if there were

21   any unsettled trades.  I would have to go back and

22   check the trade dates.

23        Q.   What I am getting at is, did you ever

24   ask Petrie or Jackson, how much am I under

25   collateralized, how much do I owe?

1                          V.T. Conte

2          A.   No.   That's not discussed because I

3     tried to do something on the 10th.  I was calling

4     in to correct the problem, to settle, and that's

5     when they told me they have already been ordered

6     to sell me out.  That's the words that they told

7     me.

8          Q.   But you didn't do anything on the 8th o

9     the 9th; is that correct?

10         A.   No, that's not true.

11         Q.   But you had some days to wait?

12         A.   No.   But I spoke with Dave Brody on the

13    8th and we could not determine what the over

14    amount was and I told him, "I am coming down there

15    to square this away."

16              Dave Brody never told me that "If it is

17    not corrected by tomorrow morning, we're going to

18    sell you out."  That was never discussed.  I said,

19    "I will take care of this."

20         Q.   What I am asking you is, how much

21    time -- counting from the 8th -- in your view, did

22    you believe you had to, as you put it, "take care

23    of this?"

24         A.   Well, I told Brody I'm coming back this

25    weekend and on Monday, I would get it squared

1                          V.T. Conte

2      away.

3          Q.   Did Brody say to you, "Don't worry.  We

4      will wait for you.  You will have plenty of time?"

5          A.   I don't remember exactly what he said,

6      but we just had a very brief conversation.  This

7      is the courtesy call for letting me know that I am

8      unsecured.

9               I said, "David, I have been trying to

10     find out that number.  Can you tell me?"  He said,

11     "No."  I said, "Well, I am sure, you know, whatever

12     it is, it could get resolved by selling some

13     shares or doing everything I had to do, but

14     unfortunately I'm on a business trip and I will be

15     back this weekend and come in first thing Monday

16     morning."

17              Then we left it at that and what

18     happened on Wednesday, the market started to go

19     down with this Clinton thing and on Thursday

20     morning, I called in and said I am going to start

21     selling.  That was my action, to start selling the

22     first thing from where I was, because I had a lot

23     of stuff.

24         Q.   Thursday, the 11th?

25         A.   Thursday was the 10th.  In fact, the

1                          V.T. Conte

2    something that you ordered, for some reason, for

3    that particular payment?

4         A.   I don't recall the exact details of the

5    transaction.

6         Q.   During that period, did you get any

7    notice either orally or by mail that you were

8    under collateralized and that there was something

9    to do to fix the account?

10        A.   I got no written correspondence in this

11   whole time period that you're talking about.

12        Q.   Did somebody tell you orally, "You are

13   to put some more money in here and that's what you

14   need to do?"

15        A.   No.  Only a call from David Brody I got

16   on September 8th and there was no discussion what

17   was needed or how much was short.

18        Q.   I think you told us that you also sold

19   some stock during that period which would be

20   reflected here?

21        A.   Oh, yes.  I don't remember the date.

22        Q.   But there were stock sales reflected?

23        A.   Yes, stock sales would have been carried

24   over in September.

25        Q.   I see you were also working on buying

1                           V.T.. Conte

2           Q.    Let me cut it short.  You could not

3     reactivate it because you don't own the property

4     of the condominium?

5           A.    No, but I own the property of the house.

6           Q.    But it was not on the book of the Credit

7     Union?

8           A.    No.

9           Q.    But you could take a home equity line on

10    your house?

11          A.    No.

12          Q.    That's what we talked about on your home

13    and it is about 250 now.

14          A.    250,000.

15                MR. UNGER:  Off the record.

16                (Discussion off the record)

17          Q.    Let's turn to '98, '99 and go in order.

18          A.    September?

19          Q.    September 8th, September 9th,

20    September 10th of '98.  Who did you talk to on

21    September 8th at the Credit Union?  In '98, you

22    talked to Dave Brody?

