UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR T. CONTE,<br>　　Plaintiff,<br>v.<br><br>US ALLIANCE FEDERAL CREDIT UNION,<br>AFFINA BROKERAGE SERVICES, INC.,<br>ROBERT AMBROSE, and JOHN WALSH,<br>　　Defendants. | Civil Action No.<br>3:01 CV 463 (EBB)<br><br>**Affirmation**<br><br>July 2, 2004 |

Eva M. Puorro, being duly sworn, hereby affirms under penalties of perjury:

1.　I make this affirmation in support of Plaintiff Victor Conte ("Plaintiff" or "Mr. Conte")'s Motion In Limine seeking the following relief:

　　(1)　Permitting Plaintiff to offer or solicit evidence or testimony, and make statements, directly and indirectly, at trial regarding the following documents produced to Plaintiff pursuant to various subpoenas issued during this proceeding:

　　　　a. Documents produced by the National Association of Securities Dealers, Inc. ("NASD") regarding the NASD's regulatory examinations of US Alliance / Affina Brokerage Services ("Affina") and related findings that Defendant US Alliance Federal Credit Union ("US Alliance" or "Defendant") / Affina Brokerage violated various statutes, rules and regulations

applicable to the financial industry (Plaintiff's Exhibit Nos. 657A, 657B, 658-662 for identification);

b. Documents produced by the NASD regarding the National Credit Union Administration ("NCUA")'s regulatory examinations of US Alliance / Affina and related findings that US Alliance / Affina violated NCUA rules and regulations (Plaintiff Exhibit Nos. 690-695 for identification).

c. Documents produced to Plaintiff by Dorsa & Associates, Inc., consisting of draft policies & procedures that Dorsa provided to US Alliance / Affina as a result of the determination of the NCUA and NASD regulatory examinations (Plaintiff Ex. Nos. 696-699 for identification).

(2)     Pursuant to Rule 5 of the United States District Court, District of Connecticut Local Rules of Civil Procedure, permitting Plaintiff to file under seal the Plaintiff's Ex. Nos. 691 through 694 for identification, referenced in paragraph 1b above, without submitting those documents to the Clerk, so that the confidentiality of those documents is protected.

(3)     Permitting Plaintiff to offer or solicit evidence or testimony, and make statements, directly and indirectly, at trial regarding the remainder of Plaintiff's proposed exhibits objected to by Defendant US Alliance, specified in further detail herein.

2.     I testify based on first hand knowledge, except where indicated. The basis of any assertion made on information and belief is stated.

3.  This case is very fact intensive, and involves over seven hundred and forty exhibits of documentary evidence generated during the parties' long relationship of over thirty years. As indicated below, Defendant has asserted objections to most of Plaintiff's over seven hundred and forty exhibits. Despite our efforts to explain the meritless nature of Defendant's objections to its counsel Martin Unger, Esq., Defendant persists in maintaining those objections. Rather than waiting to have the Court address each of those objections in turn at trial, which would take an inordinate and unreasonable amount of time, we respectfully submit this Affirmation and its accompanying Memorandum of Law so that the Court may consider and rule upon these matters before trial, thereby allowing more productive use of the Court's resources.

4.  On June 4, 2004 we sent to Martin Unger, Esq., counsel for Defendant, by federal express a list of the exhibits that Plaintiff intends to use at trial and a copy of most of the exhibits included on that list. On June 8, 2004, we sent to Attorney Unger a copy of the remaining exhibits on Plaintiff's proposed exhibit list. On June 17, 2004, and on June 23, 2004, we sent to Attorney Unger by facsimile Plaintiff's revised proposed exhibit lists.

5.  On June 21, 2004 and June 24, 2004, Attorney Unger advised Attorney Elisabeth Seieroe Maurer by e-mail that Defendant objects on the grounds of "relevancy and materiality", and on "hearsay" grounds, to most of the seven hundred forty plus exhibits that Plaintiff proposes to use at trial. (See **Exhibit "A"** hereto, which contains a copy of the e-mails that Attorney Unger sent to my office on June 21 and 24, 2004). On June 25, 2005 I sent a letter (attached

3

hereto as **Exhibit "B"**) to Attorney Unger by fax and mail, which responded to Defendant's objections to Plaintiff's proposed exhibits, and explained to Attorney Unger the reasons why Defendant's objections have no merit, in an effort to avoid unnecessary motion practice. We have not received a response from Attorney Unger to that letter.

