# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **VICTOR T. CONTE,** : | |
| : | |
| **Plaintiff,** : | **Civil Action No.** |
| **v.** : | **3:01 CV 463 (EBB)** |
| : | |
| **US ALLIANCE FEDERAL CREDIT UNION,** : | |
| **AFFINA BROKERAGE SERVICES, INC.,** : | |
| **ROBERT AMBROSE AND JOHN WALSH** : | **July 6, 2004** |
| : | |
| **Defendants** : | |

## JOINT PRETRIAL MEMORANDUM[1]

1.  <u>TRIAL COUNSEL</u>

For Plaintiff
Victor Conte

Elisabeth Seieroe Maurer, Esq. (ct11445)
Eva M. Puorro, Esq. (ct25772)
Law Offices of Elisabeth Seieroe Maurer, PC
871 Ethan Allen Highway, Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357
esmaurer@esmlaw.net
epuorro@esmlaw.net

For Defendant

Martin P. Unger, Esq. (ct22624)
Certilman Balin Adler & Hyman, LLP
90 Merrick Avenue
East Meadow, NY 11554
Phone (516) 296-7000
Fax (516) 296-7111
munger@certilmanbalin.com

---

[1] To the extent possible, jointly agreed upon portions of this memorandum are listed . Where the parties have not agreed to the contents of a particular section of this memorandum, each party's portion thereof is listed separately.

1

*Joint Pretrial Memorandum*

Steven J. Errante (ct04292)
Eric Smith, Esq. (ct 16141)
Lynch, Traub, Keefe and Errante, P.C.
52 Trumbull Street, P.O. Box 1612
New Haven, CT  06506-1612
Phone (203) 787-0275
Fax (203) 782-0278
serrante@ltke.com
esmith@ltke.com

2.    <u>JURISDICTION</u>

<u>Plaintiff Conte</u>:  This action is brought pursuant to 28 U.S.C. §1332 as there exists complete diversity of citizenship and the matter in controversy exceeds $75,000.00 as well as the principles of supplemental and pendant jurisdiction.

3.    <u>JURY/NON JURY</u>

<u>Plaintiff Conte</u>:  This case is to be tried before a jury.

4.    <u>NATURE OF CASE</u>

<u>Plaintiff Conte:</u>  This case alleges that Defendant US Alliance Federal Credit Union ("Defendant" or US Alliance") breached the fiduciary duty it owed to Plaintiff Victor Conte ("Plaintiff", "Mr. Conte"), and committed negligence in the handling and management of Mr. Conte's account.  Mr. Conte seeks to recover profit opportunities that he lost by reason of US Alliance's breach of the fiduciary duty it owed to Conte, any compensation, fees and expenses that Mr. Conte paid to US Alliance during the period

2

*Joint Pretrial Memorandum*

of US Alliance's wrongful conduct, and any profits or compensation that US Alliance obtained from Mr. Conte's accounts during that period. With respect to the negligence claim, Mr. Conte also seeks to recover damages that would restore him to the position that he would have been in had the negligence not occurred, which includes the sum of his actual loss and those losses he will sustain in the future as a result of such negligence.

Mr. Conte also seeks to recover punitive damages, attorneys' fees, court costs, pre and post trial interest, and such other and further relief as this Court finds just and proper.

Defendant US Alliance: USAlliance claims that it did nothing wrong, simply followed the terms of the Secured Loan Agreement it had with plaintiff, and that plaintiff is responsible for his own losses. USAlliance claims that it is a membership non-profit organization, that its responsibility is to its entire membership, that it accorded plaintiff as a member every consideration it could taking into account its obligations to the membership as a whole, and that plaintiff, disregarding the best interests of the other members, and hoping that the stock market would improve and thereby cure his undercollateralization, took no action, in breach of his agreement with, and obligations to, USAlliance.

3

*Joint Pretrial Memorandum*

5.    STIPULATIONS OF FACT AND LAW

    a.    Stipulations of Fact:

    1.    The plaintiff is a resident of the State of Connecticut and a member of US Alliance.

    2.    US Alliance is a federally regulated credit union that provides many different financial services.

    3.    Conte first joined the IBM Credit Union, which was a corporate predecessor of US Alliance, in 1970.

    4.    Since about 1970, plaintiff has taken advantage of multiple services of US Alliance, including loans, banking services and brokerage services.

    5.    Conte signed a Secured Loan Application on October 11, 1994.

    6.    Conte was aware that he could borrow up to 85% of the value of the assets in his portfolio that were on deposit at US Alliance.

    7.    Conte used the value of his assets on deposit at US Alliance to purchase securities, with the understanding that if he was undersecured he would have to make up the difference.

    8.    The loan receipts Conte received for the various loans he took out from 1984 until 2001 included the statement "Demand Loan – Outstanding Balance Callable on 7 Days' Notice".

    9.    All securities transactions made and authorized by Conte before September 9, 1998, were unsolicited, and no member of US Alliance or Affina encouraged plaintiff to buy or sell stock.

    10.    Conte kept track of the value of his securities portfolio on a regular basis, utilizing the automated dial-up telephone service provided by US Alliance to check portfolio account balances.

