I. Standard for Judgment as A Matter of Law

The Second Circuit applies the following standards for a post-trial Rule 50(b) motion for judgment as a matter of law:

> The moving party bears a heavy burden to prevail on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). Such an application is appropriately granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998). The Court may not arrive at this determination by evaluating the credibility of witnesses or the relative weight of the evidence. Rather, in assessing a motion for judgment under Rule 50, the Court must view the evidence in the light most favorable to the non-movant. See Caruolo v. John Crane, Inc., 226 F.3d 46, 51 (2d Cir. 2000). To grant a Rule 50(b) application, there must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of mere surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it]." Concerned Area Residents for the Environment v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994) (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992) (citations omitted)). Moreover, arguments not raised in a preceding Rule 50(a) application are not properly preserved for review in a subsequent Rule 50(b) motion. See Holmes v. United States, 85 F.3d 956, 963 (2d Cir. 1996) ("The issue was not mentioned in the ... Rule 50(a) motion. ... We therefore have no occasion to rule on this ... claim."); Cruz v. Local Union No. 3, 34 F.3d 1148, 1155 (2d Cir. 1994) ("If an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice." (citations omitted; internal quotations omitted)).

Am. Nat'l Fire Ins. Co. v. Mirasco, Inc., 2004 U.S. Dist. LEXIS 8803, * 4-6 (S.D.N.Y., 2004), citing TVT Records v. Island Def Jam Music Group, 279 F. Supp. 2d 366, 375 (S.D.N.Y. 2003).

A court may grant judgment as a matter of law "only where the evidence, viewed in the light most favorable to the non-moving party, could lead a reasonable juror to reach 'but one conclusion, in favor of [the moving] party.'" Vukel v. Osborn Communs. Corp., 1999 U.S. Dist. LEXIS 7995, *5-6 (S.D.N.Y., 1999) citing Pan American World Airways, Inc. v. Port Auth., 995 F.2d 5, 8 (2d

Cir. 1993) (internal quotation and citation omitted). When deciding a motion for judgment as a matter of law, a court "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Vukel, 1999 U.S. Dist. LEXIS at *5-6 (S.D.N.Y., 1999) citing Samuels v. Air Transport Local 504, 992 F.2d 12, 16 (2d Cir. 1993).

Moreover,

> [a] district court may not grant a motion for a judgment as a matter of law unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.' Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (internal quotation marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.' Piesco, 12 F.3d at 343.

This Is Me v. Taylor, 157 F.2d 139, 142 (2d Cir., 1998).

As indicated below, an ample evidentiary basis for the jury's finding of US Alliance's negligence in this case has been presented by Plaintiff Victor Conte. The weight of the evidence, when viewed in a light most favorable to Plaintiff, illustrates that US Alliance has failed to satisfy its burden to prove that there was a complete absence of evidence supporting the jury's finding of negligence, that the jury's finding of negligence could only have been the result of mere surmise and conjecture, or that there was such an overwhelming amount of evidence in US Alliance's favor that reasonable and fair minded jurors could not arrive at a verdict against it. See citations to Am. Nat'l Fire Ins. Co., 2004 U.S. Dist. LEXIS 8803, * 4-6 (S.D.N.Y., 2004), supra.

II. Expert Testimony Was Not Necessary For the Jury To Decide Plaintiff's Negligence Claim

Defendant US Alliance bases its motion for judgment as a matter of law on the lack of expert testimony in this case. Specifically, US Alliance alleges that judgment as a matter of law should be granted in its favor because expert testimony is mandatory in order for the jurors to "understand the specific duties and responsibilities" of US Alliance to Mr. Conte in this case, whether US Alliance acted, or failed to act, in accordance with those duties and responsibilities, and what damages are specifically attributable to such negligent acts or omissions. See US Alliance's Memorandum in Support of its Motion for Judgment As A Matter of Law ("Def. Mem"), pp. 1-2.

US Alliance attempts to convince the Court that expert testimony was required in this case, and that the jury was incapable of reaching its negligence verdict, based on its claim that the jury did not have sufficient basis with which to judge "the adequacy" of US Alliance's "professional [1] services" to Mr. Conte.

