UNITED STATE DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------x

VICTOR T. CONTE,                                :

          Plaintiff,                            :        **NOTICE OF CROSS APPEAL**

                                                :

     v.                                         :

USALLIANCE FEDERAL CREDIT                       :        No. 3:01-CV-463 (EBB)
UNION, et al,                                   :

          Defendants.                           :        DECEMBER 6, 2007

-------------------------------------------------x

      Pursuant to F.R.A.P. 4(a)(1), USAlliance Federal Credit Union, defendant in the above-captioned case, hereby gives notice and appeals to the United States Court of Appeals for the Second Circuit from the following:

    (a) jury verdict and judgment in favor of plaintiff Victor T. Conte as against defendant USAlliance Federal Credit Union, filed August 2, 2004;

    (b) the order dated November 7, 2007 and filed November 8, 2007 denying defendant USAlliance Federal Credit Union's renewed motion for judgment as a matter of law (copy attached).

THE DEFENDANT,
USAlliance Federal Credit Union

By: _____

Eric P. Smith, Esq.
Fed. Bar No. Ct 16141
Lynch, Traub, Keefer & Errante, P.C.
52 Trumbull Street
New Haven, CT 06506-1612
(203) 787-0275
(203) 782-0278 (fax)
ESmith@ltke.com

*-and-*

Martin P. Unger, Esq. (PHV)
Certilman Balin Adler & Hyman, LLP
90 Merrick Avenue, 9th Floor
East Meadow, NY 11554

## CERTIFICATION

I certify that a copy of the above was mailed on December 6, 2007 to all counsel and *pro se* parties of record as follows:

Elisabeth S. Maurer, Esq.
871 Ethan Allen Highway, Suite 202
Ridgefield, CT 06877-2811
(203) 438-1388
(203) 431-0357 (facsimile)

Eric P. Smith, Esq.