23          A.    Dave Brody called me.  I was in

24    Pennsylvania and I believe September 8th was a

25    Tuesday.  He called me on my Connecticut number,

```
 1                        V.T. Conte
 2   because that was the number that he had and that's
 3   the 438-5523 number and I picked up the number
 4   from my Pennsylvania number because I called in.
 5            So I called him right back and we had a
 6   brief conversation and I don't think the
 7   conversation lasted more than -- maybe it was less
 8   than 5 or 10 minutes.  It was the first time I
 9   talked to him.  I didn't know who David Brody was.
10   That's the first time I had opportunity to talk to
11   him and he told me he was from the Credit Union and
12   this was a courtesy call to inform me that the loan
13   was unsecured.
14        Q.   What did you say to him?
15        A.   I said, "I know that."  That is
16   basically what I said.  I have been trying find
17   out this number for the last day or two.
18            I said, "Can you tell me exactly how
19   much I am under secured?"  He said, "No.  I
20   can't."  But I think the exact wording was, "But
21   you have to call the member services."  And we
22   left it at that.
23        Q.   You didn't call member services?
24        A.   I did call.  I called member services
25   prior to that call.
```

# EXHIBIT O

1

1

2          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF CONNECTICUT
3          ----------------------------------------x

4          VICTOR T. CONTE,                           :

5                               Plaintiff,            :

6                    -against-                        :

7          US ALLIANCE FEDERAL CREDIT UNION,          :
            AFFINA BROKERAGE SERVICES, INC.,
8          ROBERT AMBROSE AND JOHN WALSH,             :

9                               Defendants.           :

10         ----------------------------------------x

11                              600 Midland Avenue
                                Rye, New York
12
                                October 23, 2002
13                              12:05 P.M.

14

15

16              EXAMINATION BEFORE TRIAL of

17         DAVE BRODY, a witness on behalf of the

18         Defendants herein, taken by the Plaintiff,

19         pursuant to Court Order.

20

21

22

23              NEW YORK REPORTING SERVICE
                   192 Lexington Avenue
24             New York, New York 10016
                   (212) 233-6797
25

```
 1                          D. Brody

 2          A.   Yes.

 3          Q.   Let me ask you first.  These incoming

 4    calls to the collection department, are they

 5    recorded?

 6          A.   To my knowledge.

 7          Q.   Is there a notice on the phone when you

 8    dial into the collection department that your

 9    calls may be recorded for quality assurance or

10    whatever the thing is that you hear when you call

11    the Credit Union?

12          A.   Yes.

13          Q.   Are your outgoing calls recorded?

14          A.   I believe so, yes.

15          Q.   So if you called Mr. Conte on

16    August 31st, September 1st and September 4th,

17    those calls would have been recorded; is that

18    correct?

19          A.   If I had made those calls, yes.

20          Q.   Or if anyone else in the collection

21    department made those calls?

22          A.   Yes.

23          Q.   Turning back to when Mr. Conte returned

24    your call on September 8th, what do you remember

25    about that call?
```

D. Brody

1

2      A.    That he spoke and I had informed him

3   that he was under secured.

4      Q.    Did you discuss assets?

5      A.    I had mentioned or I had stated, "Do you

6   have any assets?"

7      Q.    Right.  Did he tell you that he had

8   $250,000 of equity in his home?

9      A.    Not to my recollection, no.

10     Q.    You don't remember, but you're not

11  saying that it didn't happen, right?

12     A.    I don't remember it.

13     Q.    Did you discuss assets, such as cash in

14  other accounts?

15     A.    No.

16     Q.    Do you not remember or did you not

17  discuss it?

18     A.    I don't remember.

19     Q.    Do you remember discussing 401-K's or

20  other types of retirement accounts that he might

21  have?

22     A.    No.

23           MR. UNGER:  You don't remember or --

24     A.    Well, when I use the term "assets" -- I

25  mean, we're getting specific now.  I consider

1                         D. Brody

2    401-K's or anything else to be assets in general.

3    You're getting more specific.

4         Q.   I am asking you whether he disclosed to

5    you these things, if you remember him telling you

6    about them.

7         A.   I do not remember.

8         Q.   Do you remember him telling you about

9    any specific asset?

10        A.   Possibly -- no.

11        Q.   Do you remember him disclosing that he

12   had a real estate line of credit in the Credit

13   Union?

14        A.   Vaguely.  But I believe at that period

15   of time there were none.

16        Q.   Do you remember Mr. Conte telling you

17   that he was out of town?