6. For the Court's convenience, we have enclosed a chart (**Exhibit "C"** hereto), which summarizes the types of documents at issue, the objections asserted by Defendant thereto, and the reasons why such documents are relevant and admissible.

7. The exhibits objected to by Defendant may be divided into four categories: 1) Donaldson Lufkin & Jenrette ("DLJ") printouts created by Victor Conte by use of a DLJ program, containing "portfolio performance" and "market summary charts" (collectively, the "DLJ Printouts"); 2) US Alliance records created in the regular course of its business; 3) documents that Victor Conte submitted to US Alliance; 4) documents received by subpoena from third parties.

8. The DLJ Printouts [1] that Plaintiff seeks to use at trial are relevant and material for the following reasons: (1) they illustrate that it was Mr. Conte's regular habit to not only monitor his account, but to perform calculations on his loan to asset ratio based on public information available from the market; (2) they show Mr. Conte's effort to mitigate his losses, and serve to illustrate Mr. Conte's

---

[1] These DLJ printouts were generated by Mr. Conte at a DLJ web site, which draws publicly available information about stock prices and market performance from the stock market, and combines that public information with a math function. That combination allows investors to use the DLJ web site for tracking the status of their portfolios on a daily basis and for tracking market performance over time.

4

damages; (3) they relate to Mr. Conte's breach of fiduciary duty and negligence claims, by illustrating that US Alliance did not and could not provide Mr. Conte with timely access to accurate information about his account and was incapable of handling an account of this magnitude, and that Mr. Conte was thus forced to follow the market value of his portfolio and its performance, as well as perform daily calculations to determine his account status.[2]

9. The records (e.g., monthly statements, marketing materials, infograms, execution reports, etc.) generated by US Alliance in the regular course of its business objected to by Defendant are relevant, material and admissible for the following reasons: (1) they illustrate and define the breadth and scope of the relationship between Mr. Conte and US Alliance, and their ongoing conduct during that time; (2) they relate to whether a fiduciary relationship developed between the parties; (3) they illustrate that it was Mr. Conte's regular habit to not only monitor his account, but to perform calculations on his loan to asset ratio based on public information available from the market; (4) they pertain to Mr. Conte's claims of breach of fiduciary duty and negligence, by illustrating an ongoing pattern of errors and misinformation by US Alliance in its handling of Mr. Conte's account.[3]

---

[2] Moreover, after being fully informed about the PowerPoint presentation that Plaintiff intends to use at trial (see Elisabeth Seieroe Maurer's letter to the Court dated May 14, 2004, attached as **Exhibit "D"** hereto), Defendant's counsel agreed to Plaintiff's use of that PowerPoint presentation at trial, which is based to a great extent on these DLJ documents. Thus Defendant has waived any objection to these documents. (See **Exhibit "E"** hereto, which contains a letter from Attorney Unger to the Court dated May 24, 2004, by which he confirms Defendant's agreement to our use of the PowerPoint presentation at trial.)

[3] Like the DLJ Printouts, Defendant waived its objections to Plaintiff's use of documents generated by US Alliance in the regular course of business. After being informed that

5

10.   A letter and canceled checks that US Alliance received from Mr. Conte are relevant, admissible evidence because (1) they illustrate that it was Mr. Conte's regular practice and habit to monitor and maintain the loan to collateral ratio within US Alliance's guidelines; and (2) they illustrate that US Alliance did not intend and was incapable of handling an account the size of Mr. Conte's.

11.   The documents produced by the NASD and Dorsa & Associates pursuant to subpoena (1) relate to Mr. Conte's breach of fiduciary duty claim by illustrating that US Alliance failed to separate itself in any manner from Affina Brokerage, that US Alliance and Affina shared "dual employees" and were one and the same; (2) relate to Mr. Conte's negligence claim because US Alliance's violations of statues, rules and regulations can be used to illustrate that US Alliance committed negligence *per se* and can be used as evidence of negligence; and (3) show that it was indeed feasible for US Alliance / Affina to take precautionary measures to ensure they were in compliance with the statutes, rules and regulations applicable to the securities industry, and NCUA regulations.

12.   A more detailed discussion of the reasons why the documents at issue are relevant and admissible appears below. (The relevant exhibit numbers from Plaintiff's proposed exhibit list are cited below).