    11.    In 1993 Conte became undersecured due to a drop in the value of his IBM stock.

4

*Joint Pretrial Memorandum*

12.  On September 8, 1998, Conte received a courtesy call from David Brody, an employee of USAlliance's collections department, alerting him to the fact that he was undersecured in his loan account.

13.  On September 9, 1998 Conte and US Alliance did not communicate.

14.  On September 10, 1998 sales of securities held as collateral took place.

15.  Conte also on September 10, 1998 wired $50,000 to US Alliance to offset his under-collateralization, but did not order US Alliance to repurchase the stocks US Alliance had already sold.

16.  In fact, Conte informed US Alliance that he was going to sell some of the stocks anyway, but he wanted a say in which stocks were sold.

b.  Stipulations of Law:   Plaintiff Conte and Defendant US Alliance have not

entered into a Stipulation of Law.

6.    Plaintiff' Conte's Contentions

Mr. Conte alleges that Defendant US Alliance Federal Credit Union ("Defendant"

or US Alliance") breached the fiduciary duty it owed to Plaintiff Victor Conte ("Plaintiff",

"Mr. Conte"), and committed negligence in the handling and management of Mr. Conte's

account.

7.    Defendant US Alliance's Contentions

1.  USAlliance is a non-profit cooperative.

2.  Conte has been a member of USAlliance or its predecessors for approximately 30 years.

5

*Joint Pretrial Memorandum*

3.  Over those years, Conte borrowed money from USAlliance or its predecessors for, among other reasons, real estate and repaid those loans. Those loans were requested by Conte of USAlliance.

4.  USAlliance never solicited Conte to borrow money from it, either on a secured or unsecured basis.

5.  In 1998, Affina Brokerage Services, Inc. had only one customer, USAlliance.

6.  In 1998 and prior thereto Affina Brokerage Services, Inc. had no employees.

7.  Employees of USAlliance who had securities registrations with Affina Brokerage Services, Inc. did not "manage" securities transactions for members of USAlliance

8.  Rather all securities transactions by members of USAlliance (including Conte) through its brokerage services department were unsolicited. USAlliance employees merely performed the ministerial duty of conveying members' unsolicited orders to purchase or sell securities to Affina Brokerage Services, Inc.'s clearing firm for execution for the account of USAlliance.

9.  Conte opened a Secured Loan Revolving Credit Plan (the "Stock Secured Loan Account") at US Alliance in 1994

10. Conte executed the Secured Loan Application on October 11, 1994.

11. By so executing the Secured Loan Application Conte agreed to the terms of the Secured Loan Revolving Credit Plan and Disclosure Agreement on the reverse side thereof.

12. The Secured Loan Application signed by Conte includes the following relevant terms:

    Security Collateral: The value of your collateral, as determined by the Credit Union, must remain greater than the principal balance plus accrued finance charges you owe. Should the loanable value of your securities decline, the Credit Union may, at its sole option and without prior notice, transfer funds from another account or loan of yours to pay down your loan, or sell your collateral and apply the proceeds to

6

*Joint Pretrial Memorandum*

this and any other debts you may owe the Credit Union.

Stock Sales:  When necessary, Credit Union members can sell securities to repay an outstanding Credit Union loan, in whole or in part, in accordance with federal accounting procedures.

The Secured Loan Revolving Credit Plan and Disclosure Agreement provides, among other things,

**Security Interest:**  That to protect the Credit Union in the event of default, you grant to the Credit Union a security interest in any shares of Capital Stock or other stocks or bonds which have been endorsed, delivered and/or pledged to the Credit Union as collateral.  You also pledge and grant a security interest in and/or right of offset against all Credit Union account balances on which you are an account owner except qualified retirement accounts.

. . . . .

That in the event of default, the Credit Union may, at its sole option and without prior notice, transfer funds from another account or loan of yours and pay down your loans, or sell or transfer your collateral and apply the proceeds to this or any other debts you may owe the Credit Union.  If a balance still remains, you will be liable for it.  The Credit Union reserves all the rights and remedies of a secured party under the Uniform Commercial Code. (Emphasis supplied.)

13. It was Conte's view through September 10, 1998 that US Alliance would hold him to the terms of the Secured Loan Revolving Credit Plan and Disclosure Agreement marked as Defendant's Deposition Exhibit 7C.

14. In fact, Conte had no reason to believe that US Alliance would not hold him to the terms of his agreements with US Alliance.

15. Nobody at US Alliance ever advised Conte not to "worry about" the terms of the Secured Loan Revolving Credit Plan and Disclosure Agreement and that US Alliance would simply follow past practice.

16. The collateral Conte deposited in his Stock Secured Loan Account securing funds borrowed by Conte from US Alliance pursuant to the

7

*Joint Pretrial Memorandum*

Secured Loan Revolving Credit Plan and Disclosure Agreement Conte had entered into was deposited by Conte subject to the terms of such Agreement.

17. Conte understood that if his Stock Secured Loan Account was undersecured, he would have to make up the difference; and that if he was over 85% loan to value of collateral US Alliance could take immediate action, including selling the collateral to bring the loan back into balance.