As the standards cited below illustrate, the legal authorities cited by US Alliance in support of its assertion that expert testimony was absolutely required here are inapposite because they involve claims of "professional" malpractice by doctors and lawyers, and, in one case, issues within the "complex and highly specialized setting of trust indentures, high corporate finance and bankruptcy law", all of which are generally considered to be impossible for a jury to consider

[1] Contrary to what US Alliance asserts, Plaintiff at no time admitted or agreed that such "professional" standards are applicable here.

without expert testimony. See, the following cases cited by US Alliance in its brief: Milano v. Freed, 64 F.3d 91 (2d Cir., 1995) (*medical malpractice case in which the Court granted a radiologist's motion for a judgment as a matter of law because the Plaintiff failed to present evidence of the standard of conduct applicable to the radiologist*), Greene v. Payne, Wood & Littlejohn, 197 A.D.2d 664, 602 N.Y.S.2d 883 (2d Dep't 1993) (*involved the issue of whether a lawyer committed legal malpractice by failing to plead a pendent State claim at the time he instituted a Federal suit on his client's behalf*); Drab v. Baum, 114 A.D.2d 992, 495 N.Y.S.2d 684 (2d Dep't. 1985) (*legal malpractice case involving the issue of whether the attorney should have included his client's "contingent contractual liability" to the State of New York Higher Education Services Corporation as a creditor in a bankruptcy filing, which required the jury to analyze whether the lawyer's omission was based on a correct assessment of the law as enunciated by the courts at that time, and to analyze whether a motion for summary judgment in favor of State of New York Higher Education Services Corporation would have been defeated*); and LNC Investments v. First Fidelity, 2000 U.S. Dist. LEXIS 10271, at *8-9 (S.D.N.Y., 2000) (*in which the jury had to decide highly technical legal questions involving analysis of "complex and highly specialized setting of trust indentures, high corporate finance and bankruptcy law, that is, "what are the prospects that an earlier motion would have resulted in the bankruptcy court giving Plaintiffs some measure of economic relief…", matters that "clearly require the assistance of expert witnesses to understand the standard of conduct the Defendant bank' officers owed to Plaintiffs*").

The cases cited by US Alliance are as a matter of New York law, completely inapplicable here and do not even remotely present the same circumstances found in this case.

Rule 702 of the Federal Rule of Evidence sets the following standard regarding the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

USCS Fed Rules Evid R 702.

Expert testimony is not considered necessary to a case and, accordingly, its absence will not be considered fatal to a jury's verdict, if "all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation in respect of the subject under investigation." Palazzetti Import/Export, Inc. v. Morson, 2001 U.S. Dist. LEXIS 9538 (S.D.N.Y., 2001), citing United States v. Castillo, 924 F.2d 1227 (2d Cir. 1991) and Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962)(quotation omitted)). Accord: Food Pageant, Inc. v. Consolidated Edison Co., 54 N.Y.2d 167, 173 (1981).

As the New York Court of Appeals has indicated, even if it may be assumed that a particular case involves issues of great scientific or technical

complexity that require expert testimony as to the applicable standard of care, if it nonetheless appears that the jury could determine a claim such as negligence based on the evidence before it, the absence of expert testimony will not be considered fatal to the jury's finding of liability:

> [E]ven assuming that the scientific or technical complexity of certain cases may necessitate the introduction of expert testimony relating to the appropriate standard of care, the alleged failure to introduce such testimony in this case is not fatal because there was ample evidence upon which the jury could have based its determination of gross negligence unaided by the guidance of expert testimony concerning the appropriate standard of behavior. Thus, by analogy, although expert testimony is ordinarily called for in medical malpractice actions, "**when common sense and ordinary experience suggest that the condition [for which suit is brought] is incompatible with skillful or successful treatment", expert testimony may not be necessary (1 NY PJI2d 393) and, indeed, where the facts can be placed before a jury, and they are of such a nature that jurors generally are just as competent to form opinions in reference to them, then there is no occasion to resort to expert or opinion evidence**.

Food Pageant, Inc., 54 N.Y.2d at 173 (emphasis added).

New York Courts use well-settled standards to distinguish between cases involving negligence from those involving medical or "professional" malpractice:

> It is well settled [in New York] that conduct may be deemed malpractice, rather than negligence when it 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician' (Scott v. Uljanov, 74 N.Y.2d 673, 674-75, 543 N.Y.S.2d 369, 541 N.E.2d 398, quoting, Bleiler v. Bodnar, 65 N.Y.2d 65, 72, 489 N.Y.S.2d 885, 479 N.E.2d 230). 'The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts' ( Smith v. Pasquarella, 201 A.D.2d 782, 783, 607 N.Y.S.2d 489, quoting, Miller v. Albany Med. Ctr. Hosp., 95 A.D.2d 977, 978, 464 N.Y.S.2d 297).