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------X
VICTOR CONTE,                 :
                              :
        Plaintiff,            :
                              :
        v.                    :
                              :     No. 3:01-CV-463 (EBB)
USALLIANCE FEDERAL CREDIT     :
UNION, et al                  :
                              :
        Defendants.           :
------------------------------X
```

RULING ON DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF
LAW [DOC. NO. 161]

### INTRODUCTION

After a trial in this case, the jury found that defendant USAlliance Federal Credit Union [hereinafter "USAlliance"] had acted negligently when it liquidated stock that plaintiff Victor Conte [hereinafter "Conte"] had pledged as collateral for a loan. The jury awarded Conte $11,997.75 in compensatory damages. USAlliance now renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  For the following reasons, the motion is DENIED.

FACTUAL BACKGROUND

Plaintiff Conte maintained a "stock secured loan account" at defendant USAlliance, a not-for-profit, member-owned credit union. The purpose of the loan account was to allow Conte to borrow funds to buy and sell stock through defendant Affina Brokerage Services, a wholly owned subsidiary of USAlliance.  Purchases and sales of

1

stock were made through the brokerage services on Conte's own initiative and according to his directions. As security for his loans from the account, Conte pledged stock he owned as collateral. Under the terms of his agreement with USAlliance, Conte could borrow up to 85% of the value of the collateral he had pledged. The agreement provided that, in the event Conte's account became secured below this level, USAlliance "may, at its sole option and without prior notice, transfer funds from another account ... to pay down the loan, or sell [Conte's] collateral and apply the proceeds" to his debt.

In September 1998, Conte became undersecured and USAlliance began to liquidate his portfolio. In a series of communications that took place from September 8 to September 11 between Conte and various USAlliance officials, Conte unsuccessfully sought control over which stocks USAlliance sold. Eventually, Conte took steps to cure his undercollateralization and USAlliance agreed to stop selling the securities in his account. However, at this point, USAlliance had already sold off some of the stocks that Conte wished to keep.

At trial, Conte claimed that USAlliance had violated its fiduciary duty to him and that it acted negligently when it began to liquidate all of his collateral in order to resolve his undercollateralization. The jury found that USAlliance did not owe Conte a fiduciary duty, but found for Conte on the negligence

count. The jury found that Conte was 85% contributorily negligent and that the USAlliance was 15% contributorily negligent. The jury apportioned damages accordingly, awarding Conte $11,997.75 in compensatory damages.

In support of his claims at trial, Conte offered his own testimony about his dealings with USAlliance prior to the events of September 1998. He testified that, on another occasion, in late 1992, he became undercollateralized and that he had received a number of written notices and then a phone call from USAlliance. (Trial transcript from July 22, 2004 [hereinafter "Tr. 7/22/04"] at 41-51.) On that occasion he had been given an opportunity to pledge real property he owned as collateral in order to bring his security-to-loan ratio back into compliance with the agreement. (Id. at 44-60.) USAlliance officials worked with him over a period of more than three months to resolve the situation. (Id. at 55.) Conte believed that he would receive similar notice and an opportunity to resolve the situation in the future should he again become undersecured. (Id. at 56-57.) Language on the loan receipts sent by USAlliance that said "demand loan callable on 7 days notice" also apparently led Conte to believe that he would receive notice if he became undersecured. (Id. at 57-63.)

On September 8, 1998, Conte received a courtesy call from USAlliance informing him that he was undersecured. (Tr. 7/23/04 at 33.) Beginning around June of 1998 Conte had been selling stock

3

and depositing money with USAlliance in order to keep his security-to-loan ratio below the required 85% level. (Id. at 15– 30.) He became undersecured a number of times during that period but USAlliance took no action. (Id.) Conte testified that during the September 8th call he offered to pledge equity in his home and had discussed using other assets as collateral. (Id. 35-37.) Remembering that it had taken months to resolve his undercollateralization in 1993, Conte assumed that the call was not intended to alert him to an urgent matter. (Id. 39.) Conte calculated that, on the morning of September 10th, he had borrowed approximately 93% of his collateral. (Id. at 65.) Conte had sufficient assets to bring his security-to-loan ratio within the required margin, and he would have taken action to do so if he had understood the urgency of the situation. (Id. at 43.)

When Conte called USAlliance on the morning of September 10th to place orders to sell certain stocks in order to begin to remedy his undercollateralization, he was informed that USAlliance had began to liquidate his entire portfolio. (Id. at 71.) During this call, and a frantic series of calls that followed it later that day, USAlliance officials did not allow Conte to decide which stocks to sell or to have any control over which assets he would use to pay down his deficiency. (Id. at 73-74.) Adding to Conte's confusion was the fact that USAlliance officials were unhelpful in informing him of what stocks had already been sold and the fact

4

Case 3:01-cv-00463-EBB    Document 182    Filed 11/08/2007    Page 5 of 14

that the dial-up service Conte used to manage his account did not provide information about the extent to which he was undersecured. (Id. at 25, 74-75, 98, 100.) It was not until September 11th that USAlliance agreed to stop selling stock and work with Conte to resolve the situation.    (Id. at 108-12.)    At this point, Conte claimed, USAlliance had already sold some stocks that he wished to keep, thus causing him to be injured.