18        A.   I don't recall.

19        Q.   Do you remember Mr. Conte telling you

20   that as soon as he was back in town, which was the

21   following Monday, he would come down to the Credit

22   Union and resolve the issue?

23        A.   I don't recall.

24        Q.   Mr. Brody, you worked in this office; is

25   that correct?

D. Brody

1

2    position.

3              In words or substance, did you tell that

4    to Mr. Conte in that particular conversation on

5    the 8th that you had?

6         A.    My job is to determine the result of a

7    conversation, which means that Mr. Conte to call

8    back two days later.  And I had told him that,

9    "The Credit Union makes no guarantee that we

10   couldn't take any action on your account."

11        Q.    At what point in the conversation did

12   that come out, before or after Mr. Conte made you

13   aware of the situation?

14        A.    At the end.

15        Q.    That was the standard procedure?

16        A.    Yes.

17        Q.    Do you recall that coming up at the end

18   of the conversation?

19        A.    Yes, I do.

20        Q.    Did Mr. Conte, after you made that

21   remark, say anything other than "goodbye" or

22   something like that?

23        A.    No.

24              (Defendant's Exhibit 17, Cue-35, marked

25        for identification, as of this date.)

NEW YORK REPORTING SERVICE (212) 233-6797

# EXHIBIT P

ORIGINAL

1

2        UNITED STATES DISTRICT COURT

         EASTERN DISTRICT OF CONNECTICUT

3        ---------------------------------------x

4        VICTOR T. CONTE,                        :

5                              Plaintiff,        :

6                    -against-                   :

7        US ALLIANCE FEDERAL CREDIT UNION,       :

         AFFINA BROKERAGE SERVICES, INC.,

8        ROBERT AMBROSE AND JOHN WALSH,          :

9                              Defendants.       :

10       ---------------------------------------x

11                         600 Midland Avenue

                           Rye, New York

12

                           July 15, 2002

13                         2:15 P.M.

14            EXAMINATION BEFORE TRIAL of JOHN WALSH,

15       a witness on behalf of the Defendants herein,

16       taken by the Plaintiff, pursuant to Court

17       Order.

18

19

20

21

              NEW YORK REPORTING SERVICE

22                  Suite 802

              192 Lexington Avenue

23           New York, New York 10016

                 (212) 233-6797

24

25

J. Walsh

of the liquidation.  On the day of the 10th.

Q.   Can you tell me approximately what time
of the day it was?

A.   Sometime after the market opened in the
morning.

Q.   Who gave you the order to liquidate
Mr. Conte's account?

A.   Robert Ambrose.

Q.   What did you say to him and what did he
say to you?

A.   Basically he told us at the time that
they made the decision just to start selling
Mr. Conte's portfolio.

Q.   Was that before the market opened?

A.   No, it was after the market opened.  He
had to see what the market was doing.

Q.   What was the market doing?

A.   It was falling in the day.

Q.   So was it your understanding that the
decision had been made on the morning of the 10th?

A.   Yes.

Q.   Do you know what was affecting the
market at the time?

A.   I recall two outside influences.  There

J. Walsh

1

2      A.    No.

3      Q.    Did you discuss with Mr. Ambrose in any

4    way whether Mr. Conte had other assets available

5    within the credit union?

6      A.    I may have had a conversation with him

7    regarding when he decided to sell and that he had

8    checked within that account if he had assets

9    there.  I am just the executing broker.  I am

10   given instructions to do it and I carry them out.

11     Q.    So there was no reason for this given to

12   you, it was just simply to sell the whole account?

13     A.    Correct.

14     Q.    How did you go about doing that?

15     A.    The day was quite hectic and what we did

16   was, we pulled out a picture inquiry of the

17   portfolio with a list of all the securities and we

18   split that list of shares between the

19   representatives, Mr. Jackson and Mr. Petrie, and

20   they started to go in cusip number order and sell

21   each position.

22     Q.    To your knowledge, was any consideration

23   given to the tax impact that that selling strategy

24   would have?

25     A.    Directly to my knowledge, no.

J. Walsh

1

2      Q.    Did he give you a direct order to stop

3  selling?

4      A.    Yes.

5      Q.    Can you tell me what your conversation

6  was with Mr. Conte that day?