---

Plaintiff would base its PowerPoint presentation on these, and other, documents, Attorney Unger informed Plaintiff that Defendant has agreed to Plaintiff's use of its PowerPoint presentation at trial. (See Exhibit "D" hereto, Elisabeth Seieroe Maurer's letter to the Court dated May 14, 2004, and Exhibit "E" hereto, which contains Attorney Unger's response thereto dated May 24, 2004, by which Defendant agrees to that PowerPoint presentation.

I.  **DLJ Printouts**

13. The DLJ printouts included in Plaintiff's exhibit list include (1) charts showing Mr. Conte's daily portfolio value and performance[4] for the period of June – December 1998 and (2) market summary charts[5] that illustrate stock market performance over time. (Collectively, "DLJ Printouts"). (See Chart, Exhibit "C" hereto, section I titled "DLJ Printouts".)

14. Defendant has objected on relevancy and materiality grounds, to Plaintiff's use of DLJ portfolio performance printouts from June 1998 and October through December 1998, and market summary charts from June 1998 and October 1998. Contrary to what Defendant asserts, all of these documents illustrate that it was Mr. Conte's habit and regular practice to not only monitor his account, but to

---

[4] Portfolio performance records from June 1998: Plaintiff Ex. ("Pl. Ex.") Nos. 13-14, 16-17; 23-24, 26-27, 29-30, 32-33, 35-36, 38-39, 41-44, 46-49, 51, 51A, 53-54, 56-57, 59-60, 62-63, 65-66, 68-69, 74-75, 77-78.
Portfolio performance records from July through September 9, 1998: Pl. Ex. Nos. 80-81, 83-84, 86-87, 89-90, 92-93, 97-98, 100-101, 103-104, 106-107, 116-117, 119-120, 122-123, 125-126, 128-129, 131-132, 134-135, 137-138, 140-141, 143-144, 146-147, 149-152, 157-158, 160-161, 166-167, 169-170, 172-173, 175-176, 178-179, 181-182, 184-185, 187-188, 190-191, 193-194, 196-197, 199-200, 202-203, 205-206, 209-210, 220-221, 223-224, 226-227, 229-230, 232-233.
Portfolio performance records from September 10, 1998: Pl. Ex. Nos. 266-269, 275-275A, 276.
Portfolio performance records from September 11, 1998 through September 30, 1998: Pl. Ex. Nos. 280, 287-288, 291-292, 295, 297, 299, 301, 303, 305, 307, 309, 311.
Portfolio Performance records from October 1998 through December 1998: Pl. Ex. Nos. 313, 314P, 315, 316, 317, 318, 319A, 320, 322-326, 328-332, 334, 336-337, 339-350, 351-381.

[5] Market summary charts from June 1998: Pl. Ex. Nos. 15, 18, 25, 28, 31, 34, 37, 40, 45, 50, 52, 55, 58, 61, 64, 67, 70, 76, 79.
Market summary charts from July through September 9, 1998: Pl. Ex. Nos. 82, 85, 88, 91, 94, 99, 102, 105, 108, 118, 121, 124, 127, 130, 133, 136, 139, 142, 145, 148, 153, 159, 162, 168, 171, 174, 177, 180, 183, 186, 189, 192, 195, 198, 201, 204, 207, 211, 222, 225, 228, 231, 234.
Market summary charts from September 11, 1998 through September 30, 1998: Pl. Ex. Nos. 281, 289, 293, 296, 298, 300, 302, 204, 306, 308, 310, 312.
Market summary charts from October 1998: Pl. Ex. Nos. 314, 319, 321, 327, 333, 335, 338.

7

perform calculations on his loan to collateral ratio based on public information available from the market.

15. These documents are also relevant to the issues of damages and mitigation. Defendant has asserted during this proceeding that it was Mr. Conte's obligation to manage his account, and that Mr. Conte failed to mitigate his losses. The DLJ printouts covering the period after September 10, 1998 illustrate directly the manner in which Mr. Conte made efforts to monitor his account and minimize his losses.

16. All of the DLJ printouts included in Plaintiff's exhibit list are also relevant and material to Plaintiff's claims of breach of fiduciary duty and negligence. They illustrate that Mr. Conte was forced to perform calculations on an almost daily basis to determine the status of his account and his loan to collateral ratio because US Alliance did not and could not provide Mr. Conte with timely access to accurate information about this account and was incapable of handling an account of this magnitude competently and in compliance with applicable law, and industry rules and regulations.