18. From July 1, 1998 through September 11, 1998 Conte knew that he could borrow up to 85% of the value of the collateral he had deposited in his Stock Secured Loan Account.

19. To the extent Conte borrowed money in his Stock Secured Loan Account he was the borrower and US Alliance the lender.

20. Prior to his securities transactions at US Alliance, Conte maintained a securities account at Merrill Lynch where he bought and sold securities on margin.

21. Conte used the value of the collateral in his Stock Secured Loan Account to purchase securities as well as to borrow funds for personal reasons, such as the purchase of an automobile.

22. All securities transactions in Conte's Stock Secured Loan Account were unsolicited.

23. Conte did not maintain a margin account at US Alliance from October 1994 through September 11, 1998. In fact, USAlliance did not offer margin accounts. Rather, it offered Stock Secured Loan Accounts.

24. During the period July 1, 1998 through September 11, 1998 Conte knew that the collateral he had deposited in his Stock Secured Loan Account was marked to the market and/or valued daily.

25. All securities transactions in Conte's Stock Secured Loan Account were authorized by Conte.

26. During approximately the entire 30 years Conte was a member of USAlliance or its predecessors and through September 1998, nobody at US Alliance solicited or encouraged Conte (a) to purchase securities, (b) to sell securities, (c) to maintain a secured loan account, (d) to leverage such account or (e) to borrow money

8

from US Alliance, nor did Conte discuss with anyone at US Alliance as to what (f) security Conte was considering purchasing or selling or (g) Conte was using the borrowed funds for.

27.    Nobody at US Alliance ever told Conte not to "worry about" the terms of the Secured Loan Revolving Credit Plan and Disclosure Agreement and that US Alliance would simply follow past practice.

28.    From July 1, 1998 through September 11, 1998 Conte knew that he could borrow up to 85% of the value of the collateral.

29.    Conte understood that if his Stock Secured Loan Account was undersecured, he would have to make up the difference.

30.    From July 1998 through September 10, 1998 the stock market was very volatile.  This was the time of the Russian economic crisis and devaluation of the ruble as well as the time of the Monica Lewinsky affair.  It was anticipated that independent counsel, Kenneth W. Starr would issue his report to Congress regarding President Clinton's relationship with Monica Lewinsky shortly after September 9, 1998.

31.    September 7, 1998 was Labor Day.  The prior business day was Friday, September 4, 1998, and the next business day thereafter was Tuesday, September 8, 1998.

32.    During the period July 1, 1998 through September 11, 1998 Conte knew that US Alliance's calculation of the amount he had borrowed was based on settlement date.

33.    The US Alliance Form Cue-10 was available to the US Alliance Collections Department, Brokerage Services Department and executive officers on a daily basis through the US Alliance internal computer information system at least during the period from July 1, 1998 through September 16, 1998.

34.    As of the close of business on Friday, September 4, 1998, Conte had borrowed $2,663,484.06 from US Alliance in his Stock Secured Loan Account.

35.    As of the close of business on September 4, 1998, Conte's Stock Secured Loan Account was undersecured in the amount of $328,468.75.

36.    As of the close of business on Friday, September 4, 1998, Conte was in default in his Stock Secured Loan Account.

*Joint Pretrial Memorandum*

37.    During the period July 1, 1998 through September 11, 1998 Conte knew that US Alliance's calculation of the amount he had borrowed was based on settlement date.

38.    As of the open of business on September 8, 1998, Conte knew his Stock Secured Loan Account was undersecured and, therefore, that he was in default.

39.    As of the open of business on September 8, 1998 Conte's Stock Secured Loan Account was undersecured in the amount of $328,468.75 at 85% loan to collateral value and $53,142.95 at 95% loan to collateral value.

40.    During the period from September 1, 1998 through September 7, 1998 Conte knew that his Stock Secured Loan Account was at best fully leveraged and, as a result, that such account could become or was undersecured.

41.    On September 8, 1998 Conte received a "courtesy call" from David Brody of US Alliance collections department alerting him to the fact his account was undersecured.

42.    In a telephone conversation on September 8, 1998, David Brody of USAlliance Collection Department informed Conte he was undersecured and in default in his Stock Secured Loan Account and needed to immediately deposit at least $130,000 in additional collateral.

43.    Conte took no steps on September 8, 1998 to cure the default in his Stock Secured Loan Account.

44.    In fact, Conte was keeping track on a daily basis of the value of his securities portfolio against how much he could borrow in his Stock Secured Loan Account.

45.    Conte obtained prices on the securities in his Stock Secured Loan Account from his own sources several times a day.

46.    During the period September 8, 1998 through the opening of business on September 10, 1998 Conte knew that he had borrowed at least 85% of the value of the collateral he had deposited in his Stock Secured Loan Account.

10

*Joint Pretrial Memorandum*

47.  As of the close of business on September 9, 1998 Conte was in default in his Stock Secured Loan Account, which Conte already knew.

48.  As of the close of business on September 9, 1998 Conte had borrowed $2,663,484.06 from US Alliance in his Stock Secured Loan Account.

49.  As of the close of business on September 9, 1998 Conte's Stock Secured Loan Account was undersecured in the amount of $223,874.44.