Staveley v. St. Charles Hosp., 173 F.R.D. 49, 52 (S.D.N.Y., 1997) citing Barresi v. State, 232 A.D.2d 962, 649 N.Y.S.2d 207, 209 (3d Dep't 1996); and Gilinsky v. Indelicato, 894 F. Supp. 86, 94 (E.D.N.Y. 1995). In a case meeting the definition of medical malpractice or "professional malpractice", the Plaintiff "must prove that

the defendant failed to act in conformity with accepted professional standards prevailing at the place and time the services were rendered". See Kidder Peabody & Co., Inc. v. IAG International, 14 F. Supp.2d 391, 404 (S.D.N.Y., 1998). Expert testimony is required in those cases because the jury's assessment "depend[s] upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence" of a juror. See Kulak v. Nationwide Mutual Insurance Company, 40 N.Y.2d 140 (1976). See also Kidder Peabody & Co., Inc. v. IAG International, 14 F. Supp.2d 391, 404 (S.D.N.Y., 1998), citing Sitts v. US, 811 F.2d 736, 739-41 (2d Cir., 1987) (*stating that a medical malpractice plaintiff "cannot get his case to a jury in the absence of expert opinion testimony that the defendant violated those professional standards" because issues presented by medical malpractice action would "quite obviously not [be]. . . within the realm of competence of a law jury" (construing New York Law*); McDermott v. Manhattan Eye, Ear & Throat Hosp., 15 N.Y.2d 20, 255 N.Y.S.2d 65, 68 (1960) and Barry v. Liddle, O'Connor, Finkelstein & Robinson, 1997 U.S. Dist. LEXIS 18820 (S.D.N.Y. 1997)). In contrast, expert testimony is not required in negligence cases because "the alleged negligent act may be readily determined by the trier of the facts based on common knowledge". Coursen v. New York Hospital-Cornell Medical Center, 114 A.D.2d 254, 256, 499 N.Y.S.2d 52, 54 (1st Dep't, 1986).

In determining whether a claim is that of "professional" malpractice under N.Y. C.P.L.R. §§214-a and 214(6) (which are the type of claims involved in all but one of the cases cited in US Alliance's brief) New York Courts very strictly limit

their definition of a "professional" to 1) doctors; (2) lawyers; (3) accountants; (4) architects; and (5) engineers, refusing to expand that definition to other groups that that also claim to be "professionals". See, Chase Scientific Research, Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 29-30 (2001) (*declining to expand the definition of "professionals" to insurance agents or brokers*), Raymond Santiago v. 1370 Broadway Associates, L.P., 96 N.Y. 2d 765 (2001) (*"it is clear that defendant insurance brokers and agents are not professionals and, thus, that claims against them do not sound in professional malpractice", citing Chase Scientific Research, supra);* Castle Oil v. Thompson Pension Employee Plans, 299 A.D.2d 513, 750 N.Y.S.2d 629 (2d Dep't, 2002) (*holding that actuaries are not "professionals" under N.Y. C.P.L.R. 214(6), citing Chase Scientific Research, supra);* The Manes Organization v. Meadowbrook-Richman, Inc., 2 A.D.3d 292, 770 N.Y.S.2d 27 (1st Dep't 2003) (*holding that insurance brokers and insurance adjusters are not "professionals" under N.Y. C.P.L.R. 214(6), citing Chase Scientific Research, supra);* Beghardt v. Allspect, 96 F. Supp.2d 331 (S.D.N.Y., 2000) (*applying New York law, holding that home inspectors are not "professionals" under N.Y. C.P.L.R. 214(6))*. As the New York Court of Appeals discussion below illustrates, under New York Law, the definition of a "professional" cannot be expanded beyond 1) doctors; (2) lawyers; (3) accountants; (4) architects; and (5) engineers because do to so would be contrary to the Legislature's intent in defining "professional" malpractice:

> "Professional" is a term in wide usage, commonly understood to have several meanings. For example, it denotes a measure of quality, as in professional dry cleaners; a distinction from trade or businesspeople, and from amateur status, as in professional golfers; a lifework as opposed to pastime, as in professional musicians. Often there are study, licensure and continuing skills requirements, as

for barbers, electricians and real estate brokers. **Thus, neither common parlance nor licensure can determine the meaning of "professional," for surely the Legislature did not have such a vast, amorphous category of service providers in mind when it amended CPLR 214 (6)** (Alexander, 1999 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C:214 [6], 2001 Cum Pocket Part, at 214 **["The Legislature presumably sought to confer the protections of CPLR 214 (6) on a relatively small group of defendants. Otherwise, it would have shortened the six-year breach of contract period to three years for all contracts for services."]).**