No expert testimony was presented regarding the standard of care for professionals in the financial services sector.    During the trial, Conte attempted to call a witness who would offer an expert opinion about whether USAlliance's actions conformed to accepted industry customs and practices.    However, this witness did not qualify as a an expert and, consequently, did not testify.

DISCUSSION

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).    Because a judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored.    The Second Circuit has emphasized that, in ruling on such a motion, a court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor

from the evidence." Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001) (citing Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir.1998)); see also Luciano v. Olsten Corp., 110 F.3d 210, 214-15 (2d Cir. 1997); EEOC v. Ethan Allen, Inc., 44 F.3d 116, 119 (2d Cir. 1994). The Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Tolbert, 242 F.3d at 70 (quoting Smith, 861 F.2d at 367). A jury verdict should be set aside only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 79 (2d Cir. 2006) (internal citations omitted).

The defendant argues that the Court should grant its motion for judgment as a matter of law because, it claims, no testimony was presented from which the jury could have determined whether the defendant violated its duty of care. The defendant argues that, in order to establish negligence, it was necessary for Conte to prove that it failed to act in accordance with the "specific duties and responsibilities required of banking officers." (Def.'s Mem. at 1-2.) The defendant contends that, as a matter of law, only expert testimony would be sufficient to prove that the officials at

USAlliance departed from their required standard of care as banking officers. (Id.)

In this diversity action, the question of whether or not expert testimony is required to prove negligence is a question of New York State law. Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 27 (1st Cir. 2006) ("In a diversity action, whether expert testimony is required is a matter of state law") (citing Hochen v. Bobst Group, Inc., 290 F.3d 446, 451 (1st Cir. 2002)); see also Dia v. Conrad, No. 85 Civ. 1471, 1988 WL 96020 (S.D.N.Y. September 6, 1988) (holding that, under New York law, "plaintiff must present expert medical testimony on the issues of negligence and causation unless a lay jury is competent to evaluate the alleged malpractice").

New York courts have held that expert testimony is often necessary to prove malpractice by a medical professional. E.g., Gibson v. D'Amico, 470 N.Y.S.2d 739 (N.Y. App. Div. 1983) (holding that, in the absence of expert opinion regarding the standard of care in the medical professional community, plaintiff had failed to make out a prima facie case of malpractice); Milano v. Freed, 64 F.3d 91 (2d Cir. 1995) (citing cases requiring expert testimony to establish medical malpractice). However, expert testimony regarding the standard of care is not necessary in every medical malpractice case. "Ordinarily, expert medical opinion evidence ... is required, when the subject-matter to be inquired about is

7

presumed not to be within common knowledge, ... to furnish the basis for a determination by a jury of unskillful practice and medical treatment by physicians; but where the matters are within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill, the opinion of experts is unnecessary." Meiselman v. Crown Heights Hosp., 34 N.E.2d 367, 370 (N.Y. 1941); see also Fiore v. Galang, 478 N.E.2d 188, 189 (N.Y. 1985) (noting that "except as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate merit"); Hammer v. Rosen, 7 N.Y.2d 376, 380 (1960) (holding that expert opinion is not necessary to prove assaultive conduct in a malpractice case); McKinney v. Bellevue Hosp., 584 N.Y.S.2d 538, 539-40 (N.Y. App. Div. 1992).

New York courts have similarly held that expert opinion is generally necessary to evaluate the standard of care owed by other kinds of professionals, except where the jury is otherwise competent to evaluate whether the defendant has deviated from the standard of care. A plaintiff must present expert testimony to support a professional malpractice claim against an architect "except where the alleged act of malpractice falls within the competence of a lay jury to evaluate." 530 East 89 Corp. v. Unger, 373 N.E.2d 276, 277 (N.Y. 1977); see also Tirella v. Am. Properties

8

Team, Inc., 535 N.Y.S.2d 252, 255 (N.Y. App. Div. 1988). Experts may be necessary to establish professional malpractice claims against accountants. Gertler v. Sol Masch & Co., 835 N.Y.S.2d 178 (N.Y. App. Div. 2007). Similarly, a court has held that expert testimony regarding the requisite standard of care is necessary in a malpractice claim against an engineer. 470 Owners Corp. v. Heimer, 685 N.Y.S.2d 747 (N.Y. App Div. 1999). A claim of malpractice against an attorney requires expert testimony regarding the standard of care unless "the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of the professional service ... or the attorney's conduct falls below any standard of due care." Greene v. Payne, 602 N.Y.S.2d 883, 885 (N.Y. App. Div. 1993) (citations omitted).

USAlliance argues that the plaintiff sought to establish liability according to principles of "professional negligence," and that expert testimony is therefore required to establish liability. (Def.'s Reply Mem. at 2.) USAlliance points out that the jury was instructed that

> Someone who has special training and experience in a trade or profession has a duty, while acting in that capacity, to exercise the skill and degree of care that others in the same trade or profession in the community exercise under the same circumstances. In other words, you must consider whether US Alliance agents failed to exercise the skill and degree of care that others in their field ordinarily would exercise in similar circumstances.

(Id.) In addition, USAlliance attaches great significance to the

9

fact that the complaint alleges that USAlliance breached its "duty of reasonable care and to behave in a *commercially reasonable manner.*" (See Complaint ¶¶ 47-48 (emphasis added).) USAlliance argues that its motion for judgment as a matter of law should be granted because the jury had no basis upon which to determine what "skill and degree of care" was required of agents of USAlliance or to determine whether their behavior was "commercially reasonable." (Def.'s Reply Mem. at 2-3.)