7      A.    The conversation included that he wanted

8  to know, one, if Mr. Conte wanted me to come to

9  the phone after he spoke with either Mr. Jackson

10  and Mr. Petrie as to the status of the trades that

11  he had placed previously and what the balance in

12  his account was, which he could not have obtained

13  unfortunately at that time, because we had begun

14  the liquidation of the portfolio and, if anything,

15  our conversation included the fact that he needed

16  to have that portfolio and we wanted to continue

17  having it sold and the conversation went back and

18  forth regarding him trying to bring money to

19  collateralize the loan.

20      Q.    Did you explain to him how the decision

21  to sell the portfolio had come about?

22      A.    Based upon the loan, probably the fact

23  that he was over the 85 percent limit.

24      Q.    Do you remember having that conversation

25  with him?

J. Walsh

1

2      A.    No, I don't.

3      Q.    Do you remember having any conversation

4  about the order in which the stocks were being

5  liquidated?

6      A.    I recall the conversation as far as he

7  was asking which stocks we were selling and I

8  explained to him that we would take the Cusip

9  number forward.

10     Q.    Was that just a matter of how fast you

11  could fill out the paperwork to sell it or were

12  you by cusip reporting the number very arbitrarily

13  with the largest one first?

14         Was there any particular plan to that or

15  was it how it was covered on the account?

16     A.    It was collateral we held in the

17  portfolio and in their agreement, it states that

18  if it had become under collateralized, we have a

19  right to sell the portfolio and this decision is

20  to fully sell the portfolio in the order of the

21  first stock and work our way to the end.

22     Q.    Do you have a brokerage services

23  agreement with Mr. Conte?

24     A.    A brokerage services agreement, yes.  A

25  stock secured loan agreement, yes.

# EXHIBIT Q

2        UNITED STATES DISTRICT COURT

         EASTERN DISTRICT OF CONNECTICUT

3        --------------------------------------x

4        VICTOR T. CONTE,                       :

5                            Plaintiff,         :

6                  -against-                    :

7        US ALLIANCE FEDERAL CREDIT UNION,      :

         AFFINA BROKERAGE SERVICES, INC.,

8        ROBERT AMBROSE AND JOHN WALSH,         :

9                            Defendants.        :

10       --------------------------------------x

11                       600 Midland Avenue

                         Rye, New York

12

                         July 16, 2002

13                       10:10 A.M.

14

15            EXAMINATION BEFORE TRIAL of JOHN

16       PETRIE, a witness on behalf of the Defendants

17       herein, taken by the Plaintiff, pursuant to

18       Court Order.

19

20

21

22            NEW YORK REPORTING SERVICE

              192 Lexington Avenue

23            New York, New York 10016

                 (212) 233-6797

24

25

J. Petrie

1

2      Q.  And Mr. Conte made several stock sales

3  in August, did he not?

4      A.  I don't know.

5      Q.  Do you remember a stock sale on

6  September 1st?

7      A.  I don't remember.

8      Q.  Did you talk to Mr. Conte on

9  September 10th, the day that you were asked to

10  liquidate his account?

11      A.  Yes, I talked to him.

12      Q.  What did you say to him and what did he

13  say to you?

14      A.  I believe he wanted to place some sale

15  orders and I told him the account had already been

16  liquidated for order to sell everything.

17      Q.  What did he say after that?

18      A.  I think our conversation was quite short

19  at that point in time.

20      Q.  Do you remember anything else in the

21  conversation?

22      A.  No.

23      Q.  Do you remember what he said to you?

24      A.  No.

25      Q.  Did he ask you what his under

NEW YORK REPORTING SERVICE   (212) 233-6797

# EXHIBIT R

```
 1
 2      UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF CONNECTICUT
 3      -------------------------------------x
 4      VICTOR T. CONTE,                      :
 5                          Plaintiff,        :
 6                  -against-                 :
 7      US ALLIANCE FEDERAL CREDIT UNION,     :
        AFFINA BROKERAGE SERVICES, INC.,
 8      ROBERT AMBROSE AND JOHN WALSH,        :
 9                          Defendants.       :
10      -------------------------------------x
11                          One Landmark Square
                            Stamford, Connecticut
12
                            October 22, 2002
13                          10:10 A.M.
14
15
16          EXAMINATION BEFORE TRIAL of VICTOR T.
17      CONTE, the Plaintiff herein, taken by the
18      Defendants, pursuant to Court Order.
19
20
21
22
23          NEW YORK REPORTING SERVICE
               192 Lexington Avenue
24          New York, New York 10016
                (212) 233-6797
25
```

1                        V.T. Conte

2        A.    I spoke to John Walsh again later that

3   morning.  John Petrie, John Walsh after lunch,

4   Norman Jackson after lunch and I think the last

5   call of the day was with John Petrie.