17. Defendant also asserts a hearsay objection to the DLJ Printouts from July through September 9, 1998, and states it will "permit their introduction solely for the purposes of showing how Mr. Conte followed his portfolio, [and for the purposes of showing] the dates and handwriting on the exhibits". (See Exhibit "A" hereto, which contains the e-mails received by my office from Attorney Unger, containing Defendant's objections to Plaintiff's exhibits.) Defendant's objection to and attempt to limit the purposes for which we may use those documents is

unreasonable and unwarranted, particularly when one considers the many purposes (see above) for which these documents would and could be used at trial. Moreover, Defendant has waived its objections to the DLJ printouts from July 1998 through September 9, 1998 by including them in its own exhibit list --- Defendant's Exhibit G.[6]

## 2) Records Generated By US Alliance in Its Regular Course of Business

18. Many of the documents included in Plaintiff's exhibit list are US Alliance's own business records. For the reasons stated below, Defendant's objection to these documents on the grounds of "relevancy and materiality" are without basis.[7]

   a) US Alliance Account Statements from Victor Conte's account: Plaintiff's Exhibit Numbers ("Pl. Ex. Nos.") 1-6 (Jan – July 1998); 10-12 (October-December 1998); and 740-742 (January – December 1995, January – December 1996, and January – December 1997).

19. The account statements from Victor Conte's US Alliance account are relevant to Mr. Conte's claims. They illustrate the type of relationship that existed Mr. Conte and US Alliance. This Court held in its most recent decision on the Motion for Summary Judgment that the relationship of US Alliance and Mr. Conte over time, and their ongoing conduct during their thirty year relationship, is relevant in determining whether they had a fiduciary relationship and whether US Alliance breached fiduciary duties owed to Mr. Conte. The parties' behavior over time, reflected in these documents, is therefore relevant here.

---

[6] Moreover, Defendant waived any objection to these DLJ Printouts. See note 1 supra.

[7] Moreover, Defendant waived any objection to these US Alliance documents. See note 2 supra.

20. Account statements from Victor Conte's US Alliance account after September 10, 1998 also illustrate transactions performed by Mr. Conte to mitigate his losses. Defendant has asserted all along that it was Mr. Conte's obligation to manage his account, and that Mr. Conte failed to mitigate his losses. These documents refute that assertion by illustrating efforts that Mr. Conte made to mitigate.

   b) <u>US Alliance Account Statements from Victor & Doris Conte's IRA accounts:</u>  Pl. Ex. Nos. 701-730 (IRA statements March 1995 –June 1998); 732-738 (July 1998 through December 1998).

21. These documents illustrate the extent to which Mr. Conte had other assets to pledge toward maintaining his loan to collateral ratio. These documents are also directly relevant to Mr. Conte's breach of fiduciary duty claim. As this Court held in its most recent decision on Defendant's Summary Judgment Motion, the relationship of US Alliance and Mr. Conte over time, and their ongoing conduct during their thirty-year relationship, is relevant in determining whether they had a fiduciary relationship and whether US Alliance breached fiduciary duties owed to Mr. Conte. Being that these documents illustrate and define the parties' ongoing relationship, they are relevant to matters directly at issue.

   c) <u>Infograms confirming trade executions:</u>   Pl. Ex. Nos. 19-22 (Jun 98); 71-73 (Jun 98); 95-96 (July 98), 109-115 (Jul 98); 155-156 (Aug 98); 163-165 (Aug 98); 212-219 (Sep 1, 98); 314A-314O (Oct 1, 98); 315A (Oct. 5, 1998); 317A-317C (Oct. 7, 1998), 318A (October 8, 1998); 384 (September 23, 1992); 386 (January 4, 1993); 388 (February 3, 1993); 394 (Feb. 18, 2000), and 398 (October 17, 2003).

22. Defendant has objected to these documents on the grounds of "relevancy and materiality". As indicated below, those objections are not warranted. These

infograms confirm trades that occurred in Mr. Conte's account. They illustrate that it was Mr. Conte's habit during his relationship with US Alliance to supervise and scrupulously maintain his loan to collateral ratio within US Alliance guidelines.