50.  As of the close of business on September 9, 1998, Conte's Stock Secured Loan Account was approximately 100% undercollateralized i.e., Conte had little or no equity in the account or the account was above 100% loan to collateral value.

51.  Conte neither ordered purchases nor sales of securities nor added cash, securities or any other collateral as additional collateral in his Stock Secured Loan Account on either September 8 or September 9, 1998. In fact, on September 9, 1998 he had no contact with US Alliance at all.

52.  Conte took no steps to cure the short fall in collateral and default in his Stock Secured Loan Account on September 9, 1998.

53.  With knowledge that his Stock Secured Loan Account was undersecured on September 10, 1998, Conte contacted the USAlliance Brokerage Services Department in order to place an unsolicited order for yet another securities purchase, General Electric. This purchase, if affected, would entail still further borrowing from USAlliance. He did not call to place sell orders so as to cure the undercollateralization and default in his Stock Secured Loan Account.

54.  When Conte finally contacted US Alliance on September 10, 1998, he learned that orders to sell securities held as collateral in his Stock Secured Loan Account had been placed by US Alliance on September 10, 1998 and that certain of such securities had already been sold. Thereupon, belatedly, Conte took steps to try and cure the undercollateralization and defaults in his Stock Secured Loan Account.

55.  To accomplish this, US Alliance agreed at Conte's request to cancel liquidation orders that had been placed to sell securities in

11

his Stock Secured Loan Account and Conte thereafter placed orders for the sale of those securities he determined to sell. The securities held as collateral in Conte's Secured Loan Account sold on September 10, 1998 and September 11, 1998 were largely sold on Conte's express order. Only 13 securities were liquidated by USAlliance on trade date September 10, 1998.

56.    When Conte learned on September 10, 1998 that securities he had deposited as collateral in his Stock Secured Loan Account had been sold, he gave no order to repurchase them.

57.    Conte stated on September 10, 1998, regarding the securities he had deposited as collateral, that he wants "to sell today anyway."

58.    Conte stated on September 10, 1998 that, regarding the securities he had deposited as collateral, "I realize you had to sell."

59.    Conte stated on September 10, 1998 that, regarding the securities he had deposited as collateral, he was not "going to buy these stocks back at this price."

60.    Conte admitted on September 10, 1998 that the sales of securities held as collateral in his Stock Secured Loan Account which had been ordered sold by US Alliance on September 10, 1998 was due to a "mistake" Conte had made in borrowing close to the maximum permissible amount in his Stock Secured Loan Account.

61.    Conte stated on September 10, 1998 that he took no action to cure his default in the Stock Secured Loan Account because he was "waiting for an uptick."

62.    Upon learning on September 10, 1998 that USAlliance had taken action to cure the undercollateralization in his Stock Secured Loan Account, Conte told John Walsh in a telephone conversation that "he just wants(s) to have a say as to what to sell, what not to sell."

63.    By the time on September 10, 1998 that Conte began placing orders for the sale of securities to cure the undercollateralization the only securities Conte owned that he did not want to sell that had been liquidated were: Microsoft, Sun, Cisco, Dell and GE.

64.    Conte realized a long term profit of over $200,000 as a result of the sales of these securities.

12

65.    As of the close of business on September 10, 1998 Conte was in default in his Stock Secured Loan Account.

66.    As of the close of business on September 10, 1998 Conte had borrowed $2,663,484.06 from US Alliance in his Stock Secured Loan Account.

67.    As of the close of business on September 10, 1998 Conte's Stock Secured Loan Account was undersecured in the amount of $268,887.71.

68.    As of the close of business on September 11, 1998 Conte had borrowed $2,616,809.09 from US Alliance in his Stock Secured Loan Account.

69.    As of the close of business on September 11, 1998 Conte's Stock Secured Loan Account was undersecured in the amount of $145,412.61.

70.    As of the close of business on September 11, 1998 Conte was in default in his Stock Secured Loan Account.

71.    Conte admitted on September 11, 1998 that he "realized you [US Alliance] had to sell."

72.    Conte admitted on September 11, 1998 that although the securities sold by US Alliance from the collateral held in the Stock Secured Loan Account were sold at the intra-day low, that was his "concern" and not that of US Alliance.

73.    The amount Conte borrowed in his Stock Secured Loan Account as of the close of business on September 15, 1998, i.e., settlement date, was close to the maximum amount available for borrowing based on the value of the collateral Conte had deposited in his Stock Secured Loan Account.

74.    As of the close of business on September 15, 1998, i.e., the date of settlement of the securities transactions executed on September 10, 1998 in issue, Conte had borrowed $1,208,487.67 from USAlliance in his Stock Secured Loan Account.

75.    As of the close of business on September 16, 1998 i.e., the date of settlement of the securities transactions executed on September 11, 1998 in issue, Conte had borrowed $1,140,668.57 from US Alliance in his Stock Secured Loan Account.

13

*Joint Pretrial Memorandum*

76.    The vast majority of the orders placed by US Alliance on September 10, 1998 to sell securities held as collateral in Conte's Stock Secured Loan Account were entered as stop orders that is, orders to sell below the current market.  This was done in an attempt by US Alliance to avoid liquidating transactions unless the stock market continued to drop.  A stop order means that if the market did not continue to drop in those securities, sales would not occur.