Nor does the law defining "professional" for other purposes necessarily resolve the statute of limitations issue before us (see, e.g., People ex rel. Fullam v Kelly, 255 NY 396 [music a profession, not a trade, under zoning resolution]; People ex rel. Tower v State Tax Commn., 282 NY 407 [customhouse broker not a professional for purposes of unincorporated business tax exclusion]; Business Corporation Law § 1501; Education Law, tit VIII, art 130 ["The Professions"]). An abbreviated statute of limitations bars claims of allegedly injured parties, and should therefore reflect the Legislature's intent that the particular defendant groups receive such a benefit. In Karasek v LaJoie (92 NY2d 171), for example, we refused, absent legislative clarification, to include licensed psychologists within the category of "medical" services subject to the truncated limitations period of CPLR 214-a (see also, McCarthy v Volkswagen of Am., 55 NY2d 543, 548-549 [expansion of toll could "greatly and perhaps inappropriately expand the class of persons able to assert the toll ... The expansion of the statute in the manner asserted by plaintiff therefore might best be reserved for legislative attention"]).

The term "professional" is also commonly understood to refer to the learned professions, exemplified by law and medicine, which have particular relevance to the history of CPLR 214 (6). The two- and three-year malpractice statutes of limitation, after all, began with doctors, enlarged soon after to encompass attorneys and accountants. In 1996, when CPLR 214 (6) was before the Legislature for amendment, the report of the New York State Bar Association referred specifically to those categories in speaking of professional malpractice: "an architect, engineer, lawyer or accountant" (Legis Rep No. 76-B of NY State Bar Assn, Bill Jacket, L 1996, ch 623, at 13-14).

The qualities shared by such groups guide us in defining the term "professional." In particular, those qualities include extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards (see, Matter of Freeman, 34 NY2d 1, 7-8; see also, BDO Seidman v Hirshberg, 93 NY2d 382, 389-390; Port Auth. v Evergreen Intl. Aviation, 179 Misc 2d 674). Additionally, a professional relationship is one of trust and confidence, carrying with it a duty to counsel and advise clients (see, Murphy v Kuhn, 90 NY2d 266, 270; Kimmell v Schaefer, 89 NY2d 257, 263).

**This definition, we believe, implements the Legislature's intention to benefit a discrete group of persons** affected by the concerns that motivated the shortened statute of limitations (see, Alexander, 2000 Supp Practice

> Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C:214 [6], 2001 Cum Pocket Part, at 211). **We are mindful as well that our definition ideally should establish a bright line, so that, absent legislative clarification, it can be fairly and uniformly applied. Moreover, with the rise of large numbers of skilled "semi-professions"** (see, Polelle, supra, 33 USF L Rev, at 205), **any broader definition would, for the future, make it hard to draw meaningful distinctions and the groups covered by CPLR 214 (6) would quickly proliferate**.

Chase Scientific Research, Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 29-30 (2001) (emphasis added).

It is against these standards that New York Courts have held that claims that qualify as involving medical malpractice under N.Y. C.P.L.R. §214-a or non-medical "professional" malpractice under N.Y. C.P.L.R. §214(6) will require expert testimony.

It is clear that US Alliance's acts at issue here do not qualify as a matter of law as "professional" services. The authorities cited by US Alliance in support of its assertion that expert testimony was absolutely required here are inapposite because all but one involve claims of legal and medical malpractice.

The one other case cited by US Alliance in its brief in support of its motion for judgment as a matter of law, LNC Investments v. First Fidelity, 2000 U.S. Dist. LEXIS 10271 (S.D.N.Y., 2000) is also inapplicable here. First of all, the LNC Investments case was decided before the Chase Scientific Research case, cited above, in which the New York Court of Appeals held that the definition of "professional malpractice" would not, and cannot, be expanded beyond the five categories of professionals cited therein. The LNC Investments case is distinguishable also because not only did it not analyze New York law on what was considered a "professional" for the purpose of defining professional