USAlliance relies on LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 2000 WL 1024717 (S.D.N.Y. July 25, 2000), a banking malpractice case in which the court required expert testimony to prove that the defendant had departed from the standard of care for professional bankers. Citing cases requiring expert testimony to prove professional malpractice in other contexts, the court in LNC reasoned that

> [t]his is a case of alleged banking malpractice, where the participants conducted themselves within the complex and specialized setting of trust indentures, high corporate finance, and bankruptcy law. A lay jury will clearly require the assistance of expert witnesses to understand the standard of conduct the Defendant banks' officers owed to Plaintiffs [and] whether the officers failed to meet that standard ...

Id. at *3. LNC is distinguishable from the present case. In finding that USAlliance officials were negligent, the jury did not need to consider any similarly complex issues with which a layperson would be unfamiliar.

USAlliance makes too much of the distinction between ordinary

10

negligence and what it refers to as "professional negligence."
(Id. at 3.)  Not every case alleging negligence on the part of a
professional in the performance of his or her professional duties
requires expert testimony.  As noted above, even in medical and
legal malpractice cases, expert testimony is not required where the
jury is competent to evaluate the alleged breach of the defendant's
duty of care without the assistance of an expert.  "That defendants
are professionals does not automatically make plaintiffs' tort
claim one sounding in professional malpractice, for an action
against a professional sounds in simple negligence when neither
specialized knowledge nor expert testimony is necessary to
determine whether due care was exercised."  Kohl v. Green, 651
N.Y.S.2d 744, 745 (N.Y. App. Div. 1997) (holding that the "jury did
not need either specialized knowledge or an expert opinion to
determine whether [defendant building inspectors] breached their
duty to exercise reasonable care when they reported the roof in
excellent condition despite the existence of readily observable
indications of a substantial leak").  The fact that jurors were
instructed to consider what degree of skill and care should be
exercised by someone with the professional qualifications of the
agents of USAlliance does not change the rule that, in some cases,
a jury can find that a professional defendant has been negligent
without considering the standard of care in the professional
community.

11

The jury heard testimony about the inconsistent manner with which USAlliance transacted business with Conte on the various occasions when he became undersecured. The jury also heard testimony about how Conte's first communications with USAlliance on September 8, 1998 apparently reassured him that his undercollateralization was not cause for immediate alarm. The jurors' ordinary experience "provide[d] sufficient basis for judging the adequacy of the professional service" offered by USAlliance on these occasions. See Greene, 602 N.Y.S.2d at 885. Taking Conte's testimony to the true, the jurors might have concluded that USAlliance's misleading communications with Conte and its apparently arbitrary decision to liquidate Conte's entire portfolio despite the fact that he was only slightly undersecured fell "below any standard of due care," regardless of what is required of professional bankers or credit union officials. Id.

This was not a case in which the jury was required to evaluate USAlliance's conduct against the standard of due care generally owed by bankers to pledgee's of collateral in Conte's position. Conte has claimed from the beginning of the case that USAlliance breached its duty of care under the particular circumstances of this case. (See Complaint ¶¶ 8-50 (setting out circumstances under which Conte claimed that USAlliance owed him a duty of care).) While the jury was instructed to consider the degree of skill and care others in the field would exercise, it was also instructed

12

that "[t]he conduct in question must be viewed in light of the
surrounding circumstances at the time." It would have been
reasonable for the jury, in considering the circumstances
surrounding USAlliance's decision to liquidate Conte's collateral,
to find that USAlliance's actions created a reasonably foreseeable
risk of injury to Conte and that USAlliance acted unreasonably
given this risk. The jurors could have reached this conclusion
without considering industry customs and the level of skill that
bankers must exhibit in general.

        The case law demonstrates that the need for expert testimony
depends on the extent to which lay jurors are called upon to
evaluate the skill and care exercised by a professional with a high
level of training operating in complex situations. See, e.g.,
Gilinsky v. Indelicato, 894 F. Supp. 86, 94 (E.D.N.Y. 1995)
(suggesting that a jury could find that defendant medical doctor
was negligent without expert testimony and reasoning that "the
plaintiff's claim may be analyzed under principles of ordinary
negligence if the jury is able to evaluate the reasonableness of
[the defendant's] conduct on the basis of their common, everyday
experiences"). The particular circumstances under which USAlliance
was negligent do not raise questions about the specialized skills
and training of bankers and do not involve complex subject matter.

        It was within the competence of the jury to find that, under
the particular circumstances of this case, USAlliance failed to

handle Conte's account with due care. Conte's testimony about the events leading up to USAlliance's decision provided a "legally sufficient evidentiary basis for a reasonable jury to find" for him.

CONCLUSION

For the foregoing reasons, the defendant's renewed motion for judgment as a matter of law [Doc. No. 161] is DENIED.


SO ORDERED


    /s/
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 7th day of November, 2007.

14

<u>CERTIFICATION</u>

     I certify that a copy of the above was mailed on December 6, 2007 to all counsel and *pro se* parties of record as follows:

Elisabeth S. Maurer, Esq.
871 Ethan Allen Highway, Suite 202
Ridgefield, CT 06877-2811
(203) 438-1388
(203) 431-0357 (facsimile)

_____
Eric P. Smith, Esq.