6        Q.    Did you ever speak to Al Minard?

7        A.    Not that I remember, no.

8        Q.    Incidentally, there were some tapes of

9   conversations that I am going to play for you

10  eventually very briefly here.

11             Have you had the opportunity to listen

12  to those tapes?

13        A.    Were those tapes the --

14             MS. MAURER:  I would assume so.

15        Q.    The one that I produced to your counsel.

16        A.    Yes.  If those were the ones, yes.

17        Q.    Okay.  Let's try and get September 10th

18  in order.  I am going to ask for your recollection

19  of these conversations.  The first conversation

20  was with John Petrie?

21        A.    That was the first.

22        Q.    On September 10th?

23        A.    Yes.

24        Q.    You called John Petrie?  You made a

25  phone call to John Petrie?

```
 1                       V.T. Conte

 2         A.   I made a call to execute a trade and he

 3    told me that he had been ordered to sell me out

 4    and I was shocked to hear that. That's when he

 5    transferred me. He said, "Talk to my manager."

 6    And that was the first time I spoke to John Walsh.

 7         Q.   How were you going to pay for the trade

 8    you were calling in to execute? It was GE, right?

 9         A.   No. That was later. I think my first

10    call was a sell or something. I forgot exactly

11    what it was.

12         Q.   You don't recall it being a purchase of

13    GE at the market?

14         A.   That was also a call too, but I don't

15    believe that was the first call.

16         Q.   When was the first call that you recall

17    making to Petrie? Was that in the morning?

18         A.   It was in the morning. I know it was

19    after the market opened, but I don't recall the

20    exact time.

21         Q.   What was the substance of it, if you can

22    tell me?

23         A.   I don't remember exactly, but the way I

24    remember it, it was to either sell -- I thought it

25    was to sell, but before we even got to anything,
```

1                         V.T. Conte

2    he said he was ordered to sell me out.

3              He said, "We were ordered to sell you

4    out."  That's what the conversation was about that

5    took place, and then he transferred me.

6         Q.   He transferred you to somebody,

7    Mr. Walsh?

8         A.   Yes.

9         Q.   Tell me about your conversation with

10   Mr. Walsh, whatever you remember?

11        A.   Well, there was numerous conversations.

12        Q.   Tell me about this one where you spoke

13   to Petrie and he said, "Let me send you to Walsh."

14             Did he say something like that in

15   substance?

16        A.   Mr. Walsh said it was out of his control

17   and decisions were being made by the vice

18   president.

19             I said, "Who were they?"  He gave me

20   Mr. Robert Ambrose's name and Al Minard.  I said,

21   "Could I speak to them?"  He said, "Hold on.  They

22   were not available."  I believe he said, "Leave me

23   your number and we will call you."  But they never

24   called back.  I told him that I would call back.

25             Mr. Walsh just told me that it was out

1                      V.T. Conte

2  of his hands.  It was in the hands of the vice

3  president.  We had some discussion about the mess

4  that they said they would be selling out and they

5  just said that they were putting the whole

6  portfolio up for sale.

7                I said, "Do I have a right to say what

8  is being said?"  He said, "No, you have no right

9  at all."  I said, "Can you tell me in what order

10  it would be sold?  Would it be alphabetically or

11  how do they get sold?"  He said "They just put

12  them up and whatever goes, goes."  I said, "At

13  what point does the selling stop?"

14                He said, "When the loan is satisfied."

15  Then I said, "Have you taken any consideration

16  with the capital gains?"  He said, "You're just

17  selling at random just like a firehouse sale."

18                Not only that.  That was in the year

19  '98.  I was working very hard on my tax plan to

20  take my 401(k) and that was the year they came up

21  with the Roth IRA and spread your tax over the

22  four years.  So I was trying very hard to keep my

23  AGI under 150 and file jointly, because the sale

24  of these stocks would have taken me way over.