23.   Moreover, many of these infograms contain information confirming sales Mr. Conte made after September 10, 1998 in order to mitigate his losses. Defendant has asserted all along that it was Mr. Conte's obligation to manage his account, and that Mr. Conte failed to mitigate his losses. These documents illustrate that Mr. Conte did in fact manage his account and acted to mitigate his losses, and are thus relevant and material to this proceeding.

24.   Certain infograms in Plaintiff's exhibit list also pertain directly to Plaintiff's claims of breach of fiduciary duty and negligence. For example, many infograms contain evidence of what will be shown at trial as an ongoing pattern of errors and misinformation by US Alliance in its handling of Mr. Conte's account. For example, one such infogram (Ex. No. 394) provides notice to Mr. Conte that US Alliance charged Mr. Conte's account the incorrect rate of margin interest, while another infogram (Ex. No. 395) returned a title securing a 1970 loan in 2001.

25.   Other infograms define and illustrate US Alliance and Mr. Conte's relationship over time, and their ongoing conduct during their thirty-year relationship. As this Court held in its recent decision on Defendant's Summary Judgment motion, those matters are relevant and essential in determining whether US Alliance and Mr. Conte formed a fiduciary relationship, whether US Alliance breached fiduciary duties to Mr. Conte, and whether US Alliance was

negligent in its handling of Mr. Conte's account. By way of example, Pl. Ex. Nos. 384, 386, 388, and 398 contain a notice from US Alliance to Mr. Conte of an undersecured loan. The bottom portion of these documents define and provide various choices providing Mr. Conte with an opportunity to cure his undersecured loan. These documents, along with other documents that Plaintiff will use at trial, illustrate that during the parties' relationship US Alliance would provide Mr. Conte with notice and an opportunity to cure when his loan was undercollateralized.

d) Receipts

26. The receipts contained in Plaintiff's exhibit list serve several purposes. Some of the receipts contained in that list serve to illustrate that it was Mr. Conte's regular habit and practice to monitor his account, and to promptly cure any imbalance when his account was undersecured. For example, as illustrated by Pl. Ex. Nos. 390 and 391, Mr. Conte pledged real estate he owned as collateral to compensate for the shortfall caused by a sudden drop in the value of IBM shares he held in his account at the time. (See also, Ex. 387, 388, 389, relating to the drop in IBM's price). He pledged that real estate with the assistance of and upon advice given to him by US Alliance representatives.

27. Other receipts serve to illustrate and define the relationship between Mr. Conte and US Alliance and their ongoing conduct during that time. As this Court held in its recent decision on Defendant's Summary Judgment motion, those matters are relevant in determining whether US Alliance and Mr. Conte formed a fiduciary relationship, whether US Alliance breached fiduciary duties to Mr. Conte, and whether US Alliance was negligent in its handling of Mr. Conte's

account. By way of example, Pl. Ex. Nos. 396 and 397 serve to illustrate that US Alliance had in 2001 and 2003, as it had done before 1998, lent funds to Mr. Conte under the terms that any outstanding balance would be "callable on 7 days notice".

28.     Finally, other receipts included in Plaintiff's exhibit list illustrate Mr. Conte's efforts toward mitigation. (See, e.g., Pl. Ex. Nos. 294 [Sep. 17, 1998 confirmation of deposit of IBM stock to pay off loan], 350A and 393 [November 1998 confirmations of stock sales funds transfers to pay off loan]. Defendant has asserted all along that it was Mr. Conte's obligation to manage his account, and that Mr. Conte failed to mitigate his losses. These documents illustrate that such allegations are indeed untrue.

29.     Finally, other receipts (see e.g., Pl. Ex. No. 399) illustrate that it was Mr. Conte's regular habit and practice to act in good faith to pay his loans.

e) Letters:

30.     Plaintiff has objected to Pl. Ex. No. 387, a letter from IBM Federal Credit Union to Mr. Conte dated January 1993, which advised Mr. Conte of a drop in the price of IBM shares, which is the only stock that Mr. Conte held in his credit union account at the time. In response to this notice, Mr. Conte pledged as collateral real estate he owned at the time. As indicated in the section above titled "Receipts", evidence of this transaction illustrates that it was Mr. Conte's regular habit and practice to monitor his account, and take action in good faith when his account was undersecured. [See section above titled "receipts", Ex. Nos. 390,