77.    From July 1, 1998 through September 16, 1998 Conte did not have a mortgage or other realty line of credit at US Alliance.

78.    Conte could not reactivate his home equity loan because he had already sold the properties which secured such loan.

79.    The only real estate Conte owned in September 1998 was his principal residence.

80.    In September 1998, Conte took no action to mortgage or to refinance the existing mortgage on his principal residence.

81.    From September 1, 1998 through September 11, 1998 Conte made no effort to withdraw funds from his IRA account maintained at US Alliance.

82.    From September 1, 1998 through September 11, 1998 Conte made no effort to withdraw funds from his Money Max accounts maintained at USAlliance.

83.     From September 1, 1998 through September 10, 1998 Conte made no effort to deposit additional collateral in his Stock Secured Loan Account

7.  Legal Issues

    a.    Plaintiff Conte's Legal Issues:

    1.  Was US Alliance a fiduciary of Mr. Conte?

    2.  What fiduciary duties did US Alliance owe to Mr. Conte?

14

*Joint Pretrial Memorandum*

    3. Did US Alliance breach a fiduciary duty to Mr. Conte?

    4. Did Mr. Conte suffer damages as a result of such breach?

    5. Was there a reasonably foreseeable danger of injury to Mr. Conte?

    6. Was US Alliance's conduct unreasonable in proportion to that danger?

    7. Was such conduct the proximate result of any damages?

  b.   **Defendant US Alliance's Legal Issues:**

    1.   Whether this Court has subject matter jurisdiction over this action.

    2.   Whether Conte's claimed damages were inflated to meet the jurisdictional minimum.

    3.   Whether Conte's understanding, absent any acts or advice by US Alliance to Conte, that the language "Demand Loan - Outstanding Balance Callable on Seven Days' Notice" is material and relevant in this action.

    4.   Whether Conte's understanding, without any action or advice by US Alliance to Conte, that the language "Demand Loan - Outstanding Balance Callable on Seven Days' Notice" gives rise to fiduciary duties by US Alliance to Conte is material and relevant in this action.

    5.   Whether it is a matter of law as to whether there exists a fiduciary duty by USAlliance to Conte under the facts and circumstances presented here.

    6.   Whether there is an issue for the trier of facts as to whether there exists a fiduciary duty by USAlliance to Conte under the undisputed facts and circumstances presented here.

    7.   Whether there is an issue for the trier of facts as to whether there exists a fiduciary duty by USAlliance to Conte under the facts and circumstances presented here.

    8.   Whether Conte's thirty (30) years as a member of US Alliance and his business dealings in connection therewith give rise to fiduciary duties by US Alliance to Conte.

15

*Joint Pretrial Memorandum*

9.  Whether the occurrences concerning the one other occasion in 1993 when Conte's Stock Secured Loan Account became undercollateralized, and the resolution thereof, is admissible to alter the express terms of the Secured Loan Application and Secured Loan Revolving Credit Plan and Disclosure Agreement.

10. Whether a broker-dealer and its registered representatives in the ordinary course of business owe a fiduciary duty to a purchaser of securities.

11. Whether in an arms-length commercial transaction a relationship of confidence or trust sufficient to give rise to a fiduciary relationship arises absent special circumstances.

12. Whether the receipt by Conte of various documents from US Alliance stating "Demand Loan - Outstanding Balance Callable on Seven Days' Notice" gives rise to a duty by US Alliance to provide Conte with seven (7) days notice that Conte's Stock Secured Loan Account was undercollateralized and that sufficient securities would be sold to bring the account into compliance with the terms of the Stock Secured Loan Agreement between Conte and US Alliance.

13. Whether Conte's assumption, without any current action or act by USAlliance, that USAlliance would act regarding the undercollateralization at bar as it had in 1993 is admissible evidence.

14. Whether under the facts of this case a principal-agent relationship existed between Conte and US Alliance.

15. Whether the "Outstanding Balance" in the context of the Stock Secured Loan Agreement between Conte and US Alliance was "called" by US Alliance.

16. Whether upon learning on September 10, 1998 which securities held as collateral had been sold by US Alliance, Conte had the obligation to mitigate any legal damage as a result thereof by repurchasing those securities.

17. Whether the amount of capital gains taxes paid by Conte as a result of liquidating sales of securities from Conte's Stock Secured Loan Account at US Alliance constitutes recoverable damage.

18. If the amount of capital gains taxes paid is recoverable damage, whether such amount must be offset by long term losses resulting from

sales of securities from Conte's Stock Secured Loan Account at USAlliance at September 10 and September 11, 1998.

19. If the amount of capital gains taxes paid is recoverable damage, whether such amount must first be reduced by the profits received by Conte on the sales of securities on which such taxes have been paid or, in the alternative, whether Conte may keep the entire profit on the sales of such securities and still recover the full amount of capital gains tax which he paid as a result of USAlliance's sale of securities sufficient to establish sufficient collateral pursuant to the Stock Secured Loan Agreement.