malpractice, but the jury in that case had to consider issues that were impossible to analyze without expert testimony, involving actions of the Defendant bank's officers [2] in the context of the Trust Indenture Act of 1939, in their capacities as trustees in a bankruptcy action. This case involved analysis of the "complex and highly specialized setting of trust indentures, high corporate finance and bankruptcy law" that "clearly require the assistance of expert witnesses to testify about "whether the [Bankruptcy] Trustees' failure to make an earlier lift stay / adequate protection motion caused Plaintiffs economic harm", and "what are the prospects that an earlier motion would have resulted in the bankruptcy court giving Plaintiffs some measure of economic relief…". Id. at 9-10. The jurors were clearly not competent to answer such highly technical legal questions on their own. Id. Thus, the Court held expert testimony on those matters was admissible and necessary.

In contrast, Plaintiff's negligence claim does not involve or invoke "professional" standards; it involved a determination of simple negligence, based on roles and responsibilities defined in a contract, the legal effect of which was defined by the jury instructions.

As illustrated in the section below, the jury was well within its ability, based on its own common sense, to review the documentary and testimonial evidence

[2] It is quite ironic but nonetheless not surprising that US Alliance has completely changed its position about the relevance of "banking" practices to this case, to suit its needs now. In a complete "about face", US Alliance now asserts that a case involving the conduct of bank officers [LNC Investments] is relevant and supports its claim that expert testimony was required in this case. When Plaintiff attempted to present expert testimony of Charles Porten, US Alliance objected on the grounds that Mr. Porten had experience in banking, claiming in open Court that such banking experience has no relevance here.

presented at trial to determine whether US Alliance's conduct breached its duty of care to Mr. Conte.

III. The Jury's Verdict Was Consistent With the Weight of the Evidence Presented

In rendering its verdict, the jury had to decide whether US Alliance was negligent in the manner it handled Mr. Conte's account and liquidated the securities therein to cover a loan that it claims was in "default". As indicated below, the jury was well within its ability to determine whether negligence occurred by analyzing the standards of conduct contained in those agreements, and considering the other evidence before it. Moreover, the jury's decision that US Alliance was indeed negligent was supported by the significant evidence it heard about the manner in which US Alliance breached its duty to Mr. Conte by, inter alia, failing to give notice or time to cure.

The jury heard often contrasting testimony from Mr. Conte and US Alliance representatives, as to "what happened" between them, and who said what to whom, at or near the time that Mr. Conte's account was liquidated on September 10, 1998. Essential to the jury's determination of negligence was the parties' duties and responsibilities as defined in a document alleged to be a contract between US Alliance and Mr. Conte, which was titled "Secured Loan Application" and "Secured Loan Revolving Credit Plan and Disclosure Agreement" (all of which shall hereinafter be referred to herein as the "Secured Loan Agreement") [Plaintiff's Trial Exhibit 392]. The Secured Loan Agreement,

for example, contained provisions granting US Alliance a security interest in the securities that Mr. Conte held in his securities account at the credit union, which in turn made those securities collateral for the loan at issue. The Secured Loan Agreement also contained definitions of the parties' duties and responsibilities before and upon "default", and defined when a loan was considered to be in "default". It provided, for example, that upon "default" US Alliance would be able to sell the securities in Mr. Conte's account that were as per the terms of that agreement, being used as collateral for the loan at issue. It also provided an agreement that "the Credit Union's responsibility for your collateral in its possession…to use reasonable care for the custody and preservation of your collateral".

As US Alliance acknowledges in its own agreement (see the Secured Loan Agreement above), a 'secured party' like US Alliance "must use reasonable care in the custody and preservation of collateral in his possession". N.Y. UCC §9-207. When collateral such as securities are placed into the secured party's possession, that duty "is not limited solely to the physical preservation of same" but "extend to the exercise of such care as a reasonably prudent pledgee would exercise under like circumstances to protect and preserve the validity and value of the securities. This is the rule at common law and also under the Uniform Commercial Code". Grace v. Sterling, Grace & Co., 30 A.D. 2d 61, 64, 289 N.Y.S.2d 632, 638 (1968).

New York law permits the parties in a pledgor-pledgee relationship like the one between Mr. Conte and US Alliance, to by agreement "determine the

standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable". N.Y. U.C.C. §1-102. Such an agreement may not relieve a defendant from "the burden of exercising due care in maintaining the pledged assets" as required under New York law, but it "sets the standards by which such due care is to be measured". Brodheim v. Chase Manhattan Bank, 75 Misc.2d 285, 288 (Sup. Ct., N.Y. Co., 1973).