25                I was mentioning this to John and I

1                          V.T. Conte

2    remember saying it to John.  He said, "While you

3    bring up some very valid points, we left it at

4    that."  And there was no more discussion,

5    something to the effect that he would have Mr. Al

6    Minard or Robert Ambrose call me back and I left

7    my phone number.  They never did call me back.  I

8    called them back again.

9          Q.    When you got the monthly record that you

10   looked at, was your tax based on those reports,

11   your purchase prices?

12         A.    I'm sorry.  What on a monthly basis?

13         Q.    When you got your monthly statement from

14   the Credit Union, which --

15         A.    Yes?

16         Q.    -- the one we looked at, Exhibit 6, take

17   a look at any one of them.  They would not have

18   your purchase price?

19         A.    No.

20         Q.    So if the Credit Union were going to

21   pick a security to sell to bring you into

22   compliance, they couldn't do it on that basis,

23   could they?

24         A.    Not off that statement, no.  But they

25   have --

```
 1                      V.T. Conte

 2        A.   Well, they were supposed to call me back

 3   which they never did.

 4        Q.   And you called again?

 5        A.   I called back again.

 6        Q.   And you got whom?

 7        A.   I called back Mr. Walsh directly.  He

 8   gave me his extension and I called him back

 9   directly.  I don't know exactly what happened, but

10   I remember two gentlemen spoke to the vice

11   president.  They were not available for whatever

12   reason and I was never given a reason.  I pleaded

13   with Mr. Walsh.

14        I said "Just random selling.  Can't you

15   do this?  Can't you do that?"  We had a discussion

16   and he said he couldn't guarantee anything because

17   it was out of his hands.

18        After that, we got into another

19   conversation about what it would take to stop it.

20   I said, "I could send you money right now today."

21   He said, "Wire it."  I said, "Certainly."  That's

22   when I wired the 50,000.

23        I believe that conversation took place

24   right after lunch.  It was some time after

25   2:00 o'clock that I found out that the wire would
```

1                        V.T. Conte

2     not be valid or something.  So I wired it the next

3     morning and it went into the account the next

4     morning.  That was 11th.  Then I also made

5     arrangements for FedEx to deliver the other shares

6     from the dividend reinvestments from First Chicago,

7     and I got all the wheels in motion.

8          Q.   Let me ask you this:  What time

9     approximately was the first conversation with

10    Mr. Petrie, and then Mr. Walsh on the 10th?

11         A.   I couldn't tell you exactly, but it was

12    after the market opened, that much I knew.

13         Q.   And before noon?

14         A.   Oh, yes, it was long before noon.

15         Q.   Did Mr. Walsh or Mr. Petrie tell you in

16    that conversation that certain stocks had already

17    been sold, if you recall?

18         A.   No.  Petrie told me later when I called

19    back that stocks had been sold.

20         Q.   I'm asking about the first conversation

21    with Petrie, and then I will get to Walsh.

22         A.   Petrie did not tell me nothing.

23         Q.   And Walsh did not tell you anything?

24         A.   Walsh told me some of the stuff was sold

25    and he was rattling them off and some stocks -- I

NEW YORK REPORTING SERVICE  (212) 233-6797

1                      V.T. Conte

2    Norman Jackson reviewed with me what had been

3    sold, because some of them were large blocks.

4    They were like 2, 3, 4000 and they did not go off

5    to do one trade.  They went off to trade 1,000 to

6    500, etcetera.  He was rattling off the numbers to

7    me.

8               I must have had him on the phone for 15

9    minutes, maybe longer.  By that time, it was close

10   to 3:00 o'clock or 2:30 or 3:00.  Then I said,

11   "Okay.  I will get back to you."

12              Then I called back again and John Petrie

13   picked up the phone and that must have been just a

14   couple of minutes before the market closed.  I

15   wanted to see those orders because they were all

16   switched to market orders, because the market went

17   down further.

18        Q.    Incidentally, do you remember telling

19   Mr. Walsh in that first conversation that you were

20   waiting for an uptake?

21        A.    For an uptake?

22        Q.    Yes, for the market to go up.

23        A.    I don't remember, but I probably would

24   have said that.