391 therein.] Moreover, Pl. Ex. No. 389, a letter to Mr. Conte notifying him of the activation of his realty loan, is relevant for the same reasons.

f) <u>Credit Union Reports that US Alliance filed with the NCUA;</u>

31. Pursuant to the rules and regulations of the NCUA, US Alliance filed reports with the NCUA. Plaintiff has included two of those reports, dated December 2002 and December 2003 (Pl. Ex. Nos. 441 and 441A), in his exhibit list. Those reports contain evidence of US Alliance's financial condition and ability to pay damages, which are factors to be considered under New York Law when calculating punitive damages.

g) <u>Marketing Material:</u>

32. Plaintiff also included in his exhibit list marketing material that US Alliance made available to its members and/or provided to Mr. Conte. (<u>See</u> Pl. Ex. Nos. 412-424 ([1992-1997]; 425-427 [Jan-Mar 1998]; 428 [Sept 1998]; 429-440 [Dec 1998-Feb 2001]; 442 [Jan 2004]; 443-448 [Oct. 1990-Mar. 1998]. Those documents pertain to Mr. Conte's claims of breach of fiduciary duty and negligence. These documents illustrate, for example, the extent to which US Alliance marketed itself as a provider of brokerage and other services, the lack of separation between US Alliance's brokerage and banking functions, and serve as an example of the ways in which US Alliance tried to gain Mr. Conte's trust and allegiance. As illustrated by this Court's decision on Defendant's summary judgment motion, all of those matters are directly relevant to the issue of whether and in what manner a fiduciary relationship developed between the parties,

whether US Alliance breached its fiduciary duties to Plaintiff, and to what extent US Alliance was negligent in the handling of Mr. Conte's account.

h) <u>Documents Relating to Sales Made After September 10, 1998:</u>

33. Plaintiff also included in his exhibit list the following documents generated by US Alliance, all of which relate to sales that Mr. Conte made after September 10, 1998 in an effort to mitigate his losses:

   a. <u>Authorizations to Buy</u>; Pl. Ex. Nos. 456 472 529 532 540 573, 575 578 588 600, 602 615 640 644, 647 650 653];

   b. <u>Infograms re: purchases</u>: Pl. Ex. Nos. 457; 469; 473; 530; 533; 536; 538; 541, 542; 551; 574, 576; 579; 586; 589, 590, 591; 601, 603; 613; 616; 641; 645, 648; 651; 654;

   c. <u>Letters</u>: Pl. Ex. No. 458;

   d. <u>Receipts and notices reflecting stock split</u>: Pl. Ex. Nos. 458; 534; 604; 642; 646; 655;
   e. <u>Infograms reflecting sales to secure loans</u>: Pl. Ex. No. 459;

   f. <u>Infograms and Notifications (1099-B) re: stock sales</u>: Pl. Ex. Nos. 474; 531, 531A; 535 & 535A; 537 & 537A; 539 & 539A; 543, 543A, 543B, 544, 544A; 552; 577; 580; 587; 592; 605; 614; 617, 618; 621A; 643, 643A; 649, 649A; 652, 652A; 656, 656A;

i) <u>Execution Reports (a/k/a "order tickets")</u>: Pl. Ex. No. 507.

34. These documents are also relevant to Mr. Conte's claims of breach of fiduciary duty and negligence. For example, the credit union's execution reports, "Notifications of sale", and Infograms, illustrate US Alliance's continuing inability to provide Mr. Conte with timely, current information about this account. As was revealed during discovery, the process of a trade begins when a US Alliance employee completes and sends an execution report to its clearing broker. Once

the trade is completed, the clearing broker on Affina's behalf sends a "Notification of Sale" (1099-B) to US Alliance. Those "Notifications" contain no information about the account for which a trade was made. Therefore, in order for US Alliance to calculate what trades occurred in which of their members' accounts, and the extent to which any shortfall in collateralization was resolved through those trades, US Alliance representatives had to compare the execution reports, by hand, with the Notifications. Once the execution reports and Notifications were matched by hand, US Alliance then entered that trade information in its computer system, which then generated and sent to its members an "Infogram" confirming the completed trades.