20. Whether in the circumstances here Conte can recover as compensable damage interest paid on his Stock Secured Loan Account.

21. Whether in the circumstances here Conte can recover the amount of commissions paid on purchases and sales of securities in his Stock Secured Loan Account.

22. Whether in the circumstances here legal fees are compensable damage.

23. Whether under the facts and circumstances here, punitive damages may be awarded.

24. What is a "forced" sale of securities.

25. Whether under the circumstances here, sales of securities by Conte constitute a "forced sale" of securities.

26. Whether Conte can recover damages based on securities sales ordered by Conte on September 10, 1998 and September 11, 1998.

27. Whether Conte failed to mitigate his damages.

28. Whether Conte breached the Stock Secured Loan Agreement by failing to keep the value of collateral in his Stock Secured Loan Account as required.

29. Whether in light of the Stock Secured Loan Agreement US Alliance was obligated to advise Conte that he needed to deposit additional collateral.

*Joint Pretrial Memorandum*

30. Whether in light of the Stock Secured Loan Agreement US Alliance was obligated to give Conte notice prior to selling collateral to cure an undercollateralization in Conte's Stock Secured Loan Account.

31. Whether USAlliance was entitled to protect its interests whenever Conte's Stock Secured Loan became undercollateralized and liquidate securities in Conte's Stock Secured Loan Account without prior notice to Conte.

32. Whether USAlliance as lender had a fiduciary obligation to Conte as Borrower respecting Conte's Stock Secured Loan Account at USAlliance.

9. Voir Dire Questions

a. Plaintiff Conte's Proposed Voir Dire Questions:

1. Your full name, spell your last name.

2. Your age.

3. City of residence for the last five years (not your address). If New Haven, please identify area of the city.

4. Marital status. (married, divorced, widowed).

5. Whether you have children (number, ages).

6. Education (level of school, degrees).

7. Military service, if any (branch, years of service, rank, duties, type of discharge if any).

8. Your employment for the last five years (employer and job description).

9. Employment for the last five years of persons living with you:

   a. Spouse
   b. Children
   c. Parents
   d. Roommates

18

*Joint Pretrial Memorandum*

      e.  Others

10.    Outside interests and hobbies:  favorite TV and radio shows, newspapers, magazines.

11.    Whether you have served on a jury before; when and what kind of case; whether a verdict was reached (do not disclose what the verdict was).

12.    Do you know any of the attorneys involved in this case?

      a.  Elisabeth Maurer
      b.  Eva Puorro
      c.  Martin Unger
      d.  Eric Smith
      e.  Hugh Keefe
      f.  Andrew Zeitlin
      g.  Frederick S. Gold
      h.  S. Peter Sachner
      i.  Jacqueline D. Bucar
      j.  Steven Errante

13.    Do you know the judge presiding over this case?

14.    Do you know any of the following witnesses that have been proposed to give testimony in this case:

      a.  Victor Conte
      b.  Darren Conte
      c.  Charles Porten
      d.  Robert Ambrose
      e.  John Walsh
      f.  John Petrie
      g.  David Brody
      h.  Al Menard
      i.  Barry Moseley
      j.  James Rothenberg
      k.  Peter Boyd

15.    Have you or a close friend, or a member of your immediate family been a party to or a witness in a civil lawsuit, arbitration, administrative action, regulatory action or criminal case (other than

routine traffic case)?  If so, specify the type of proceeding(s), date(s), and nature of your (their) involvement (plaintiff, defendant, witness, crime victim, etc.), and the outcome.

16.    Have you or a close friend or member of your immediate family ever worked in the financial or securities industry?  If so, please specify when such employment occurred, who was employed in the financial or securities industry.

17.    Have you or a close friend or member of your immediate family ever been convicted of any crime (not including minor traffic offenses)?  If so, please specify such conviction(s) occurred, and the nature of any such conviction.

18.    Do you hold any philosophical or religious beliefs that would prevent you from sitting in judgment of another person or company?

19.    Have you or a close friend or member of your immediate family ever held a securities account?  If so, please identify whether any of the following occurred and describe the outcome of each situation:  (1) complained to the securities firm or any of its employees about the manner in which your securities account was handled; (2) received a margin call; (3) assets in account were liquidated due to a "margin call"

20.    Have any of your close friends or members of your immediate family ever worked for a bank?  If so, was that bank office involved to any degree either itself or through an affiliate in that same office, with the selling of securities, insurance or any other financial products?

21.    Have you ever purchased any securities, or any other financial products, from a bank? If so, please describe when, what was purchased and for how long you engaged in such transactions.

22.    Is there anything about this case, the identity or status of parties, or anything else you've seen or heard today that would impair your ability to be fair and impartial juror?

b.    <u>Defendant US Alliance's Proposed Voir Dire Questions:</u>

_Joint Pretrial Memorandum_

1.    The plaintiff in this case is Victor T. Conte.  Do any of your know Mr. Conte.

2.    The plaintiff in this case is represented by Elisabeth Seieroe Maurer, Esq. and Eva M. Puorro of the Law Offices of Elisabeth Seieroe Maurer, PC.  Have you ever had any relationship with that law firm.  Have you ever heard of that firm.  Do any of you know Ms. Maurer.  Do any of you know Ms. Puorro.