Thus, a party's disposition or sale of collateral before "default" has occurred, or alternatively, upon "default", in a manner not permitted by the terms of the agreement between them, is considered a breach of the pledgee's non-waivable duty to use reasonable care in the custody and preservation of collateral in his possession. N.Y. UCC §9-207. See Grace, 30 A.D.2d at 64, 289 N.Y.S.2d at 638 and Bank of China v. Chan, 937 F.2d 780, 783-4 (2d Cir. 1990) (*both of which discuss pledgee's non-waivable duty to use reasonable care for custody and preservation of collateral, which includes duty to preserve value of collateral, before and after contractually defined "default" occurs, and that such a duty is violated through unlawful, unauthorized disposition or sale of collateral*). The pledgee is liable for any loss caused by the failure to use such care. See N.Y. U.C.C. §§9-207(1), 9-207(3). See also, Grace, 30 A.D.2d at 64, 289 N.Y.S.2d at 638 and Bank of China, 937 F.2d at 783-4 (2d Cir. 1990).

The jury had ample evidence before it to competently and thoroughly consider and decide Plaintiff's negligence claim. As indicated above, US Alliance chose to provide Mr. Conte with contractually defined procedures and standards of care which governed their relationship, from which its conduct could be

measured. Questions of interpretation of an alleged contract are matters solely for the jury to decide, while the question of the legal effect of that alleged contract is a matter solely for the judge to decide. In neither issue is expert testimony permitted. Marx & Co. v. Marx & Co., Inc. v. The Diner's Club, Inc., 550 F.2d 505, 510 (2d Cir., 1976) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge".)[3]

The jury was therefore, well within its ability and authorized as a matter of law, based on its own common knowledge and experience to consider the evidence and apply the legal standards provided to it by the Court in determining whether US Alliance was negligent. The jury was well within its ability, and role as jurors, to read and interpret the standards of conduct defined in the Secured Loan Agreement between the parties, to determine the credibility of testimony it heard concerning that agreement and the parties' conduct, to determine whether the standards of "reasonable" conduct defined in that agreement was violated, and to determine whether Mr. Conte experienced any damages as a result of the conduct testified to. Neither specialized "banking" knowledge nor "professional" expert testimony is required to determine whether US Alliance acted in a reasonably prudent manner or failed to exercise "due care" with respect to Mr. Conte. See, generally, Coursen v. New York Hospital-Cornell Medial Center,

[3] In Marx & Co., Inc., the Court held that it was improper to allow an expert's testimony on the meaning of the contract between the parties and what Defendant 'should have' done pursuant to the terms of that contract, which were central issues in that case. See, Marx & Co., Inc., 550 F.2d at 510-511. The Second Circuit held that the those issues were respectively for the Court, and the jury, to decide, and were not the proper subject for expert testimony. Id.

114 A.D.2d 254 (1st Dep't 1986) (*holding that expert testimony was not required in a case alleging negligence against hospital employees).*

The jury was presented with a significant amount of evidence about the manner in which US Alliance and Mr. Conte's relationship developed, and the acts and omissions of US Allliance that breached its duty of care to Mr. Conte. By way of example only, the jury heard evidence of how US Alliance failed to inform Mr. Conte properly of what it considered to be a "default" occurring in Mr. Conte's account. The jury also heard a significant amount of testimony about how US Alliance liquidated Mr. Conte's account, rather than giving Mr. Conte fair notice and an opportunity to cure any problems occurring with respect to his account's collateral. The jury heard also significant evidence of how US Alliance's actions caused Mr. Conte's financial damages. These matters are just a sampling of the significant amount of evidence that the jury was presented with on Mr. Conte's negligence claim.

The jury was thus completely capable as a matter of law to determine the claims it had before it, without expert testimony. Its verdict of negligence was consistent with the evidence before it.

**CONCLUSION**

For the reasons stated above and in his prior pleadings and during any hearings before the Court, Plaintiff Victor Conte respectfully submits that Defendant US Alliance's Motion for Judgment As A Matter of Law should be denied in its entirety.

PLAINTIFF
VICTOR T. CONTE
/s
BY: ______________________________

Elisabeth Seieroe Maurer (ct11445)
Eva M. Puorro (ct25772)
Law Offices of Elisabeth Seieroe Maurer, PC
871 Ethan Allen Hwy., Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357
e-mail: esmaurer@esmlaw.net