25        Q.    That, in fact, was what you had been

            NEW YORK REPORTING SERVICE   (212) 233-6797

```
 1                      V.T. Conte
 2   because I did not know what I had.
 3        Q.   That was all in that conversation with
 4   Jackson?
 5        A.   In the conversation with Jackson.  It
 6   was just an update as to --
 7        Q.   What had been sold?
 8        A.   Yes.  I started out with 50 stocks and
 9   now I got 25 or something.
10        Q.   Now, after the conversation which you
11   thought was about 2:00 o'clock --
12        A.   Sometime between 2:00 and 3:00.
13        Q.   -- whom did you talk to next that day?
14        A.   I called back and it was about -- just
15   about 4:00 o'clock, and John Petrie picked up the
16   phone.  I wanted to get an update as to my
17   account, because, by now, according to my
18   calculations, I figured that the loan had been
19   paid down substantially and I was getting closer
20   to the number.
21             There was something in that conversation
22   like, "We will figure that out tonight and we
23   can't do that until after the market closes."
24   That meant that I could not get another dial-up
25   until the next morning, which would have been the
```

NEW YORK REPORTING SERVICE  (212) 233-6797

# EXHIBIT S

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X

VICTOR T. CONTE,
    Plaintiff,

v.

US ALLIANCE FEDERAL CREDIT UNION,
AFFINA BROKERAGE SERVICES, INC.,
ROBERT AMBROSE, and JOHN WALSH,
    Defendants.

------------------------------------------------------------X

:  Civil Action No.
:  3:01 CV 463 (EBB)
:
:
:
:  May 15, 2003
:
:
:

## AFFIRMATION OF ELISABETH SEIEROE MAURER

1.    Attached as Exhibit "A" is a copy of deposition excerpts of Victor T. Conte.

2.    Attached as Exhibit "B" is a copy of deposition excerpts of Robert Ambrose.

3.    Attached as Exhibit "C" is a copy of deposition excerpts of John Walsh.

4.    Attached as Exhibit "D" is a copy of deposition excerpts of David Brody.

5.    Attached as Exhibit "E" is a copy of deposition excerpt of John Petrie.

6.    Attached as Exhibit "F" is a copy of a tape transcript. (Speakers: Vic Conte, Norman, John Petrie, Al Menard)

7.    Attached as Exhibit "G" is a copy of a tape transcript. (Speakers: Vic Conte, John Petrie, John Walsh, Norman)

8.    Attached as Exhibit "H" is a copy of tape transcript. (Speakers: Barry Moseley, Vic Conte, John Petrie)

9.    Attached as Exhibit "I" is a copy of a Cue-10 report dated September 8, 1998.

10.    Attached as Exhibit "J" is a copy of a Cue 10 report dated September 10, 1998.

11.    Attached as Exhibit "K" is a copy of a computer tickler system entry.

12.    Attached as Exhibit "L" is a copy of an undercollateralized report. (Stock Valued at 90%)

13.    Attached as Exhibit "M" is a copy of an undercollaterized report. (Stock Valued at 100%)

14.    Attached as Exhibit "N" is a copy of an account statement of Victor T. Conte for the period of 10/01/94 through 10/31/94.

15.    Attached as Exhibit "O" is a copy of a receipt for check disbursement from Mr. Conte's loan account.

16.    Attached as Exhibit "P" is a copy of correspondence from Charles Porten, CFA dated December 28, 2002.

17.    Attached as Exhibit "Q" is a copy of the NASD Exit Conference Summary Form.

18.    Attached as Exhibit "R" is a copy of correspondence from John Walsh to Dexter Tom, NASD dated February 15, 2000.

19.    Attached as Exhibit "S" is a copy of correspondence from John Walsh to Dexter Tom, NASD dated March 6, 2000.

20.    Attached as Exhibit "T" is a of the NCUA Examination Report.

21.    Attached as Exhibit "U" is a copy of Dorsa & Associates, Inc. Draft Policies and Procedures.

22.    Attached as Exhibit "V" is a copy of Defendant's Request for Admissions.

23. Attached as Exhibit "W" is a copy of Plaintiff's Response to Defendant's Request for Admissions.

24. Attached as Exhibit "X" is a copy of the secured loan application dated October 11, 1994.

25. Attached as Exhibit "Y" is a copy of the NCUA Policies and Procedures Part 712 and NCUA Letter to Credit Unions Number 150.