### III. Documents that US Alliance Received from Victor Conte

a) <u>Canceled checks from Mr. Conte's Bank:</u> Pl. Ex. Nos. 154 and 208:

35. These checks are evidence of payments that Mr. Conte made in August, 1998 to maintain his loan to collateral ratio. These documents further illustrate that it was Mr. Conte's regular practice and habit to monitor and maintain the loan to collateral ratio within US Alliance's guidelines.

b) <u>Letter to US Alliance from Mr. Conte dated June 13, 2000 (account statements from September, October, November and December 1998 attached thereto):</u> Pl. Ex. No. 394A:

36. Mr. Conte sent a letter to US Alliance in order to inform US Alliance that its own account statements from October, November and December 1998 contained the incorrect amount of annual interest charged in Mr. Conte's account. Those statements reveal that US Alliance's system was set up so that

16

it could only communicate information about "year to date" interest charges up to $99,999. The system was not intended to handle and could not display year to date interest charges of $100,000 or more. Being that Mr. Conte's year to date interest figures exceeded $99,999 after the issuance of his September 1998 statement, US Alliance thereafter from October through December 1998 issued statements that communicated to Mr. Conte incorrect "year to date" interest figures. (For example, the account statement that US Alliance provided to Mr. Conte's incorrectly shows Mr. Conte's year to date interest charges as "$2,389.99", rather than correctly stating "$102,389.99".) These documents illustrate that it was not US Alliance's intent to handle an account of Mr. Conte's size and that it was incapable of competently doing so.

## IV. Documents Produced by Third Parties Pursuant to Subpoena

   a) <u>NASD / NCUA Documents produced by NASD pursuant to subpoena</u>: Pl. Ex. Nos. 657A, 657B, 658-662; 690-695;

37.    These documents are relevant to Mr. Conte's breach of fiduciary duty and negligence claims. They illustrate that prior to and during 1998 US Alliance violated NASD and NCUA rules and regulations by, among other things, failing to separate or distinguish itself from Affina in any manner, by conducting and controlling all brokerage services, and by failing to implement and enforce policies and procedures that the securities laws, rules and regulations require.

38.    These documents also illustrate that US Alliance and Affina shared "dual employees", that is, US Alliance officers and employees, also worked for and served Affina in various capacities. This Court held in its recent decision on

Defendant's Motion for Summary Judgment that where a bank acts beyond the usual debtor and creditor relationship and assumes a brokerage function, and shares "dual employees" with its brokerage affiliate, are all relevant proof that a fiduciary relationship developed between the bank and its customer, and that a breach of fiduciary duties and negligence occurred. Thus, these documents are relevant to this proceeding.

39. These documents are also relevant for other reasons. As illustrated by the accompanying Memorandum of Law, US Alliance's violations of the statutes, rules and regulations listed in these documents, can be used by the jury to conclude that US Alliance committed negligence *per se*, and can be used by the jury as evidence of negligence.

40. Plaintiff agreed by stipulation with the NCUA, to keep confidential and privileged the documents at issue concerning the NCUA's regulatory examinations of US Alliance / Affina (Plaintiff Ex. Nos. 690-695 for identification). (A copy of that Stipulation will be forwarded to Defenant's counsel for countersignature, and will be forwarded to the Court so it may be "so ordered", if and when the Court determines that Plaintiff may use these documents as evidence at trial). Plaintiff thus respectfully requests the Court's permission to file those documents under seal with the Court, without submitting those documents to the Clerk, so that the confidentiality of those documents may be preserved.

  b) <u>Information produced by Dorsa & Assoc, Inc.:</u>   Pl. Ex. Nos. 696-699:

41. These documents illustrate that US Alliance did not develop or implement policies and procedures required by applicable laws rules and regulations

18

governing the securities industry. New York Law permits a jury to conclude from a party's violation of applicable statutes that it committed negligence *per se*, and to use violations applicable regulations as evidence of negligence. These documents are thus relevant to Mr. Conte's claims of negligence and breach of fiduciary duty.

c) <u>SEC Uniform Application for BD Registration, Amended Form BDs</u>:
   Pl. Ex. Nos. 663-689.

42. These documents illustrate that it was indeed feasible for US Alliance and Affina to take precautionary measures to ensure they were in compliance with the statutes, rules and regulations governing the securities industry, and NCUA regulations, which the NASD and NCUA found they failed to comply with, as per the above NASD, NCUA reports.

Dated: July 2, 2004
       Ridgefield, Connecticut

_____
Eva M. Puorro (ct25772)