3.    Defendant USAlliance Credit Union is represented by Martin P. Unger, Esq. and Robert Connolly, Esq. of the law firm of Certilman Balin Adler & Hyman, LLP and Eric P. Smith, Esq. and Steven J. Errante, Esq. of the law firm of Lynch, Traub, Keefe & Errante, P.C. Have you ever had any relationship with either law firm.  Have you ever heard of those firms.  Do any of you know Mr. Unger.  Do any of you know Mr. Connolly.  Do any of know Mr. Smith.  Do any of you know Mr. Errante.

4.    This case will involve the testimony of several witnesses.  Please tell me if you know or think you know any of the following persons: Robert Ambrose, John Walsh, David Brody, Barry Mosley, John Petrie, Charles Porten and James Rothenberg.

5.    Are you employed.  If so, who are you employed by and what kind of work do you do.

6.    Do you have any hobbies.  If so, what are they.

7.    Are you married.

8.    Do you own your own home.  If so, do you have a mortgage or a home equity loan.

9.    Are you familiar with non-profit organizations such as charities.  If so, which ones.

10.   Do you know what a non-profit organization is.

11.   Are you or is any member of your immediate family (including parents, children, spouse, ex-spouse, siblings and first cousins) a member of a credit union.

12.   If so, what credit union.

21

13.    Have you or has any member of your immediate family ever used the services or loan facilities of a credit union.

14.    If so, what services or loan facilities were used.

15.    If so, did you experience any problems with such services or loan facilities.

16.    Are you familiar with USAlliance Federal Credit Union.

17.    If so, how did you become familiar with it.

18.    Have you or has any member of your immediate family had any problem or complaint with a credit union or bank.

19.    If so, what was the problem or complaint.

20.    Have you or has any member of your immediate family ever borrowed money from a bank or credit union.

21.    If so, did you have any problems in connection with the loan.

22.    Have you or has any member of your immediate family had a judgment entered for non-payment of a debt.

23.    If so, what were the circumstances.

24.    Do you have any feeling or belief that in a bank (lender)-customer (borrower) relationship the customer is always right.

25.    Have you or has any member of your immediate family ever maintained a securities account at a broker-dealer or stock brokerage firm.

26.    If so, was the account a margin account.

27.    If so, did you or any member of your immediate family receive margin calls.

28.    If so, were the margin calls satisfied.

29.    Do you know what a margin account is.

30.    Were any securities from any securities account that you or any member of your immediate family maintained at a broker-dealer or a stock brokerage firm ever sold without your consent.

22

31.    If so, what were the circumstances.

32.    Have you or any member of your immediate family ever had any problems with a broker-dealer or a stock brokerage firm.

33.    If so, please describe the problems.

34.    Have you or has any member of your immediately family ever had any problems with a stock broker.

35.    If so, please describe the problems.

36.    Do any of you have any member of your immediate family in the securities business.  If yes, please detail.

37.    Do any of you have a relative in the banking or credit union business.  If yes, please detail.

38.    Have you or has any member of your immediate family been a party in any litigation or arbitration.

39.    If so, please describe what the situation was about and what the result was.

40.    Have any of you been a party to or a witness in a lawsuit involving a claim of breach of fiduciary duty or negligence. If yes, please provide the details.

41.    Have you ever served on a jury before.

42.    If so, what kind of case.

43.    What was the result.

44.    Do any of you have any beliefs or feelings about a bank or credit union that lends money that would influence your ability to decide the case solely on the evidence you will hear during trial.

45.    Do you have any view as to whether the terms of agreements should be followed by the parties, that is, that parties should live up to their agreements.

46.    If so, what is your view.

47.    Do you think that because a corporation may have greater assets than the plaintiff, that it would be okay to have the corporation pay

the plaintiff something even though it did nothing wrong – simply because it has greater assets.

48.   Do you believe people must be bound by the contracts which they sign.

49.   Do you think a person can avoid his obligation under a contract by simply stating he believes the contract meant something else, assuming there is no basis for his interpretation, understanding, or belief.

10.   List of Witnesses

a.   Plaintiff Conte's Witnesses:

1.   Victor Conte:   will testify about his relationship with US Alliance, and matters at issue regarding the mishandling of his US Alliance account, and the damages he suffered as a result thereof.

2.   Darren Conte:  will testify as to the creation of the demonstrative aides and PowerPoint presentations to be used by Mr. Conte at trial.

3.   Charles Porten:  Mr. Porten will present expert testimony regarding whether US Alliancce conformed to accepted customs and practices in the financial services industry.

4.   Robert Ambrose;  will testify about matters relating to the handling and management of Mr. Conte's account at US Alliance, Mr. Conte's relationship with US Alliance.

24

5. <u>John Walsh</u>:  will testify about matters relating to the handling and management of Mr. Conte's account at US Alliance, Mr. Conte's relationship with US Alliance.

6. <u>John Petrie</u>:  will testify about matters relating to the handling and management of Mr. Conte's account at US Alliance, Mr. Conte's relationship with US Alliance.