26. Defendant US Alliance asserts that Conte entered into a stock secured loan agreement in 1994 comprised of Exhibits 7a, 7b, and 7c to Conte's deposition that controls the resolution of this dispute. (Attached as Exhibit "X")

27. This assertion is in error for the following reasons.

   a. On October 11, 1994, Conte borrowed $25,000 from the credit to lend to his son, Damon Conte, for a truck loan. Attached as Exhibit "N" is Conte's credit union statement, showing the increase in his loan account and the cash disbursement. Also attached as Exhibit "O" is the receipt received by Conte with the $25,000 check, which says, "demand loan, callable on 7 days notice".

   b. In Conte's deposition, the relevant pages are attached as Exhibit "A", at page 63, line 13, Conte specifically testifies that he does not remember receiving 7a or 7b when he signed 7c.

   c. US Alliance admits in Ambrose's deposition at page 15, line 21, the relevant pages of which are attached as Exhibit "B", that

they have no record of Conte ever receiving 7a or 7b or that either was in any file related to him.

28.   US Alliance asserts that David Brody gave Conte a dollar amount needed to cure his undercollateralized position on September 8, 1998, and a demand that Conte do so immediately.  This assertion is also in error.

  a.   David Brody testified in his deposition, the relevant pages of which are attached as Exhibit "D", that he did not remember telling Conte the dollar amount necessary to cure the undercollateralized position.  Further, the computer tickler system had no record of that disclosure being made, but did indicate that Conte had offered to resolve that matter in two days. (Attached as Exhibit "K")

  b.   Further Conte testified in his Affidavit submitted herewith that Brody never provided that information or asked him to take any specific action.

29.   US Alliance presents transcripts of certain tapes as evidence of the events which transpired between Conte and the Credit Union.  However, these tapes are at best an incomplete version, and therefore, a suspect version of the events that transpired.

  a.   Walsh testified that he spoke with Conte before September 10, 1998. See Walsh deposition, the relevant pages of which are attached as Exhibit "C".  Further, Walsh testified that all incoming and outgoing calls

4

were taped recorded. However, US Alliance has never produced any
evidence of Walsh's purported calls to Conte. Conte testified he had
never spoken to Walsh before September 10.

b.    US Alliance asserts that Brody told Conte the dollar amount need to
cure the undercollaterlized position on September 8, 1998, and that
calls to and from Brody's department were also taped. Yet, no
such tape has been produced.

c.    Conte describes in his deposition and in his affidavit a conversation
with Walsh on the morning of September 10, 1998, during which
Walsh expresses surprise that Conte has IRA assets in the credit
union and says, "You're raising some very good issues" when
Conte asks if the credit union has considered the tax impact of the
liquidation in establishing the manner of the liquidation. No such
taped conversation has been produced.

d.    Finally, Ambrose in his deposition describes the difficulty that US
Alliance is having finding tapes because they are not indexed
saying, "...those are not time-stamped. It does not help us find when the
call has been taped". (See attached Exhibit "B" page 144, lines 2-3)

The failure to produce these critical conversations raises an inference that the contents of the tapes would be adverse to US Alliance's position.

Dated:  May 15, 2003

Elisabeth Seieroe Maurer

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------------------------------------X
VICTOR T. CONTE,                         :
        Plaintiff,                       :
                                         :
v.                                       :
                                         :
US ALLIANCE FEDERAL CREDIT UNION,        :
AFFINA BROKERAGE SERVICES, INC.,         :
ROBERT AMBROSE, and JOHN WALSH,          :
        Defendants.                      :
-----------------------------------------------------------X
```

**Civil Action No.**
**3:01 CV 463 (EBB)**

<u>**CERTIFICATION**</u>

**May 16, 2003**

I hereby certify that a copy of the foregoing Affirmatioin of Elisabeth Seieroe

Maurer has been sent, via facsimile and Federal Express, on this 16th day of May,

2003, to the following counsel and pro se parties of record.

Martin P. Unger, Esq.
Certilman Balin Adler
90 Merrick Ave
East Meadow, NY 11554

Elisabeth Seieroe Maurer