7. <u>Al Menard</u>:   will testify about matters relating to the handling and management of Mr. Conte's account at US Alliance, Mr. Conte's relationship with US Alliance.

8. <u>Barry Moseley</u>:  will testify about matters relating to the handling and management of Mr. Conte's account at US Alliance, Mr. Conte's relationship with US Alliance.

9. <u>Peter Boyd</u>:  will testify as to the creation of demonstrative aides to be used by Mr. Conte at trial

Mr. Conte reserves the right to call any witness listed by Defendant, and to call additional witnesses for purposes of rebuttal and/or impeachment.

b. <u>Defendant US Alliance's Witnesses</u>:

1.    ROBERT AMBROSE, Sr. Vice President of Member Support USAlliance Federal Credit Union

25

*Joint Pretrial Memorandum*

600 Midland Avenue

Rye, NY 10580-3999

Mr. Ambrose is expected to testify as to what a federal credit union is, USAlliance loan procedures, and books and records including electronic records maintained at USAlliance, reports available to USAlliance personnel, as well as his actions concerning liquidation orders in Conte's Stock Secured Loan Account.

Mr. Ambrose will also identify various USAlliance personnel and testify as to conversations with Conte including a meeting between Conte, John Walsh, and Mr. Ambrose later in September 1998.

2    JOHN WALSH,

Affina Brokerage Services, LLC

600 Midland Avenue

Rye, NY 10580-3999

In 1998 he was the manager of the Brokerage Services Department of USAlliance.  Since November of 2000 is the chief operating officer of Affina Brokerage Services, LLC, a wholly owned subsidiary of USAlliance.

Mr. Walsh is expected to testify concerning the services provided by his Department and its procedures, information regarding customer accounts available to the Brokerage Services Department, and the relationship between USAlliance and Affina.

Mr. Walsh will also testify regarding personnel employed in the Brokerage Services Department of USAlliance and their job  duties as well as his conversations with Conte on September 10 and September 11, 1998 and thereafter.

3.    DAVID BRODY

USAlliance Federal Credit Union

600 Midland Avenue

26

Rye, NY 10580-3999

Between 1992 and the first half of 2000, Mr. Brody was in the Collection Department of USAlliance. Since that time Mr. Brody has been in the Consumer Loan Department of USAlliance. Mr. Brody is expected to testify concerning his job responsibilities, information regarding stock secured loan accounts available to him in 1998, and his conversation with Conte on September 8, 1998.

4.     BARRY MOSELEY

USAlliance Federal Credit Union

600 Midland Avenue

Rye, NY 10580-3999

Mr. Moseley was employed in the Brokerage Services Department at USAlliance in 1998 and was also a registered person at Affina Brokerage Services, Inc. in 1998.

Mr. Moseley is expected to testify as to information available to him regarding stock secured loans and other loans at USAlliance, his job description, methods by which customers placed orders for purchase or sale of securities and his conversation with Conte, particularly on September 10 and September 11, 1998.

5.     JAMES L. ROTHENBERG, Esq.

380 Madison Avenue, 21st Fl.

New York, NY 10017

Mr. Rothenberg is expected to testify as an expert witness concerning the definition of certain securities terms, custom and practice concerning the valuation of accounts collateralized by securities, any obligations to contact the borrower prior to liquidation and custom and practice regarding the determination of the order in which securities are to be liquidated in a situation in which an account is undercollateralized.

6.     VICTOR T. CONTE

Mr. Conte will identify his voice and the voices of others on the various tape recordings.

27

*Joint Pretrial Memorandum*

7.    Defendant reserves the right to call any witness listed by Plaintiff.

8.    Defendant reserves the right to call additional witnesses for purposes of rebuttal and/or impeachment.

11.   Exhibits

Plaintiff Conte's Proposed Exhibits:  **EXHIBIT "A"** ATTACHED HERETO

contains Plaintiff Conte's List of Proposed Exhibits.

**DEFENDANT'S OBJECTIONS TO EXHIBITS DESIGNATED BY PLAINTIFF IN HIS EXHIBIT LIST (REVISED) DATED JUNE 23, 2004 (EXCEPT AS TO RELEVANCE)**

Defendant objects to exhibits numbers 80-94, 97-108, 116-153, 157-162, 166-207, 209-211, 220-234, 266-269, 275, 275A, 276, 280-281, 287-289, 291-312 on the grounds that the information contained therein is hearsay, except that defendant will permit the introduction of such documents solely for the purpose of showing how plaintiff maintained his portfolio, the dates on such documents, and the handwriting thereon.

Defendant US Alliance's Proposed Exhibits [2]

*** = exhibits to which no party objects on authenticity grounds

**** = exhibits to which no party objects on authenticity or admissibility grounds

**** A.    Form of authorization to purchase and sell securities executed by Conte, dated December 19, 1996.

---

[2] Defendant US Alliance's exact description of its proposed exhibits is included. However, use of Defendant's exact description shall not be construed that that Plaintiff agrees or admits that Defendant's description is complete or accurate. Plaintiff's objections to admissibility and authenticity of Defendant's proposed exhibits are noted immediately below each exhibit description.

28